**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**COALITION FOR HUMANE IMMIGRANT RIGHTS**
2533 West 3rd Street, Suite #101
Los Angeles, CA 90057

**PEDRO TRUJILLO**
2533 West 3rd Street, Suite #101
Los Angeles, CA 90057.

*Plaintiffs,*

v.

**U.S. DEPARTMENT OF HOMELAND SECURITY**
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0525

**MARKWAYNE MULLIN**, *in his official capacity as the Secretary of Homeland Security*
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0525

**TODD BLANCHE**, *in his official capacity as the Attorney General*
950 Pennsylvania Avenue NW
Washington DC 20530.

*Defendants.*

Case No.: ____________________

**COMPLAINT**

No Jury Demanded

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I. INTRODUCTION

1. "Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency." *Luria v. United States*, 231 U.S. 9, 22 (1913). The current actions of the United States Executive Branch directly seek to undermine this longstanding principle of equality among *all* citizens. After establishing a national atmosphere of fear and disappearing protections for nonwhite residents, the Executive Branch

continues its attacks on its minority citizens, now targeting the lawful exercise of the right to vote by non-U.S. born citizens. The right to vote is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Depriving any group of citizens of this right undermines the very heart of our fundamental democracy.

2. Defendants seek to interfere with the election rights of citizens, the right of individual states to conduct their own free and fair elections, and to undermine any elections results for the upcoming Congressional midterm elections. They do so by waging a campaign of misinformation and threats, which, combined, severely harms individual voters.

3. In July 2026, President Trump addressed the nation claiming that hundreds of thousands of noncitizens were illegally registered to vote in several states across the nation. California officials were sent a letter alleging more than 190,000 non-citizens are registered on the California voter roll. Methodology for arriving at this figure has never been provided and it is almost certainly widely incorrect. Nevertheless, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) doubled down on these unfounded claims, with the DOJ issuing threats of criminal prosecution to every Secretary of State in the country, and the DHS threatening to "hunt down" individual noncitizen voters.

4. While the continuous unsupported claim of rampant noncitizen voting alone does significant work in undermining voter confidence, continued attacks in the form of threats on both States and naturalized citizens violate core legal principles instilled in our statutes and Constitution. Comparing government databases to try and arrive at a list of noncitizen registrants has been shown to result in erroneous data. Anyway, Congress has never authorized such activities and in fact has by statute prohibited invasion of voter privacy through government data matches in this way.

5. This Court has already ruled against the Administration's effort to create an eligible voter database entitled the Systematic Alien Verification for Entitlements (SAVE) database system. *See League of Women Voters v. United States Dep't of Homeland Sec*., Civil Action No. 25 - 3501 (SLS), 2026 LX 332862 at *7–8 (D.D.C. June 22, 2026). It is unknown to Plaintiffs whether Defendants are utilizing SAVE for the actions that form the basis of this Complaint or whether another or other datasets were employed to arrive at the 190,832 figure leveled at California election officials. Meanwhile, naturalized citizens, lawfully eligible to vote, now face fear and extra scrutiny of their right to vote enshrined in their very citizenship.

6. Defendants must be enjoined from further interfering with individual states' constitutional right to hold their own elections, from spreading further disinformation and from unlawfully intimidating naturalized citizens who have a constitutional right to vote.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are United States agencies and officials, 28 U.S.C. § 1346(a)(2).

8. This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 702, 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

9. Venue is appropriate in the District of Columbia pursuant to 28 U.S.C. § 1391(e).

## III. PARTIES

10. Plaintiff Coalition for Humane Immigrant Rights ("CHIRLA") is a nonprofit, nonpartisan, community based, member driven organization headquartered in Los Angeles, California. CHIRLA's core mission is to promote advancement of human, civil and labor rights of

immigrants and refugees. Founded in 1986, CHIRLA has over 50,000 active members and engages thousands more with locations throughout California and in Washington D.C. These members consist of immigrants of varying legal status, including those who became naturalized citizens and are lawfully registered to vote. CHIRLA is a 501(c)(3) organization and through its Civic Engagement Department provides voter and election education and works to register naturalized immigrants to vote.

11. Among its work, CHIRLA has provided legal services to aid immigrants in a lawful path to citizenship. In the past two years alone, CHIRLA has helped over 100 lawful permanent residents become naturalized U.S. citizens.

12. In addition to this work, CHIRLA founded the Immigrant Political Power Project. The purpose of this project is to empower voters and achieve a true participatory democracy through outreach, education, and voter registration services to those eligible. Through its work with state and local organizations, CHIRLA has lawfully registered many voters.

13. CHIRLA's Community Education Department also provides other educational resources, including "Know Your Rights" resources outlining constitutional protections and privacy rights of immigrant communities. The Department reaches the immigrant community, including legal permanent residents eligible to naturalize as well as naturalized citizens, through a range of community-based activities, including resource tabling, educational workshops, direct conversations with community members in all open spaces, and via the department's Immigrant Assistance Hotline.

14. Plaintiff Pedro Trujillo lives and is qualified and registered to vote in California. Mr. Trujillo was born outside of the United States and became a naturalized citizen in 2021. Mr.

Trujillo plans to vote in California in the upcoming general election in November 2026 and subsequent elections. He is also Director of Organizing at CHIRLA.

15. Defendant Markwayne Mullin is the United States Secretary for Homeland Security. Mullin is being sued in his official capacity.

16. Defendant Department of Homeland Security is a cabinet department of the United States Federal government with the primary mission of safeguarding the United States from domestic and international threats.

17. Defendant Todd Blanche is the United States Attorney General and is being sued in his official capacity.

## IV. LEGAL FRAMEWORK

***The Elections Clause***

18. Article I, Section 4, Clause 1 to the U.S. Constitution, known as the Elections Clause, provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

19. The Supreme Court explained the scope of the Elections Clause in considering the interplay of state and federal elections power in a challenge to the federal National Voter Registration Act (NVRA) in *Arizona v. Inter Tribal Council of Arizona, Inc.* There it held "[t]he Clause's substantive scope is broad" and includes "regulations relating to 'registration.'" 570 U.S. 1, 8-9 (2013) ("ITCA"). "In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices.'" *Id*. at 9 (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)).

20. In explaining the scope of the Elections Clause, the Supreme Court held that the presumption against preemption that applies to statutes enacted pursuant to other sources of congressional power is irrelevant to Congress's Elections Clause enactments. "That rule of construction rests on an assumption about congressional intent: that Congress does not exercise lightly the extraordinary power to legislate in areas traditionally regulated by the States." *Id.* at 13 (citation modified). The Court explained, however, that "[t]here is good reason for treating Election Clause legislation differently: The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to 'make or alter' state election regulations." *Id.* at 14 (quoting U.S. Const. art. I, § 4, cl. 1).

21. The Court held further that "[w]hen Congress legislates with respect to the 'Times, Places, and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States. Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.* And the Court reasoned that the "federalism concerns" present in other areas of congressional action are weaker with regard to congressional enactments under the Elections Clause, because "the States' role in regulating congressional elections . . . has always existed subject to the express qualification that it 'terminates according to federal law.'" *Id.* at 14–15 (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

22. Notably the Constitution and these cases say nothing of the federal executive branch holding power over elections. And, it is not as if Congress has been silent on appropriate safeguards and procedures for voter registration. Congress passed the NVRA pursuant to its powers under the Elections Clause to the U.S. Constitution and it comprehensively addresses

establishment of voter rolls and maintenance thereof, including voter removal. *See* 52 U.S.C. §§ 20501–20511. Nowhere do these statutes authorize the activity undertaken by the federal executive branch complained of herein. Further, nothing in the NVRA, or other federal laws, authorizes the database comparisons complained of herein. Indeed, those provisions maintain voter registration authority in the hands of state and local officials.[1]

***The Social Security Act and Privacy Act***

23. Further, the actions complained of herein violate existing federal law. The Social Security Act, originally enacted in 1935, established identifying Social Security numbers to "[enable] employers to submit accurate reports of covered earning for use in administering benefits…" *League of Women Voters v. United States Dep't of Homeland Sec*., Civil Action No. 25 - 3501 (SLS), 2026 LX 332862 at *7–8 (D.D.C. June 22, 2026). Under the current iteration of this Act, federal employees are prohibited from disclosing Social Security Numbers and any related SSN records. *Id*. at *8.

24. Similarly, the Privacy Act of 1974 prohibits agencies from "disclos[ing] any record which is contained in a system of records…except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," or unless such disclosure fits an enumerated exception. 5 U.S.C. §§ 552a(b)(1)-(13).

25. The Privacy Act, through the Computer Matching and Privacy Protection Act of 1988, "prohibits federal agencies from disclosing records to other federal agencies, state governments, or local governments through a 'computer matching program' without written

[1] The Supreme Court has accepted review of case reconsidering ITCA for next term (*Republican National Committee v. Mi Familia Vota*, No. 25-1017 (2027)), but that case again only presents questions concerning the interplay of state and Congressional elections power. No case has determined the federal executive holds any elections power whatsoever. Indeed, the constitutional text includes only "the Congress."

agreement…" as well as sets up strict procedures on how such agreements should be utilized. *League of Women Voters,* 2026 LX 332862 at *14 (citing 5 U.S.C. § 552a(o)(1)).

26. The Act does not authorize: "(1) the establishment or maintenance by any agency of a national data bank that combines, merges, or links information on individuals maintained in systems of records by other Federal agencies; (2) the direct linking of computerized systems of records maintained by Federal agencies"; or "(3) the computer matching of records not otherwise authorized by law." *Id. at *14–15 (citing* Computer Matching and Privacy Protection Act of 1988 § 9, 102 Stat. at 2514) (internal citations omitted). Rather, the Act works "to prevent the creation of formal or de facto national data banks, centralized Federal information systems, or interagency computer data banks." *Id. at *11–12 (citing United States v. Weber*, 816 F. Supp. 3d 1168, 1194 (C.D. Cal. 2026) (internal citations omitted) (adding that the Act ensured it would be "legally impossible for the Federal Government in the future to put together anything resembling a 1984 personal dossier on a citizen.")).

27. Finally, the Privacy Act requires a strict notice and comment requirement when any "system of records" is changed or used in a new way. 5 U.S.C. § 552a(a)(5), (e).

28. Under the Administrative Procedure Act (APA), agencies are required to "engage in reasoned decision-making" and to "reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *League of Women Voters,* 2026 LX 332862 at *85 (internal citations omitted).

29. An action that is arbitrary and capricious violates the APA. An action is "arbitrary and capricious if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to

a difference in view or the product of agency expertise.'" *Id*. at *85–86 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). This standard "demands an agency give a reasoned justification for its decision to alter an existing regulatory scheme." *Id*. at *86 (internal citations omitted).

30. On June 22, 2026, the United States District Court for the District of Columbia found that the Department of Homeland Security, through its maintenance of a system known as the Systematic Alien Verification for Entitlements or SAVE system as a way to verify citizenship and immigration status, violated the Social Security Act, the Privacy Act and the APA and vacated the use of the latest version of the SAVE system. *See id*.

***Equal Protection Clause***

31. The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any citizen equal protection of the laws. This prohibits discrimination against naturalized citizens compared to U.S. born citizens.

32. Policies that "discriminate against the fundamental right to vote are subject to strict scrutiny and invalid unless '[] can demonstrate that such laws are necessary to promote a compelling governmental interest.'" *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 826 (N.D. Ohio 2006) (quoting *Dunn v. Blumstein,* 405 U.S. 330, 342 (1972)).

33. If there are "other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference." *Id*. (quoting *Dunn,* 405 U.S. at 342–43).

34. While preserving the integrity of an election is a compelling interest, there must be "legislative history []or empirical evidence of the interests" driving the policy. *Id*.

35. Further, any interest in preserving the integrity of an election must be balanced by the "significant interest" of the fundamental right to vote. *Id*. Policies that create unequal requirements for voting on naturalized citizens justified by only a vague government interest do not pass strict scrutiny. *Id*.

## V. FACTUAL ALLEGATIONS

***2025 Election Interference Efforts***

36. Since 2025, the Trump Administration has attempted to exercise control over elections throughout the nation in ways that vastly exceed its authority. Despite numerous adverse court rulings declaring these efforts unlawful, the Executive Branch continues to level unlawful attacks, implement unlawful rules and make inaccurate and harmful statements meant to undermine the election system in the country.

37. Between July and September of 2025, the U.S. Department of Justice sought the complete unredacted voter registration list from California and almost every other state. DOJ's express purpose in requesting these voter lists was to compare them to those within the SAVE system. Jude Joffe-Block*, The Justice Department plans to share sensitive voter data with Homeland Security*, NPR (Mar. 27, 2026), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs.

38. After California refused to provide the requested voter lists, the DOJ filed suit, which the District Court eventually dismissed, and the case is currently on appeal. *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026). Several other similar lawsuits against other states followed the same trajectory.

39. Following this attempt at obtaining voter rolls, the Executive Branch launched several initiatives purportedly aimed at preventing noncitizen voting, including the institution of

Executive Orders calling on DHS and the Attorney General to take action to investigate noncitizen voting, institute state information sharing agreements, withhold funds from "uncooperative" states, and compile and distribute databases of state citizenship lists. The administration also continued to demand records from at least eight other states, including Ohio and Michigan, and has included Immigration and Customs Enforcement (ICE) in such investigations.

40. In addition to these efforts, the Executive Branch has directed state U.S. Attorneys to "lead the election fraud crusade." Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen* Voters, PROPUBLICA (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations. Despite the prioritization of such efforts, only 41 persons have been charged with illegal voting from January 2026 to May 2026, out of 150 million potential voters. *Id.*

41. On July 7, 2026, the DOJ claimed to have sent letters to election officials in all 50 states reminding them of their duty to "undertake certain actions to ensure that only eligible U.S. citizens cast votes in elections for federal office," and threatening criminal prosecution of any election official that "knowingly retains noncitizens" on a state voter roll. Sarah N. Lynch, *DOJ Threatens Criminal Action Against States that Allow Noncitizens to Vote*, CBS NEWS (July 8, 2026), https://www.cbsnews.com/news/doj-threatens-criminal-action-against-states-that-allow-non-citizens-to-vote/.

42. On July 10, 2026, DHS issued a press release claiming that all Federal Emergency Management Agency (FEMA) grant recipients must, among other things, use the DHS SAVE system to verify the citizenship of their state voter rolls. *DHS Requires States to Adopt Common-Sense Election Security Measures Before Receiving Federal Funds,* DHS (July 10, 2026),

https://www.dhs.gov/news/2026/07/10/dhs-requires-states-adopt-common-sense-election-security-measures-receiving-federal.

43. Additionally, DHS also stated that states must use the SAVE system, or another authorized government system to verify the citizenship of anyone working at polling places or operating election systems. This requirement applies to all individuals involved in the administration of elections.

44. DHS claims that "FEMA will withhold 20% of the grant recipient's total HSGP award until they submit proof of compliance with these requirements and the Department verifies that proof." *Id.* At least two lawsuits challenging this provision are currently pending. *See Metropolitan Government of Nashville and Davidson County, Tennessee v. U.S. Department of Homeland Security,* No. 1:26-cv-02886 (D.D.C 2026); *State of Illinois v. Federal Emergency Management Agency,* No. 1:26-cv-00485 (D.R.I. 2026).

45. On July 16, 2026, President Donald Trump utilized a televised, primetime address to the nation to discuss the issues of election security, not only resurrecting previously debunked claims regarding the 2020 election but also claiming to declassify and release "critical intelligence, revealing shocking vulnerabilities in our election infrastructure." *See* THE WHITE HOUSE, *President Trump Delivers an Address to the Nation, Jul. 16, 2026*, at 21:37-21:48 (YouTube, July 16, 2026), https://www.youtube.com/watch?v=iIlqG0untYM (last visited August 28, 2026).

46. After starting his speech by excoriating immigrants entering from the nation's previously "wide open borders," President Trump claimed that an investigation by the Department of Homeland Security ("DHS") identified approximately 278,000 non-citizens registered to vote. Zachary B. Wolf & Annette Choi, *Trump's Speech Claiming US Election Vulnerabilities,*

*Annotated*, CNN (July 17, 2026), https://www.cnn.com/interactive/2026/07/politics/annotated-transcript-trump-speech-us-election-vis/.

47. President Trump claimed the true number of non-citizens registered to vote was considerably higher than 278,000 since "Democrat states refuse to share their voter files…" THE WHITE HOUSE, *President Trump Delivers an Address to the Nation, Jul. 16, 2026*, at 34:58-35:02.

48. Although claiming that the "critical intelligence" in the declassified materials would reveal shocking vulnerabilities in election infrastructure, none of the materials reveal further data or details supporting his claim of noncitizen voting. Rather, such materials simply reiterate the prior claims without support and include a chart regarding alleged discoveries made by states using the SAVE system.

| **Proactive SAVE User States** | | |
|---|---|---|
| **State** | **Deceased** | **Non-Citizen** |
| Georgia | 42,776 | 2,549 |
| Ohio | 59,774 | 769 |
| Tennessee | 37,850 | 1,009 |
| Texas | 111,573 | 2,296 |
| North Carolina | 34,622 | 1,599 |
| Idaho | 4,328 | 49 |
| Alabama | 33,165 | 465 |
| Missouri | 10,660 | 1,112 |
| Louisiana | 15,231 | 419 |
| Kansas | 10,197 | 449 |

49. The harms are not limited to President Trump's address because it was followed immediately by agency action. Secretary of DHS Markwayne Mullin publicly claimed that the over 250,000 non-citizens registered to vote were from 4 U.S. States, specifically 190,832 in California; 35,152 in New Jersey; 15,903 in Nevada; and 14,576 in Pennsylvania. *DHS Secretary Markwayne Mullin Sends Letters to Secretaries of State Warning About Non-Citizens on Voter Rolls*, DHS (July 17, 2026), https://www.dhs.gov/news/2026/07/17/dhs-secretary-markwayne-mullin-sends-letters-secretaries-state-warning-about-non. Again, no detailed methodology was

provided for how these numbers were calculated, specifically whether the unlawful SAVE system was used, or another database.

50. Despite these numbers, there have only been seven noncitizen voting cases in these four states listed by Secretary Mullin. These states have a total of approximately 40 million registered voters. *See* Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, PROPUBLICA (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations. Furthermore, these numbers appear to be inconsistent with an analysis the Census Bureau published this month on non-citizen voting. *See Noncitizen Voting in the 2020 Election, A Beginning Analysis,* U.S. CENSUS BUREAU (AUG. 2026), https://www.census.gov/content/dam/Census/library/publications/2026/dir/noncitizen-voting-in-the-2020-election.pdf. The Census Bureau analysis alleges 4,300 noncitizen voters in the 2020 election in California. These two analyses cannot be reconciled. The reality, based on decades of academic study and investigation, is that most likely neither is correct.

51. That same day, Secretary Mullin also sent letters to the Secretaries of State of these four states, informing them of the number of non-citizens registered to vote in the state and claiming that the data for some registrants "match a non-citizen in our files." The letter asked that each state work with DHS to identify non-citizens and gave a deadline of July 30, 2026, to contact their office. *Id.*

52. Since the July 17 address, Secretary Mullin has publicly stated that if states did not run their current voter lists through federal DHS maintained databases, they would not receive federal grants. U.S. DEPARTMENT OF HOMELAND SECURITY, *Secretary Mullin Delivers Remarks on President Trump's Update on Election Integrity Efforts*, at 11:01 (YouTube, July 17, 2026), https://www.youtube.com/watch?v=jjuVaRAEpe4. This was only the latest in threats to cut

funding from states, with the Federal Emergency Management Agency (FEMA) previously requiring state and local recipients to comply with the latest federal voluntary voting system guidelines, including utilizing the SAVE system to verify citizenship of election workers. U.S. DEP'T OF HOMELAND SEC., Notice of Funding Opportunity (NOFO): Fiscal Year 2025 Homeland Security Grant Program 17–18 (July 28, 2025), https://www.fema.gov/grants/preparedness/homeland-security/fy-25-nofo.

53. He has also stated that he would "scrub all election records, looking for illegal aliens and those who are ineligible to vote," also threatening that "if you're illegal and attempted to vote…we will find you and we will charge you." Steven Portnoy et al., *Mullin threatens to withhold aid from states that don't comply with DHS election directives*, ABC 7 NEWS (July 17, 2026), https://abc7news.com/story/mullin-threatens-withhold-aid-states-dont-comply-dhs-election-directives/19528135/; Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin threatens states over elections*, NBC NEWS (July 17, 2026), https://www.nbcnews.com/politics/elections/homeland-security-secretary-markwayne-mullin-threatens-states-election-rcna588002.

54. State and local election officials are in danger of criminal and civil prosecution by the federal government if they do not proceed to remove the unknown, unidentified registrants the Administration claims are noncitizens.

55. On August 17, 2026, the Assistant Attorney General for Civil Rights Harmeet Dhillon stated that the Department of Justice (DOJ) is reviewing state voter rolls for potential ineligible registrations and referring suspected cases of allowing non-citizen voters to be on a voter roll for prosecution. BLOOMBERG TALKS: *Harmeet Dhillon* (Bloomberg, Aug. 17, 2026), https://www.bloomberg.com/news/audio/2026-08-17/bloomberg-talks-harmeet-dhillon-podcast.

56. On August 31, 2026, it was reported that DHS planned to use the Department's Homeland Security Investigations agency to launch "a coordinated criminal voter fraud surge initiative to pursue investigative leads, conduct field interviews, and support timely prosecutorial review" in nine states from September to mid-October. *See* Priscilla Alvarez, et. al. *Exclusive: DHS plans to launch voter fraud investigation surge Tuesday*, CNN (August 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations. The states that are being targeted include Washington, Wisconsin, Missouri, Georgia, California, Pennsylvania, Nevada, New York, and Connecticut. *Id.*

57. Further, upon information and belief, these officials are expected to heed the federal administration's demand without being provided the actual list of alleged individuals summed to create the numbers published by the federal government.

58. No data supporting the details in the chart above are provided. Upon information and belief, the administration compared various government databases to arrive at these figures.

59. Historically, efforts to identify noncitizen voter registrants have involved comparison of government databases collecting information on persons who seek or obtain some government benefit or license and are asked their citizenship and/or immigration status with the actual voter roll.

60. Persons who identify themselves as non-citizens at one point when interacting with government clerks often remain so tagged on government lists despite later being naturalized as a citizen.

61. When the State of Texas attempted a similar effort to identify noncitizens on its voter rolls, the District Court concluded:

> The Secretary of State through his dedicated employees, beginning in February 2018, made a good faith effort to transition from a passive process of finding

> ineligible voters through the jury selection system in each county to a proactive process using tens of thousands of Department of Public Safety driver license records matched with voter registration records. Notwithstanding good intentions, the road to a solution was inherently paved with flawed results, meaning perfectly legal naturalized Americans were burdened with what the Court finds to be ham-handed and threatening correspondence from the state which did not politely ask for information but rather exemplifies the power of government to strike fear and anxiety and to intimidate the least powerful among us.

*Texas LULAC v. Whitley*, SA-19-CA-074-FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019) (cleaned up).

62. A similar conclusion was reached by the trial court in a challenge to Florida's effort to compare databases to locate noncitizen voter registrants. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1347-1348 (N.D. Fla. 2012) (Hinkle, J.) (explaining that Florida election officials identified only "a small number" of ineligible voters from Secretary of State's list of "180,000 registered voters who he said might be noncitizens").

63. In both of those cases, the actual list of targeted voters was provided to the officials who were expected to undertake the removals. Here, the federal government has placed local officials, voter registrants and the voter registration assistors, such as these Plaintiffs, at legal risk without providing the list much less the methodology for creating the list. Functionally, local officials have been told, under the threat of criminal, civil and financial penalty, to "go fish."

64. The federal government's purported number of noncitizens on voter rolls has already been contradicted by DHS. Just as recently as August 25, 2026, "a DHS official acknowledged in the meeting with Nevada officials that [16,000 noncitizens on the voter roll] was 'the ceiling' and each voter still had to be manually reviewed. Then, a day later, DHS provided the state with a list of 185 ID numbers pertaining to voters the agency said it was confident were noncitizens." Jude Joffe-Block & Miles Parks, *DHS acknowledges the noncitizen numbers it touted on voter rolls were inflated*, NPR (Aug. 25, 2026), https://www.npr.org/2026/08/25/nx-s1-

5940807/noncitizen-voters-trump-nevada-call; *see also* Nick Corasaniti, *Homeland Security Made a Big Claim About Noncitizen Voting. Now It Can't Prove It.*, The New York Times (Aug. 20, 2026), https://www.nytimes.com/2026/08/20/us/politics/trump-nevada-voter-election-fraud.html.

65. What past similar efforts have shown (such as the Florida and Texas examples above) is that even were the federal administration to compare relatively accurate databases, even were those databases to include accurate citizenship information, both highly unlikely facts, and even if the administration could lawfully compare these lists, the exercise is likely to result in mostly false positive matches. This is because large datasets such as these often include errors. Further, varying databases are prepared with different input methodology, include different fields and often contain multiple entries for the same person.

66. It is well documented in social science the difficulty of performing such comparisons and achieving reliable results. For example, Matthew K. Berent, Jon A Krosnick & Arthur Lupia, *Measuring Voter Registration and Turnout in Surveys: Do Official Government Records Yield More Accurate Assessments?* 80(3) Pub. Op. Q., 597, 621 (Fall 2016):

> We find that several apparently viable methods of matching survey respondents to government records severely underestimate the proportion of Americans who were registered to vote. Matching errors that severely underestimate registration rates also drive down "validated" turnout estimates. As a result, when "validated" turnout estimates appear to be more accurate than self-reports because they produce lower turnout estimates, the apparent accuracy is likely an illusion.

67. In another example, Ted Enamorado, Benjamin Fifield & Kosuke Imai, *Using a Probabilistic Model to Assist Merging of Large-Scale Administrative Records,* 113(2) Am. Pol. Sci. Rev., 353, 371 (2019):

> Unfortunately, a unique identifier that unambiguously links records is often unavailable, and data may contain missing and inaccurate information. These problems are severe especially when merging large-scale administrative records.
> Furthermore, deterministic merge methods cannot quantify the uncertainty of the merging procedure and instead typically rely on arbitrary thresholds to determine

> the degree of similarity sufficient for matches. This means that post-merge data analyses fail to account for the uncertainty of the merging procedure, yielding a bias due to measurement error. These methodological challenges are amplified especially when merging large-scale administrative records.

68. In another example from Nahid Anwar, Amit Jain & Jaclyn J. Kettler, *Detecting Anomalies in Voter Registration Data*, 25(2) Elec. L. J.: Rules, Pol., and Pol'y 113, 126 (2026):

> Through our collaborative efforts with the Idaho Secretary of State office, we identify and characterize various anomalies such as missing values in the required fields, abnormal age entries, unspecified gender types, non-unique driver's license numbers, and formatting errors.

69. And another example from Stephen Ansolabehere & Eitan D. Hersh, *ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name*, 4(1) Stat. and Pub. Pol'y, 1–10 (2017):

> Typographical errors and erroneous fields arise because of keystroke errors in databases. They may occur at a low frequency, but will reduce the accuracy of the matching process. They may be particularly common in databases like voter registration files, where citizens often submit hand-written applications for registration and clerks record the fields into a database. Errors and inconsistencies in fields will create false negatives, non-matches that should be matches, because the entry in one segment of A-D-G-N on one of the databases is incorrect and does not match the A-D-G-N in the target database with which a match is sought. Even when the incidence of key-punching errors is low, the probability of at least one error in a series of multiple indicators is not trivial. Erroneous fields, such as invalid numbers, also arise. For example, SSN9 fields sometimes contain 111111111, 123456789 or 999999999, which are invalid SSN9s.

70. Social Scientists and Statisticians with years of training have published again and again on the difficulty of performing the task the President and DHS have claimed to perform and have not arrived at a solution that would produce a relatively accurate match list. The lack of disclosure of methodology for the claims made by the administration concerning non-citizen voting alone raises suspicion but, more importantly, violates the lawful method for agency decision-making and rulemaking.

71. Upon information and belief, the allegations of numbers of registered noncitizen voters are wrong. Further, the administration's publication of these figures, without disclosing the support or methodology, harms Plaintiffs and the public at large by spreading the baseless claim that there are widespread noncitizen registration and voting. More acutely, it places persons on a state voter roll (and the people who lawfully helped them register to vote) at risk of being unlawfully targeted due to "ham-handed" database comparisons.

***The SAVE System***

72. One database that may have been utilized by DHS to arrive at the figures the President and DHS published may be the SAVE system. This system is the result of an overhaul by DOGE and DHS. [2]

73. Prior to May 2025, the SAVE system utilized limited records maintained by DHS, the Department of State, and the DOJ to confirm citizen and immigration status for the purpose of granting benefits and licenses, as well as to verify citizenship of registered voters. *League of Women Voters,* 2026 LX 332862 at *17.

74. Following an Executive Order on March 25, 2025, a modified SAVE system was established requiring DHS, in coordination with DOGE, to compare federal immigration and SSA databases with voter records. *Id.* at *18-19. The SSA shared "Master Files of Social Security Numbers" with DHS to be included in the modified SAVE system.

75. The SAVE system, which DHS is attempting to mandate nationwide, consistently mistakenly labels citizens as noncitizens. While DHS reported a five to ten percent error rate, some

[2] As mentioned *supra*, Plaintiffs are unaware of the specific database or methods Defendants used in determining the number, however this does not affect the causes of actions listed below. The use of the SAVE system or any other database absent the proper procedures, considerations of other federal statutes, and the forced use of these databases on states is unlawful.

jurisdictions utilizing the system report an over fifty percent inaccuracy rate. U.S. DEPT. OF HOMELAND SEC. AND CAL. DEP'T OF HEALTHCARE SERVS., COMPUTER MATCHING AGREEMENT BETWEEN DHS-USCIS AND CA-DHCS 11, https://perma.cc/E5WW-7YQH; Jen Fifield & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, TEX. TRIB. (Feb. 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/. As of February, of this year, at least five states that have utilized the SAVE system were provided with incorrect information. Fifield, *A Federal Tool.*

76. DHS has been aware of the inaccuracy risks embedded in the SAVE System since 2025. Records showed that DHS knew that the SAVE system risked giving false or inaccurate results for voter verification purposes, as it did not contain updated information regarding an individual's citizenship status. *League of Women Voters,* 2026 LX 332862 at *20-21.

77. Often, states that use the SAVE system send noncitizen lists to counties within their state to flag unlawful voters *before* verifying the accuracy of the lists. Fifield, *A Federal Tool.* As a result, naturalized citizens, mistakenly marked as noncitizens, have been required to prove their citizenship in order to vote.

78. Those within the DOJ have expressed concern regarding the use of the SAVE system, including the legality and risks encompassed in sharing such a large-scale trove of private information. Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, PROPUBLICA (Aug. 14, 2026), https://www.propublica.org/article/noncitizen-voting-trump-homeland-security-investigations. Some even resigned after these concerns went unheeded. *Id.*

79. Use of the SAVE system has been found unlawful by two courts. On June 22, 2026, a federal court in Washington, D.C. found that the SAVE program violated the Social Security Act and the Privacy Act. *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501,

2026 WL 1784297, at *1 (D.D.C. June 22, 2026). *But see Florida v. U.S. Dep't of Homeland* Sec., No. 3:24-cv-00509, 2026 WL 1968339, at *4 (N.D. Fla. July 7, 2026) (ordering that four states be permitted to access the overhauled SAVE program).

80. Just days later, on June 25, 2026, a federal court in Massachusetts found a provision of an Executive Order from March 31, 2026, ordering DHS to create a database of eligible voters using the SAVE program and other databases was unlawful and enjoined DHS, DOJ and others from "taking any steps to create a new federal program to superintend and control Plaintiff States' maintenance of their voter rolls." *California v. Trump,* No. 26-cv-11581, 2026 WL 1826490, at *17 (D. Mass. June 25, 2026).

81. Despite the court orders enjoining the SAVE system, Defendants continue to press their claims of noncitizen voter registration.

82. Upon information and belief, the behavior complained of herein was not limited to the use of SAVE and therefore Defendants believe themselves not to be bound by the SAVE related court injunctions. The targeted states, their officials, voters on those state voter rolls, and these Plaintiffs remain at legal risk.

## VI. HARM TO PLAINTIFFS

### Injuries to Individuals

83. The Plaintiffs and individual members of CHIRLA reasonably fear and are emotionally distressed by the dissemination of inaccurate information falsely indicating that they are encouraging non-citizens to unlawfully attempt to vote.[3] Dissemination of such information renders Plaintiffs vulnerable to a realistic probability that they or their members' voter registration

[3] These injuries are in addition to the injuries suffered by the very establishment and use of the SAVE act or any similar database as an inherent violation of privacy and mishandling and misuse of their personal data by DHS through this system.

will be cancelled or investigated due to a likely arbitrary and unfounded suspicion. At a minimum, considering the dissemination of such inaccurate information and threats made by the Executive Branch, Plaintiffs will be forced to put increased effort into ensuring that Plaintiffs' members voter registrations are not canceled, while some of Plaintiffs' members will likely refrain from voting or registering. Plaintiffs face reasonable fear and emotional distress that this dissemination of information will threaten their personal safety in voting and their overall ability to engage in their legal right to vote or register altogether.

84. Plaintiffs and their members face further harm by the imminent risk that as non-U.S. born persons, they will be labeled as noncitizens who are unlawfully voting. This dissemination of such inaccurate information is harmful because it can result in the "revocation or threatened revocation of their voter registration," and also implies that they are engaged in criminal conduct. *League of Women Voters*, 2026 LX 332862 at *17.

85. Plaintiffs and their members also fear and are emotionally distressed by the mishandling and dissemination of their personal information through comparison of government databases that include their private information. Further, despite being targeted, Plaintiffs and their members suffer from the lack of information regarding the use and accounting of their personal data as well as the right to comment on the procedures DHS is utilizing to target the voter rolls in their state. These fears and distress are compounded by the knowledge that their personal information has been disseminated and utilized for an inaccurate and unlawful system used to label naturalized citizens like themselves as noncitizen voters.

86. CHIRLA's core mission is to protect the civil rights of immigrant communities, central among which is protecting and advancing lawful electoral participation among immigrants, Latinos, English learners and new voters. CHIRLA seeks to increase the number of naturalized

citizens registered to vote as well as voter participation among this community. It accomplishes this mission through nonpartisan voter outreach, education and assistance, specifically in checking their eligibility for voter registration, and encouraging and helping them to register.

87. Unlawful and unfounded claims of unlawful immigrant voting have a chilling effect on voter turnout of naturalized citizens. Claims and targeted investigations can lead to erroneous disenfranchisement of lawful voters, additional obstacles to voting and unfounded criminal investigations of lawful voters, all of which lead to even lower voter participation in the immigrant community.

88. Decreases in voting and voter registration in the immigrant community directly undermine the core mission of CHIRLA to ensure protection of immigrant civil rights (of which the right to vote is central) and promote and expand voter participation among naturalized immigrant communities. With naturalized citizen voters, a central bloc of CHIRLA's membership, being targeted, threatened, and intimidated by the government, the complained of activities frustrate CHIRLA Plaintiffs' work to ensure the protection and growth of New American voting power.

89. Recent announcements and actions by the Executive Branch, specifically the office of the President, DHS and the DOJ, inflict these direct and devastating harms to CHIRLA.

90. Plaintiff and Members of CHIRLA have provided private information to government agencies, such as the Social Security Administration (SSA) when applying for Social Security Numbers (SSN). They had a reasonable expectation of that information being kept private, in compliance with the federal laws cited herein. Given recent statements, as well as past actions by DHS utilizing the SAVE program or other similar databases, the sharing of private

information of the Individual Plaintiffs and CHIRLA's members is seriously likely and imminent, if it has not already occurred.

91. This unlawful conduct also harms CHIRLA's participation levels. The Organizational Plaintiff CHIRLA has seen participation in their programs reduced, including participation in naturalization ceremonies and voter registration events.

92. Due to the increased targeting of naturalized citizen voting, CHIRLA has had to divert significant resources away from its other programs to ensure protections for lawful voting for its members. Plaintiff is being forced to prioritize and put more resources towards state and local policy advocacy as well as democracy defense and other programs. These are designed to shield immigrant communities of all statuses, including those currently naturalizing and the recently naturalized, from the incessant attacks by the federal government. Plaintiffs community education is also being forced to prioritize topics of voting rights for all citizens (naturalized and otherwise) due to this targeting.

93. Plaintiffs have and will suffer harm as a result of the statements and threats made by President Trump, the Department of Homeland Security and the Department of Justice. These statements not only violate privacy and voter protections, but subject Plaintiffs to "hatred, contempt and ridicule," through the implication that, through the nature of their work and/or the location of their birth, they are ineligible to vote and are thus "criminals" for exercising their right to vote.

## VII. CAUSES OF ACTION

### COUNT ONE
**Violation of the APA (Privacy Act)**
**Agency Action Contrary to Law and Required Procedure, 5 U.S.C. § 706(2)**

94. Plaintiffs repeat and incorporate by reference each of the allegations in this Complaint as set forth fully herein.

95. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

96. DHS is an "agency" under the APA.

97. Defendants' attempt to require states to put sensitive voter information through federal DHS maintained databases is a "final agency action for which there is no other adequate remedy in a court," within the meaning of the APA. Id. § 704.

98. By requiring states to submit voter rolls through federal DHS maintained databases, Defendants have established and significantly changed "system[s] of records" containing information about individuals that is retrieved by unique identifier. *Id.* § 552a(a)(5).

99. Defendants' actions do not comply with any of the Privacy Act's basic protections, including its non-discretionary "[r]equirements" for "system[s] of records." *Id*. § 552a(e)(1)-(12).

100. Accordingly, Defendants' coercion of states to submit their voter rolls through federal DHS maintained databases is "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," id. § 706(2)(C), and "without observance of procedure required by law," *id.* § 706(2)(D).

**COUNT TWO**
**Violation of the APA**
**Arbitrary and Capricious Agency Action, 5 U.S.C. § 706(2)**

101. Plaintiffs repeat and incorporate by reference each of the allegations in this Complaint as fully set forth herein.

102. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

103. The Administrative Procedure Act embodies a "basic presumption of judicial review," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967), and instructs reviewing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Review is not available, however, "to the extent that" a relevant statute precludes it, § 701(a)(1), or the agency action is "committed to agency discretion by law," § 701(a)(2).

104. DHS is an "agency" under the APA.

105. No statute authorizes the federal agency action here.

106. Defendants' coercions of states to submit their sensitive voter information through federal DHS maintained databases and threats to change voter file records in order to "scrub all election records looking for illegal aliens and those who are ineligible to vote," are arbitrary and capricious because, among other things, Defendants failed to engage in reasoned decision-making or reasonably explain their actions.

107. The Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." C*ity of Arlington v. FCC,* 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,* 894 F.3d 95, 112 (2d Cir. 2018) (quoting *NLRB v. Local 32B-32J Serv. Emps. Int'l Union,* 353 F.3d 197, 202 (2d Cir. 2003)). Furthermore, another court has already found the executive branch's actions to be unlawful with respect to the use of the Systematic Alien Verification for Entitlements or SAVE system on voter rolls. *League of Women Voters et al. v. U.S. Department*

*of Homeland Security, et al.,* 1:25-cv-03501 (D.D.C. June 22, 2026). Use of SAVE or any other database by Defendants is similarly unlawful.

**COUNT THREE**
**Violation of Non-Discretionary Official Duties in Violation of Procedural Due Process**
**Mandamus, 28 U.S.C. § 1361**

108. Plaintiffs incorporate by reference the allegations in this Complaint as if fully set forth herein.

109. The Fifth Amendment guarantees a right to procedural due process.

110. The right to vote is a fundamental constitutional right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

111. As such, there is a constitutionally protected liberty interest involved in being able to register to vote and not having that voter registration targeted and/or unilaterally canceled without notice. *See, e.g., Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *5 (N.D. Ill. Mar. 13, 2006).

112. Moreover, under *Armstrong v. Exceptional Child Center*, 575 U.S. 320 (2015), and *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), Plaintiffs may bring a cause of action to enjoin the unconstitutional actions of federal officers.

113. *Bolling v. Sharpe*, 347 U.S. 497 (1954), confirms that due process (and equal protection principles) constrains the federal government through the Fifth Amendment. The governing test for how much process is due is *Mathews v. Eldridge*, 424 U.S. 319 (1976), requiring

a balancing of the private interest affected, the risk of erroneous deprivation under existing procedures, the value of additional safeguards, and the government's interest.

114. The actions from Defendants and the Executive Order risk mass vote denial without providing any adequate procedures for voters to cure their voter registration. Furthermore, Defendants' public announcement and provision to the State of a list of persons they incorrectly believe are non-citizens who are ineligible to vote presumably includes Plaintiff and then requests by letter that the state impair the Plaintiff's ability to vote.

115. Depriving voters of their rights without procedures to provide notice and a cure process is another procedural due process violation.

**COUNT FOUR**
**Article I, Section 4, Clause 1 – Elections Clause Violation**

116. Plaintiffs repeat and incorporate by reference each of the allegations in this Complaint as if fully set forth herein.

117. The Tenth Amendment prohibits the commandeering of state power and provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

118. The United States Constitution confers broad authority to states to regulate the conduct of state and federal elections. U.S. Const. art. I, § 4, cl. 1; *Storer v. Brown,* 415 U.S. 724, 729–30 (1974); *Marston v. Lewis,* 410 U.S. 679, 681 (1973) (per curiam); *Krislov v. Rednour,* 226 F.3d 851, 859 (7th Cir. 2000); *Gelb v. Board of Elections,* 224 F.3d 149, 153–54 (2d Cir. 2000).

119. Article I, section 4, clause 1 of the United States Constitution provides "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." Article I, section 4,

clause 1 of the United States Constitution provides to the States the specific right to regulate their elections.

120. Without explicit directives from Congress regarding the time, place, and manner of federal elections, states are given exclusive power over their election systems.

121. In instances in which Congress has declined "to preempt state legislative choices" by adopting federal legislation, the Elections Clause vests the States with responsibility for the "mechanics of congressional elections." *Foster v. Love,* 522 U.S. 67, 69 (1997); *see also Voting Rts. Coal. v. Wilson,* 60 F.3d 1411, 1414 ( 9th Cir. 1995) ("The broad power given to Congress over congressional elections has been extended to presidential elections[.]"). These clauses further grant States "wide discretion in the formulation of a system[.]" *United States v. Classic,* 313 U.S. 299, 311 (1941).

122. DHS's actions violate the Elections Clause and state sovereignty by directly commandeering state power over elections and control of their voter rolls.

**COUNT FIVE**
**Ultra Vires**

123. Plaintiffs repeat and incorporate by reference each of the allegations in this Complaint as if fully set forth herein.

124. Non-statutory ultra vires review is available when an agency takes action "entirely in excess of its delegated powers and contrary to a specific prohibition in a statute," unless a statutory review scheme "provides aggrieved persons with a meaningful and adequate opportunity for judicial review" or "forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas,* 605 U.S. 665, 681 (2025) (citation modified).

125. To the extent any statutes arguably authorize Defendants to combine certain specific data systems for particular purposes, they do not authorize Defendants to force states to

submit voter registration and voter rolls to DHS and permit DHS to combine, consolidate, link, and analyze highly sensitive personal data stored in disparate agency systems of records across the government for new purposes unrelated to the reasons for the data's collection.

126. The Privacy Act explicitly prohibits interagency national data banks. *See* 5 U.S.C. § 552a. And the other provisions of the Privacy Act establish specific prerequisites to creating any system of records—which Defendants have defied through the use of unauthorized databases.

127. Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions. Such non-statutory causes of action survive displacement by the APA. *See Fed. Express Corp. v. United States Dep't of Com.,* 39 F.4th 756, 763 (D.C. Cir. 2022).

128. Defendants' actions are therefore ultra vires and unlawful.

**COUNT SIX**
**Violation of the Separation of Powers**

129. Plaintiffs repeat and incorporate by reference each of the allegations in this Complaint as if fully set forth herein.

130. The Constitution authorizes private Plaintiffs "to sue to enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 327 (2015).

131. "Federal agencies are creatures of statute. They possess only those powers that Congress confers upon them. If no statute confers authority to a federal agency, it has none." *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021).

132. No statute gives Defendants authority to require states to submit voter registration information through DHS databases, let alone allow DHS to determine if voter information is up to date for the purpose of verifying citizenship of voters and voter registrants. *See* 5 U.S.C. § 552a.

133. Nor does the Executive Branch possess any constitutional authority over elections. The Constitution's "Elections Clause provides that Congress—not the President—is the check on States' authority to regulate federal elections." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 194 (D.D.C. 2025); *see* U.S. Const. art. I, § 4, cl. 1.

134. Defendants have therefore violated the separation of powers.

**COUNT SEVEN**
**Violation of Equal Protection Clause of the Fifth Amendment**

135. Plaintiffs repeat and incorporate by reference each of the allegations in this Complaint as if fully set forth herein.

136. The Fifth Amendment of the United States Constitution prohibits the federal government from denying any person the equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

137. The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure" and the right to an effective vote is protected. *See Burdick v. Takushi,* 504 U.S. 428, 433 (1992). Restrictions to the right to vote, including the right to register to vote and not be unlawfully scrutinized and/or removed from a voter roll, are subjected to scrutiny under the equal protection guarantee.

138. When analyzing the constitutionality of a restriction on voting, the court "must weigh 'the character and magnitude of the asserted injury to the rights … that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

139. When a burden on the right to vote is severe or discriminatory, the regulation must be "'narrowly drawn to advance a state interest of compelling importance.'" *Id*. (*quoting Norman v. Reed*, 502 U.S. 279, 289 (1992)).

140. Defendants' coercion of States to screen their voter rolls against federal databases, that may improperly and erroneously flag a lawful voter as unqualified to vote because at one point those citizens were naturalized, situates these voters differently for no legitimate or rational reason.

141. Indeed, the databases Defendants rely upon are known to contain errors, omissions and outdated records particularly as to naturalized citizens.

142. Defendants' actions therefore deny Plaintiffs and their members the equal protection of laws guaranteed by the Fifth Amendment.

**COUNT EIGHT**
**Violation of the APA (Not in Accordance with Law—Unconstitutional Delegation)**
**5 U.S.C. § 706(2)**

143. Plaintiffs repeat and incorporate by reference each of the allegations in this Complaint as if fully set forth herein.

144. Under the APA, the Court "shall… hold unlawful and set aside" final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

145. DHS is an "agency" under the APA.

146. Defendants' attempt to require states to put sensitive voter information through federal DHS maintained databases is a final agency action subject to judicial review.

147. Separation-of-powers principles prohibit an agency from deciding an issue of great political significance or issues traditionally governed by state or local law, absent a delegation from Congress to do so, under the "major questions doctrine." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022).

148. The major questions doctrine applies when an agency attempts to seize broad power of matters of economic and political significance. *Id.* at 716. "Courts 'expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.'" *Id.*

149. Defendants' actions concern matters of vast political significance and salience because the actions and outcomes relate to issues of the ability to register and cast a ballot. This is an area that the States have legislated for several decades and where state power can only be preempted by explicit acts of Congress.

150. As explained *supra,* there has been no act of Congress requiring that Defendants use any database on state voter files to verify a voter's citizenship. Congress has explicitly legislated on proof of citizenship for registering to vote in Federal elections, *see generally* HAVA (52 U.S.C. § 20901 et seq.) and NVRA (52 U.S.C. § 20503 et seq.) and has not provided DHS or any federal agency this power.

151. Defendants' actions trigger the major questions doctrine and violate principles of separation-of-powers by seizing broad authority over matters of great political significance without clear congressional authorization.

## VIII. DEMAND FOR RELIEF

For these reasons, the Plaintiffs pray that the Court:

a. Declare unconstitutional, unlawful, vacate, and set aside Defendants' decision to impose the list matching exercise/voter purge on the State of California and its local elections officials;

b. Stay the decision to impose the list matching exercise/voter purge on the State of California and its local elections officials, pursuant to 5 U.S.C. § 705;

c. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with them from imposing the list matching exercise/voter purge on the State of California and its local elections officials;

d. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with them from imposing the list matching exercise/voter purge on the State of California and its local elections officials in the future without compliance with appropriate APA procedure;

e. Order Defendant Mullin to rescind the letter directed at the State of California;

f. Award Plaintiffs their actual and/or nominal damages;

g. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

h. Grant any other relief that the Court deems fit and proper.

Dated this 2nd day of September, 2026

Respectfully submitted,

Xavier Becerra*
Senior Advisor and Voting Rights Counsel
108 W. 2nd Street, #310
Los Angeles, CA 90012
Telephone: 310-924-9310
Scheduling.becerra@gmail.com

/s/ Chad W. Dunn
Chad W. Dunn (DC Bar No. 987454)
Sonni Waknin*
Bernadette Reyes*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org

*Licensed in the State of California, *Motion to appear pro hac vice*, forthcoming

COALITION FOR HUMANE IMMIGRANT RIGHTS
Carl Bergquist (D.C. Bar No. 1720816)
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone:310-279-6025
cbergquist@chirla.org

Adam Reese*
2533 West Third Street, Suite 101 Los Angeles, CA 90057
Tel: 213-353-1333
areese@chirla.org
*Licensed in the State of California, *Motion to appear pro hac vice*, forthcoming