**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COALITION FOR HUMANE IMMIGRANT RIGHTS and PEDRO TRUJILLO,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as the Secretary of Homeland Security; and TODD BLANCHE, in his official capacity as the Attorney General,

*Defendants*.

Case No. 1:26-cv-03072-JEB

**PLAINTIFFS' SUPERCEDING EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 3

I. CHIRLA is Formed to Serve the California Immigrant Community ..... 3

II. CHIRLA Expands Nationwide and Offers Support Services for Immigrants. ..... 4

III. Defendants Prepared Flawed Voter Lists. ..... 5

IV. Defendants Utilize Their Voter Lists to Threaten Voters and Election Officials. ..... 9

V. CHIRLA Has to Expend Spend Time, Money, and Effort to Protect its Members Right to Vote and Counter the Chilling Effect Defendants' Actions Have had on Voters. ..... 13

VI. Defendants Have Every Intention of Continuing Their Voter List Maintenance Threats in California and in Apparently Other States. ..... 14

LEGAL STANDARD ..... 14

I. Temporary Restraining Order ..... 14

II. Preliminary Injunction ..... 15

ARGUMENT ..... 15

I. Plaintiffs Have Standing. ..... 15

A. CHIRLA Has Both Organizational and Associational Standing. ..... 15

i. Organizational Standing ..... 15

ii. Associational Standing ..... 19

B. Plaintiff Trujillo has Standing ..... 21

C. Plaintiffs' Case is Ripe Because Even if DOJ's Civil Suit is Unsuccessful, Plaintiffs Need Affirmative Relief to Remedy These Harms. ..... 23

II. Plaintiffs are Likely to Succeed on the Merits of Its Claims. ..... 23

A. Defendants' Policy and actions exceed statutory authority and violate Congress's express commands and are arbitrary and capricious. ..... 23

B. Defendants' Policy and actions are ultra vires. ..... 26

C. Defendants' Policy and actions violate the Constitution. ..... 28

III. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief. ..... 29

IV. Balance of Equities and Public Interest Favor an Injunction. ..... 31

CONCLUSION ..... 33

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ........ 20, 22

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ........ 28

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 26

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........ 27

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
323 F.R.D. 54 (D.D.C. 2017) ........ 16

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ........ 24

*Common Cause v. U.S. Dep't of Just.*,
No. CV 26-1352 (SLS), 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ........ 16

*ConverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) ........ 30

*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ........ 15

*Dept. of Homeland Security, et al. v. League of Women Voters,*
26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026) ........ Passim

*District of Columbia v. Trump*,
810 F. Supp. 3d 19 (D.D.C. 2025) ........ 31

*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 30

*Equal Rts. Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ........ 17

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003) ........ 25

*Fed. Express Corp. v. United States Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .................................................................................... 27
*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................................. 23
*Food & Water Watch, Inc. v. Vilsack*,
808 F. 2d 905 (D.C. Cir. 2015)................................................................................. 16
*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................................................................. 16
*Grand Canyon Trust v. Pub. Serv. Co. of N.M.*,
283 F. Supp. 2d 1249 (D.N.M. 2003)....................................................................... 26
*Husted v. A. Randolph Inst.*,
584 U.S. 756 (2018) .................................................................................................... 1
*Ill. State Bd. of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979) .................................................................................................. 33
*Indep. Mkt. Monitor for PJM v. FERC,*
*(PJM),* 162 F.4th 1167 (D.C. Cir. 2025) ................................................................. 16
*Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
(*EPIC*), 878 F.3d 371 (D.C. Cir. 2017) .................................................................. 16
*Jafarzadeh v. Nielsen*,
321 F. Supp. 3d 19 (D.D.C. 2018)............................................................................. 23
*Jolt Initiative, Inc. v. Paxton*,
821 F. Supp. 3d 706 (W.D. Tex. 2026) ..................................................................... 33
*Judge v. Quinn*,
612 F.3d 537 (7th Cir.) .............................................................................................. 21
*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
119 F.4th 58 (D.C. Cir. 2024) ................................................................................... 31
*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .................................................................................................. 24
*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) .................................................................................................. 27

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025)........................................................................ 16, 19, 20, 30

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)........................................................................................ 19, 30, 32

*Lewis v. U.S. Parole Comm'n*,
743 F. Supp. 3d 181 (D.D.C. 2024).................................................................................... 27

*Luria v. United States*,
231 U.S. 9 (1913) .................................................................................................................. 2

*Meese v. Keene*,
481 U.S. 465 (1987) ............................................................................................................ 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................................................. 24

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995)............................................................................................. 20

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................................................ 15

*Nyunt v. Chairman, Broadcasting Board of Governors*,
589 F. 3d 445 (D.C. Cir. 2009)............................................................................................ 27

*Obama for Am. v. Husted*,
697 F.3d 423 (6th Cir. 2012) ............................................................................................... 33

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ................................................................................................................ 33

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015)................................................................................. 26, 32

*Richardson v. Trump*,
496 F. Supp. 3d 165 (D.D.C. 2020)............................................................................... 30, 31

*Sandusky Cnty. Democratic Party v. Blackwell*,
387 F.3d 565 (6th Cir. 2004) ............................................................................................... 22

*Shelley v. Am. Postal Workers Union*,
775 F. Supp. 2d 197 (D.D.C. 2011)..................................................................................... 15

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) .......... 31

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 28

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) .......... 32

*Trudeau v. F.T.C.*,
456 F.3d 178 (D.C. Cir. 2006) .......... 27

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 26

*United States v. Gradwell*,
243 U.S. 476 (1917) .......... 29

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981) .......... 15, 31

*Venetian Casino Resort, L.L.C. v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) .......... 26

*Vote Forward v. DeJoy*,
490 F. Supp. 3d 110 (D.D.C. 2020) .......... 15, 17, 30

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .......... 30

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 29

**Statutes**

5 U.S.C. § 704 .......... 26, 27

5 U.S.C. § 706(2) .......... 26

5 U.S.C. § 706(2)(A) .......... 24

5 U.S.C. § 706(2)(C) .......... 24

8 U.S.C. § 1373(c) .......... 6

18 U.S.C. § 242 .......... 32

18 U.S.C. § 595 .......... 32

52 U.S.C. § 20101 ........ 2
52 U.S.C. § 20301 ........ 2
52 U.S.C. § 20501 ........ 2, 25
52 U.S.C. § 20507(c)(2)(A) ........ 1, 3, 6, 25
52 U.S.C. § 20901 ........ 2
52 U.S.C. §§ 10101, 20701 ........ 2
52 U.S.C. §§ 10301 ........ 2
Cal. Elec. Code § 2213 ........ 29

**Rules**

Federal Rule of Civil Procedure 65(a) ........ 15

**Regulations**

Cal. Code Regs. tit. 2, § 19061 ........ 29

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 1 ........ 28
U.S. Const. art. I, § 4, cl. 1 ........ 28
U.S. Const. Art I ........ 1

## INTRODUCTION

Defendants, employing flawed data and database matching processes, have compiled list after list of alleged noncitizen voters and used those lists to browbeat, cajole, and intimidate California voters and election workers. (Hereinafter referred to as "Alleged Non-Citizen Removal Policy" or the "Policy"). At this moment, voters, like Plaintiff Trujillo, face possible federal arrest and criminal prosecution if they vote and it turns out they are on one of the flawed lists—based on Defendants' public statements. Local immigrant support and voting rights organizations, such as Plaintiff CHIRLA, are working day and night to keep Defendants' Policy from suppressing votes and limit voters who go into hiding. Election workers face the choice to 1) follow the guidance of state election officials and ignore the Defendants' voter lists while focusing on administration of the ongoing election, and risk federal criminal prosecution or 2) work the flawed lists, in violation of federal and state law, and further jeopardize the voting rights of eligible citizens. Only affirmative relief against Defendants' list matching activities and concomitant demands eliminates the irreparable and ongoing harms of Defendants' activities.

Defendants' actions are plainly illegal. For one, the Policy violates the National Voter Registration Act ("NVRA") by forcing on voters, voter support organizations, and election workers a "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days prior to a federal election. *See* 52 U.S.C. § 20507(c)(2)(A)). Further, preparing flawed lists from varying government databases, coupled with government threats and intimidation, is not within Defendants' legal authority. "The Constitution gives States the authority to set the qualifications for voting in congressional elections as well as the authority to set the 'Times, Places and Manner' to conduct such elections in the absence of contrary congressional direction." *Husted v. A. Randolph Inst.*, 584 U.S. 756 (2018) citing U.S. CONST. Art I, Sec. 2, cl.1 and Art I, Sec. 4, cl.1.

Congress has not by statute vested any Defendant with the authority they are trying exercise over the ongoing election and those that follow. In fact, each time Congress has passed legislation on elections, the enacted provisions acknowledge and maintain voter registration and election activities as powers and functions of state or local officials. *See e.g.,* the Voting Rights Act (52 U.S.C. §§ 10301 *et seq.*), the National Voter Registration Act (52 U.S.C. § 20501 *et seq*.), the Uniformed and Overseas Citizens Absentee Voting Act (52 U.S.C. § 20301 *et seq*.), the Voting Accessibility for the Elderly and Handicapped Act (52 U.S.C. § 20101 *et seq*.), the Civil Rights Act (52 U.S.C. §§ 10101, 20701 *et seq*.), and the Help America Vote Act (52 U.S.C. § 20901 *et seq*.).

Plain and simple, Defendants do not have the authority to undertake the Policy. Whatever authority Defendants could muster, the Policy was adopted and implemented in violation of the Administrative Procedure Act ("APA"). And, because the Policy targets naturalized citizens, and they are the most likely to be wrongfully flagged, the Policy violates the Equal Protection Clause of the Fifth Amendment because "[u]nder our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency." *Luria v. United States*, 231 U.S. 9, 22 (1913).

Plaintiffs, the Coalition for Humane Immigrant Rights ("CHIRLA") and Pedro Trujillo (herein "Plaintiffs"), ask this Court to issue a temporary restraining order and a preliminary injunction enjoining Defendants as follows:

1. Declare that Defendants have acted unconstitutionally in violation of the Elections Clause, Qualifications Clause, separation of powers doctrine, and anticommandeering doctrine and have further acted unlawfully and ultra vires in violation of the APA and the NVRA by 1) compiling lists of alleged noncitizen voters utilizing government databases, publicizing the size

and scope of those lists, and issuing demands and threats (civil and criminal) against voters who choose to vote and may be on one of the lists and against and California election officials: (i) to remove lists of registered voters from voter registration lists; (ii) refuse to issue ballots to such voters; and (iii) segregate (and ultimately not count) ballots cast by such voters;

2. Enjoin Defendants from any action under the Policy until final judgment in this case;

3. Enjoin Defendants from continuing to unconstitutionally and unlawfully seek to induce California election officials to undertake a "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of the election in violation of the NVRA moratorium, specifically 52 U.S.C. § 20507(c)(2)(A)); and

4. Enjoin Defendants from continuing to unconstitutionally and unlawfully impose themselves upon election administration procedures that the Constitution and federal law assign to the States, including: (i) applying data-base matching on the State's voter rolls; (ii) removal of registered voters from voter registration lists; (iii) issuance of ballots to registered voters; and (iv) the counting and tabulation of ballots.

## STATEMENT OF FACTS

### I. CHIRLA is Formed to Serve the California Immigrant Community.

In 1986, CHIRLA was founded to advance and protect the rights of immigrants and refugees. *See* ECF No. 1 at ¶ 10. CHIRLA was built upon the work of one of its founders, Father Luis Olivares, who protected refugees escaping abuse in Central America. *See* CHIRLA, *Misson & History*, https://www.chirla.org/who-we-are/about-us/mission-history/ (last accessed October 21, 2026). Since its founding, the organization has tirelessly worked and advocated for immigrants and refugees in search for a new and safe life in the United States. *Id.* This mission includes

assisting those eligible to obtain their U.S. citizenship, once citizenship is obtained, assist with voter registration and thereafter encourage voter participation. Decl. of Angelica Salas at ¶ 3 (Exhibit 5).

**II. CHIRLA Expands Nationwide and Offers Support Services for Immigrants.**

Today CHIRLA is a nonprofit, nonpartisan, community based, member driven organization headquartered in Los Angeles, California whose core mission is to promote advancement of human, civil and labor rights of immigrants and refugees. ECF No. 1 at ¶ 10. CHIRLA has over 50,000 active members and engages thousands more with locations throughout California and in Washington D.C. *Id.* These members consist of immigrants of varying legal status, including those who became naturalized citizens and are lawfully registered to vote. *Id.*

Through its Civic Engagement Department, CHIRLA provides voter and election education and works to register naturalized immigrants to vote and also provide legal services to aid immigrants in a lawful path to citizenship. *Id.* at ¶ 10-11. In the past two years alone, CHIRLA has helped over 100 lawful permanent residents become naturalized U.S. citizens. *Id.* at ¶ 11. CHIRLA founded the Immigrant Political Power Project. The purpose of this project is to empower voters and achieve a true participatory democracy through outreach, education, and voter registration services to those eligible. Through its work with state and local organizations, CHIRLA has lawfully registered many voters. *Id.* at ¶ 12. Thereafter, it continues to educate them on upcoming elections and encourage them to vote.

CHIRLA's Community Education Department also provides other educational resources, including "Know Your Rights" resources outlining constitutional protections and privacy rights of immigrant communities. *Id.* at ¶ 13. The Department reaches the immigrant community, including legal permanent residents eligible to naturalize as well as naturalized citizens, through a range of

community-based activities, including resource tabling, educational workshops, direct conversations with community members in all open spaces, and via the department's Immigrant Assistance Hotline. *Id.*

**III. Defendants Prepared Flawed Voter Lists.**

Since 2025 the Trump Administration, by and through Defendants, have waged war on their greatly exaggerated specter of voter fraud, zeroing in particularly on theories of non-citizen voting. As a result, federal efforts were and have been focused on purging voter lists across the nation of these suspected unlawful voters. Last year, DHS modified SAVE to incorporate Social Security Administration records, including Social Security numbers, to permit bulk searches as part of the attempt to thwart what they characterized as rampant non-citizen voting. *See Dept. of Homeland Security, et al. v. League of Women Voters,* 26A308, 2026 WL 2879700, at *1 (U.S. Sept. 25, 2026) (per curiam). Continuing with this focus on alleged non-citizen voting, on July 10, 2026, DHS issued a press release stating that Federal Emergency Management Agency ("FEMA") grant recipients must use SAVE to verify the citizenship of their state voter rolls, and that FEMA would withhold 20 percent of a recipient's Homeland Security Grant Program award until the recipient submits proof of compliance. ECF No. 1 at ¶¶ 42–44. On July 17, 2026, Secretary Mullin stated publicly that 190,832 non-citizens were registered to vote in California and sent a letter to the California Secretary of State asking the State to work with DHS to identify them by July 30, 2026. Secretary Mullin also stated that states that did not run their voter lists through DHS databases would not receive federal grants and that individuals who attempted to vote unlawfully would be charged. *Id.* at ¶¶ 49, 51–53.

On August 17, 2026, the Assistant Attorney General for Civil Rights stated that the Department of Justice is reviewing state voter rolls for potential ineligible registrations and

referring suspected cases of non-citizens on voter rolls for prosecution. DHS subsequently announced an HSI voter fraud "surge" initiative in nine states, including California. *Id.* at ¶¶ 55–56. DHS has since acknowledged that its non-citizen figures are incorrect. *See* Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. TIMES (Sept. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html. Just one month later, a federal whistleblower alleged that, at the direction of DHS and U.S. Citizen and Immigration Services ("USCIS") leadership, staff in the USCIS Fraud Detection and National Security Directorate were directed, as part of an "Unlawful Voter Initiative," to use sensitive personally identifiable information to access state voter registration websites to verify individuals' immigration and voter registration statuses, and to create law enforcement records on individuals, including U.S. citizens, for possible referral to HSI. *See* Benjamin Swasey & Jude Joffe-Block, *Federal agents may have broken state laws in voter fraud hunt, whistleblower claims*, NPR (Sept. 14, 2026), https://www.npr.org/2026/09/14/nx-s1-5968892/dhs-whistleblower-voter-fraud.

On September 25, 2026, in a similar case before this Court, the Supreme Court issued an opinion granting a stay of an injunction this court issued against the SAVE database match program. *See League of Women Voters,* 26A308, 2026 WL 2879700, at *3. In granting the stay, the Supreme Court cited to the 90-day NVRA provision and noted that "that moratorium limits the potential impact of staying the District Court's order in this case." *Id.* (citing 52 U.S.C. § 20507(c)(2)(A)). On the merits, the Supreme Court preliminarily concluded that 8 U.S.C. § 1373(c) "requires DHS to respond to inquiries from state and local agencies 'seeking to verify or ascertain the citizenship or immigration status of any individual.'" *Id.* The Supreme Court did not authorize the mandatory voter purges or federal mandates the evert stateuse SAVE, but instead

noted that in that particular case, the voter plaintiff lived in "a State (Louisiana) that used the modified SAVE program." *Id.* at *2.

Defendants, Supreme Court stay in hand, disregarded the order's rationale and continued the Policy including compilation of lists coupled with command to California that its officials work off the lists. DOJ attached to their *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue in *USA v. California et al*., No. 2:26-cv-12025 (October 19, 2026), ECF No. 22-1; ECF No. 22-2 (Exhibit 2), some declarations that partially explain how the voters lists are compiled. *See id.* at 22-3, 22-4 (Exhibits 3,4). These declarations provide some information on how the DHS, through the Fraud Detection and National Security Directorate (FDNS) "analyzed the original [California voter] file and then enhanced the data with third-party data. FDNS then manually reviewed the data with immigration officials who are trained to determine citizenship status." *Id.* at ECF No. 22-4 at ¶ 22 (Exhibit 4). For example, the Assistant Director for the Cyber and Operational Technical section at Homeland Security Investigations (HSI) stated that "FDNS developed a model that uses information from the voter roll and combines it with information from a reliable third-party data analytics and investigative platform to learn more about the individuals…FDNS then compares the enhanced voter file data to USCIS holdings to score the extent to which the individual profile matches an individual within DHS holdings." *Id.* at ECF No. 22-3 at ¶ 15. (Exhibit 3).

These database activities are fraught with error. A qualified expert in such methodologies has described in detail many of the problems in the declaration attached. *Id.* at ECF No. 37-2. (Exhibit 6). Indeed, a sample review has already shown errors in Defendants' list, with indications that some on the list were likely born in the U.S. Miles Parks & Jude Joffe- Block, *Some on DOJ's*

*20,000 "likely" noncitizen list in Calif. appear to be U.S.-born*, NPR (Oct. 20, 2026, 10:15pm) https://www.npr.org/2026/10/20/nx-s1-6009873/california-doj-voter-rolls-noncitizens.

Meanwhile, voters, like Plaintiff Trujillo and like Plaintiff CHIRLA's members, have no way to know which are caught on these lists, and which may be subjected to detention, arrest and/or prosecution should they vote. *See* Decl. of Trujillo at ¶ 7-8.

At times, Defendants seems to acknowledge the flaws in their lists but nevertheless continues to issue criminal and civil threats. For example, Acting Deputy Attorney General Trent McCotter stated "[w]e want California to work with us. There may be some names on there who it turns out ultimately are citizens. We're not perfect." USAO Central District of California, *Operation Protect the Vote Announcement* (Youtube Oct. 19, 2026) at 20:20-20:28, https://www.youtube.com/watch?v=zmZq3DrhwOM. This is an admission that citizens and election officials throughout the state face fear of federal criminal prosecution based on admittedly "not perfect" information.

To make matters worse, on October 19, 2026, Dr. Jerome Corsi and John "Rich" Richards, who is the owner of ELLY, a software that cross references voter registration records with other third party data, appeared on a YouTube program together where it was announced that access to ELLY had been given to the Department of Homeland Security and the DOJ and that "they are using the tool themselves to do their criminal investigations." *See* Wayne Allyn Root, *Exposing Election Fraud Ep. 2| The Software to End the Election Fraud Debate!* (Youtube, Oct. 19, 2026,) at 16:15-16:28, https://www.youtube.com/watch?v=7ReV0e3HIjU.

On October 20, 2026, Peter Ticktin, the founder of the Ticktin Law Group went on a Youtube program and stated that he counseled the President of the United States regarding the Elly program that Rich Richards has developed. *See* Wayne Allyn Root, *Exposing Election Fraud Ep.*

*3| Virtual/Fake Residences, and The "Voters" Who Use Them* (Youtube, October 20, 2026) at 5:00-5:28, https://www.youtube.com/watch?v=8kpCZYY2e1I. Defendants are utilizing unproven software and systems to compile lists of people it believes are noncitizen registered voters and then are taking those lists to state and county officials and threatening them with criminal consequences if they do not engage in list maintenance activities, within the moratorium period, while voting is underway.

**IV. Defendants Utilize Their Voter Lists to Threaten Voters and Election Officials.**

On October 13, 2026, DOJ, helmed by Defendant Blanche, gave "California authorities 48 hours to review a list of alleged noncitizen voters or face legal action." Andrew Goudsward & Jacob Bogage, Trump's DOJ threatens to block California voters in explosive pre-election showdown, THE INDEPENDENT (Oct. 14, 2026), https://www.the-independent.com/news/world/americas/us-politics/justice-department-california-noncitizen-voters-b3066489.html. The demand, attached as Exhibit 7, which was authored by Deputy Attorney General R. Trent McCotter, stated that federal officials provided to Los Angeles County a thumb-drive, with a password written on a sticky note, containing the names of persons that the federal government believes are non-citizens who were issued a mail ballot. *Id.* They further demanded that any person who is on the DOJ list must have their ballot either withheld or segregated if already returned and not counted. *Id.* The letter threatens additional action if the California officials do not acquiesce to the DOJ's request by "noon EST" tomorrow, October 15, 2026. See Ex. A at 2. Nearly every communication from Defendants includes a threat of criminal prosecution.

The 48-hour letter, coming while voting for this federal election is underway, included a list of approximately 20,000 voter names—a markedly smaller number than the approximately

190,000 an earlier DOJ's demand communicated. *See* Safiyah Riddle & Eric Tucker, *Justice Department threatens California with legal action over claim of noncitizens on voter rolls*, ABC NEWS (Oct. 14, 2026) https://abcnews.com/US/wireStory/justice-department-threatens-california-legal-action-noncitizens-voter-137262192 and ECF No. 1 at ¶ 3. This latest demand came despite the Supreme Court having ruled in the League of Women Voters case that federal government database matches could be used when 1) a state asked for such information and 2) not within the "moratorium limits" of the NVRA. See ECF No. 21 at 3-4 citing *Dept. of Homeland Security, et al. v. League of Women Voters*, 26A308, 2026 WL 2879700, at *1 (U.S. Sept. 25, 2026) (per curiam).

For their parts, the State and Los Angeles County have refused the work the lists. *See USA v. California et al*., No. 2:26-cv-12025 (C.D. Cal. October 15, 2026), ECF No. 31-1 at 3. Secretary Weber responded by stating that voting was underway, and she asserted that the request was unlawful. *Id.* However, since August 2026, the California Secretary of State's office has received federal grand jury subpoenas for voter records of around 300 individuals and has provided, or is in the process of providing, responsive records. *Id.* at ECF No. 31-1 at 2. Other counties in California, such as Orange and San Diego County, have also received similar subpoenas. Jeanne Kuang & Ana B. Ibarra, *Trump sues California over allegations of noncitizens registering to vote*, CAL MATTERS (Oct. 15, 2026) https://calmatters.org/politics/2026/10/trump-sues-california-voting/. It is unknown which other counties have received lists from Defendants and may be working them.

In response to Secretary Weber's letter, also on October 15, 2026, the United States filed a lawsuit against the State of California, California Secretary of State Weber, and Los Angeles County Registrar-Recorder Dean Logan in the Central District of California. See *USA v. California*

*et al*., No. 2:26-cv-12025, at ECF No. 1. This suit demands, among other things, that election officials sequester ballots from voters on Defendants' list. DOJ's civil lawsuit comes after the weeks of threats of criminal prosecution to California election officials and voter citizens that are described in Plaintiffs' Complaint. *See e.g.,* ECF 1 at 11-17. That following day, DOJ sent a follow-up letter to California Secretary of State Shirley Weber and Los Angeles County Registrar-Recorder, stating that with respect to segregating the ballots that the "legal consequences for either facilitating or ignoring a federal crime are significant." *USA v. California*, No 2:26-cv-12025, ECF No. 31-2 at 13. All of this has been well publicized in media throughout the state.

The ongoing threats from the federal government concomitant with these transmitted lists are causing real and concrete harm. In one of the threats, President Trump tweeted out "They will all go to jail for a long period of time!!!" referencing the DOJ's letter to Los Angeles County that warned the County that if they tabulate the votes of alleged non-citizens, they could potentially face federal criminal prosecution. See @realDonaldTrump (Truth Social Oct. 16, 2026), https://truthsocial.com/@realDonaldTrump/posts/117453415283228242. Additionally, First Assistant United States Attorney Bill Essayli for the Central District of California stated in a social media post related to the DOJ's lawsuit against California that "The 20K represents the number of noncitizens confirmed by a review of federal databases. This has been confirmed by @USCIS and @HSI_HQ." @USAttyEssayli (X.com Oct. 16, 2026), https://x.com/USAttyEssayli/status/2111192176046796897?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E2111192176046796897%7Ctwgr%5E64d345a9d156c2a7d14686f854e113937c901650%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fpjmedia.com%2Fcatherinesalgado%2F2026%2F10%2F17%2Fessayli-destroys-sen-padillas-pathetic-election-fraud-excuse-n4958401.

On October 19, 2026, DOJ announced that twenty-eight lawful permanent residents in California were being charged with federal crimes related to fraudulently registering to vote in U.S. elections. (Exhibit 1). These charges come despite DOJ's long-standing policy not to bring election related criminal actions in the lead up to an election. The timing, place and manner of these arrests only further instill fear in Plaintiffs, voters and election officials, a likely intended result. Brittny Mejia & Kevin Rector, *California residents accused by feds of voter fraud react with shock, confusion and anger*, LOS ANGELES TIMES (Oct. 19, 2026) https://www.latimes.com/california/story/2026-10-19/california-voter-fraud-charges-defendants-react. This is intention is made even more clear by the simultaneous "surge in federal immigration raids" in California. Melissa Gomez, *Surge in ICE raids is aimed at discouraging voter turnout, immigration advocates say*, LOS ANGELES TIMES (Oct. 16, 2026) https://www.latimes.com/california/story/2026-10-16/surge-in-ice-raids-is-aimed-at-discouraging-voter-turnout-immigration-advocates-say. Meanwhile, DOJ has ramped up proceedings to strip naturalized voters of their citizenship. *See e.g.,* https://www.justice.gov/opa/pr/justice-department-moves-strip-citizenship-40-criminals-largest-single-period. Voters in the immigrant community that CHIRLA serves, have received the message—vote at your legal peril.

The Central District of California Court has scheduled a hearing on October 27, 2026, to consider the United States TRO request as well as motions to intervene by private parties. Motions to dismiss are also pending in that case. As of October 22, 2026, the United States filed a notice of appeal to the Ninth Circuit asking the court to rule on the district court's "constructive denial of an injunction." *USA*, No. 2:26-cv-12025-DOC-ADS, ECF No. 74. No party has filed and no hearing is scheduled on a motion seeking the relief requested herein.

### V. CHIRLA Has to Expend Spend Time, Money, and Effort to Protect its Members Right to Vote and Counter the Chilling Effect Defendants' Actions Have had on Voters.

In direct response to the Defendants' actions CHIRLA has developed and implemented two new projects, spent additional staff time and resources to combat fear and intimidation, and diverted resources away from other programmatic areas. *See e.g.,* Exhibit 5. For example, CHIRLA's electoral team has developed and implemented two new programs directly in response to DOJ and DHS's California activities. *Id.* at ¶ 10. The first program is focused on "Voter-know-your-rights" trainings. *Id.* This training includes educational materials developed on California's Voter Bill of Rights, and what to do if a voter is stopped at the polls and questioned regarding their citizenship. *Id.* CHIRLA's other program created in the last two weeks is a brand-new mobilization effort targeted towards U.S. born voters who are high-propensity voters that have expressed an unwillingness and concern around voting in this election because of the DOJ's California based activities. *Id.* These programs are something that CHIRLA has only developed in response to members who feel threatened because of Defendants' actions. *Id.*

Additionally, for the first time, CHIRLA has had to divert resources to address the concerns and fear that U.S. native-born members have expressed about exercising their right to vote due to concern that the DOJ, DHS, and other federal agencies may target these voters and their families. *Id* at ¶ 9. In the last week alone, CHIRLA's staff has had to put hundreds of additional hours that the organization would not have expended to combat the fear and confusion that Defendants have caused in California. *Id.*

CHIRLA has identified and continues to identify scores of members and clients who are likely to have been improperly flagged by Defendants as non-citizen voters. Decl. of CHIRLA at ¶ 5 (Exhibit 9). CHIRLA is attempting to contact these voters and others it identifies who now

"need to take . . . affirmative steps to avoid risk of harm . . ." to their voter registration, mail ballot and right to vote in general. *See League of Women Voters,* 26A308, 2026 WL 2879700, at *2. CHIRLA is spending time, money and effort to prevent its members from 1) being scared or convinced not to vote, 2) illegally removed from the list of eligible voters, and 3) having their ballots segregated or rejected all together. At the same time CHIRLA is preparing to assist in the legal defense of voters wrongly sued or prosecuted because of the Policy.

### VI. Defendants Have Every Intention of Continuing Their Voter List Maintenance Threats in California and in Apparently Other States.

The harms described herein from the Policy are likely to continue in California and elsewhere. Just yesterday, DOJ publicly stated that it is working on extending the Policy to other states. Julia Ainsley, et al., *DOJ weighs election litigation against more states*, NBC NEWS (Oct. 21, 2026, 4:07pm) https://www.nbcnews.com/politics/justice-department/doj-weighs-election-litigation-states-rcna604872.When and if that happens, and those states are identified, CHIRLA will have to divert allocated resources in those places and spend time, money and effort assisting their members in those states.

## LEGAL STANDARD

### I. Temporary Restraining Order

"The court may issue a temporary restraining order ('TRO") when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary injunction required by Federal Rule of Civil Procedure 65(a) can be held." *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011). The factors to evaluate a TRO request are identical to those for a preliminary injunction. *Id.*

### II. Preliminary Injunction

A plaintiff seeking a preliminary injunction must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities supports the plaintiff; and (4) that issuance of an injunction is in the public interest. *See Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 117-18 (D.D.C. 2020). "The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 418 (2009). Within the D.C. Circuit, the four factors are evaluated on a "sliding scale." *Davis v. Pension Ben. Guar. Corp.,* 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). "If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* Additionally, "[a] party thus is not required to prove [its] case in full at a preliminary-injunction hearing." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

## ARGUMENT

### I. Plaintiffs Have Standing.

Both CHIRLA and Individual Voter Pedro Trujillo have standing. To establish Article III standing, a plaintiff must show (1) that they suffer an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is likely caused by the defendant; and (3) that the injury would be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000).

#### A. CHIRLA Has Both Organizational and Associational Standing.

Organizational Plaintiff CHIRLA has both organization and associational standing.

##### i. Organizational Standing

An organization establishes that is has suffered a concrete and demonstrable injury if (1) "the agency's action or omission to act injured the organization's interest" and (2) "whether the

organization used its resources to counteract that harm." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 323 F.R.D. 54, 60 (D.D.C. 2017) (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F. 2d 905, 919 (D.C. Cir. 2015).

"[O]rganizations can have standing to challenge practices that directly interfere with their core activities, such as direct services programs." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 179 (D.D.C. 2025), *judgment entered*, No. 25-CV-0946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026), and *aff'd,* No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026), and *aff'd*, No. 25-5476, 2026 WL 1991571 (D.C. Cir. July 2, 2026) (internal citations omitted). Allegations by a plaintiff organization that a defendant's conduct perceptibly impaired the organization's ability to provide services or disrupted daily operations is a sufficient cognizable injury. *See Common Cause v. U.S. Dep't of Just.*, No. CV 26-1352 (SLS), 2026 WL 3033772, at *9 (D.D.C. Oct. 9, 2026).

With respect to organizational resources, an organization must identify "how it has 'used its recourses to counteract' the injury." *Indep. Mkt. Monitor for PJM v. FERC (PJM),* 162 F.4th 1167, 1174 (D.C. Cir. 2025) (citing *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* (*EPIC*), 878 F.3d 371, 377 (D.C. Cir. 2017). A plaintiff's decision to use its resources to counteract a defendant's actions are not self-inflicted injuries because the expenditure is voluntary. *See Equal Rts. Ctr. v. Post Props., Inc.,* 633 F.3d 1136, 1140 (D.C. Cir. 2011).

In *Vote Forward v. DeJoy*, the district court found that plaintiff Vote Forward established organizational standing because the redirecting of the organization's limited resources and spending of additional funds due to the USPS's new mail in voting policy directly conflicted with Voter Forward's mission and made Vote Forward activities more difficult. *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 120 (D.D.C. 2020) (internal citations omitted). At issue in the case was

USPS's policy change in July 2020 that caused delivery delays of first-class mail and the impact such delays would have on vote-by-mail ballots. *Id.* at 117. The court viewed actions such as the unforeseen redirection of labor and funds to addressing USPS's actions, Vote Forward having to move up their planned get-out-the vote letters because USPS's policy change threatened to diminish the success of their organizational efforts, and the implementation of "new programs to test the time it to deliver letters" were actions directly taken to counteract the harm caused by USPS. *Id.* at 120.

CHIRLA suffers a concrete and particularized injury because Defendants' have frustrated its mission. One of CHIRLA's core missions is "to protect the civil rights of immigrant communities, central among which is protecting and advancing lawful electoral participation among immigrants, Latinos, English learners and new voters." Exhibit 9 at ¶ 2. This mission is effectuated through assisting those eligible to obtain their citizenship, and once citizens, helping those with voter registration and encourage political association. Exhibit 5 at ¶ 3.

Because of Defendant's actions, including the most recent surge of arrests of legal permanent residents who the DOJ alleges illegally registered and/or voted, CHIRLA has had to develop and implement new programs to reach their members and effectuate their mission. *Id.* at ¶ 10. For example, CHIRLA staff have had to divert time to reaching members and other voters who, coupled with the threat of the DOJ prosecuting voters they have identified on their alleged non-citizen voter list and increased immigration and customs enforcement in California, feel the need to shelter in place at their homes because they are terrified of interactions with DHS. *Id.* at ¶ 17. CHIRLA has started to develop a new program and create infrastructure meant to connect CHIRLA members and residents in California with legal assistance related to possible criminal defense connected to DOJ and DHS's voting-related actions. *Id.* at ¶ 12.

Instead of focusing on their traditional voter engagement efforts, CHIRLA has developed and implemented new mobilization efforts targeted towards their members who are U.S. born, high-propensity voters that have expressed an unwillingness and concern around voting. *Id.* at ¶ 10. This type of program is unprecedented for CHIRLA and something that CHIRLA has not had to develop for prior election cycles. *Id.*

Moreover, CHIRLA's U.S. native-born members have expressed fear around voting due to concern that the DOJ, DHS, and other federal agencies may target these voters and their families. *Id.* at ¶ 9. CHIRLA has now had to increase our mobilization work over the past week, with CHIRLA staff putting in hundreds of additional hours that the organization would not have expended in efforts to combat the fear and confusion that DOJ and DHS have caused in California. *Id.*

If Defendants' purpose in creating their alleged non-citizen voter list, issuing threats to California election officials regarding names on the list, and charging 28 alleged noncitizen voters while arresting several of them earlier this week was intended to chill voters, it has had that intended effect.

CHIRLA has no way to know the actual lists because they are not public. So, all of the voters CHIRLA serves have to wonder, and many fear, that they are being targeted. *See* Decl. of Erika Schwedt at ¶ 9 (Exhibit 8). Whether or not they have been, the demand made by Defendants requires CHIRLA and its members to divert resources and spend time, money and effort to take additional steps to ensure they are not on the list and, if they are, take steps to ensure their voting rights are not impeded. Exhibit 5 at ¶ 8, 19 ("CHIRLA is anticipating having to develop a ballot-curing program, which is something that the organization has never engaged in and is developing in response to DOJ and DHS's actions.").

Courts have recognized that organizations whose missions are to encourage political participation and register their members to vote in federal elections have organizational standing to challenge actions that would affect the franchise. *See League of United Latin Am. Citizens*, 780 F. Supp. 3d at 190; *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016). Given this, Defendants' flagging of alleged non-citizens in California coupled with threats and demands that these alleged non-citizens have their ballots segregated and possibly not counted during this present election are agency actions that clearly have harmed CHIRLA's mission to register and encourage their members to vote.

It is not the Defendants' effort to find illegal voting, and work with state officials to address those crimes where they actually occur, that harms Plaintiffs. What harms Plaintiffs is using inaccurate and flawed database matches and queries to create large lists of suspects, demand state and county officials work that list of suspects or else be criminally prosecuted and undertake these actions while threatening arrest and in fact arresting immigrants, including those alleged to illegally register to vote. The harm is imminent because of the upcoming election and compounded by the public attention Defendants seek and obtain for these events. Defendants' actions extremely frustrate and harm CHIRLA's ability to carry out its core mission. As such, CHIRLA has established organizational standing.

**ii. Associational Standing.**

In this Circuit, an organization has associational or representational standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1435 (D.C. Cir. 1995).

First, CHILRA's members would have standing to sue in their own right because policies that harm the ability for an individual to register to vote and have their vote counted are a concrete injury. *See League of United Latin Am. Citizens*, 780 F. Supp. 3d at 190 (Holding that "several Nonpartisan Plaintiffs have shown a substantial likelihood that they have associational standing to challenge Section 2(a) of the Executive Order because that provision would directly harm the concrete interests of their individual members in registering to vote and having their votes counted in upcoming federal elections."). This is especially true for when a voter might be erroneously flagged as a non-citizen by the government because of their status as a naturalized citizen. *See Arcia v. Fla. Sec'y of State,* 772 F.3d 1335, 1342 (11th Cir. 2014) (finding that the foreseeable threat that the citizenship database matching program Florida was seeking to institute possess on organizations such as the Florida Immigrant Coalition, inc. to its members if they are identified as a non-citizens was sufficient to establish associational standing).

CHIRLA's members are naturalized citizens who fear that they will be unable to confirm their citizenship if the Defendants' Policy is permitted to move forward. Exhibit 5 at ¶ 8. Because CHIRLA's members are comprised of newly registered naturalized citizen voters it is likely its members have been placed on the list of purported non-citizens that Defendants have provided to Los Angeles County and California election officials. *Id.* at ¶ 7. Moreover, CHIRLA's members have been actively discouraged from voting in this upcoming election due to Defendants' actions. *Id.* at ¶ 16. Actions taken to discourage a lawful voter from voting are concrete, particularized, and imminent harms. *See Judge v. Quinn*, 612 F.3d 537, 545 (7th Cir.), *opinion amended on denial of reh'g*, 387 F. App'x 629 (7th Cir. 2010) ("Where a plaintiff's voting rights are curtailed, the injury is sufficiently concrete to count as an 'injury in fact.'").

Moreover, the systems utilized by Defendants have proven to be notoriously inaccurate, increasing the risk that members of Organizational Plaintiff are harassed and terrified for no reason and/or will have their ballots undelivered or uncounted under the Policy. The most recent threats by Defendants, compounded with countless other threats and recent on the ground actions by the federal government, directly impact CHIRLA members, serving as constant intimidation of their exercise of their legally protected right to vote, causing them fear and emotional distress in their personal safety voting and can chill members' election participation. Exhibit 5 at ¶ 14; Exhibit 8 at ¶8-10. Further, the interests at stake here, the voting rights of naturalized citizens, are germane to CHIRLA's purpose in protecting the civil rights of its members. The injunctive relief sought by CHIRLA does not require the individual participation of the organization's members.

**B. Plaintiff Trujillo has Standing.**

Similarly, Plaintiff Trujillo also has standing because he is a newly naturalized voter in California who is at risk of being on the Defendants alleged non-citizen voter list and having his ballot flagged.

A voter suffers a particularized, concrete, and imminent injury when a defendants' policy has the realistic probability of being wrongly identified as being ineligible to vote. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004). In *Arcia*, the Eleventh Circuit found that two individual voters had standing to prospectively challenge the Florida Secretary of State's use of the SAVE database on voter rolls because, as naturalized citizens, "there was a realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process." *Id.* In *Sandusky Cnty. Democratic Party*, the Sixth Circuit found that because "a voter cannot know in advance that his or her name will be dropped from the rolls…" that a person who

is voting in an upcoming election and could be subjected to such mistakes are "not speculative or remote" harms but "are real and imminent." *Id.*

The same is true here. Trujillo is a registered voter within Los Angeles County and was recently naturalized in 2021. Decl. of Trujillo ¶ 2, 4 (Exhibit 10). Plaintiff Trujillo plans to vote in the upcoming general election, *id.* at ¶ 5, however, given the proven inaccuracy of Defendants alleged non-citizen lists, is at heavy risk of being placed on the list of purported noncitizens. Plaintiff Trujillo also suffers the harm of fear and emotional distress that he will be removed from the voter lists or might otherwise be persecuted or prosecuted for simply exercising his legal right to vote. *Id.* at ¶ 7-8. Trujillo must also now take affirmative steps and possibly spend money, in addition to time and effort, to ensure that Defendants' actions do not harm his ability to vote this year. *Id.* at ¶ 9. "Such a 'need to take . . . affirmative steps to avoid risk of harm . . . constitutes a cognizable injury' supporting standing." *League of Women Voters,* 26A308, 2026 WL 2879700, at *2 (citing *Meese v. Keene*, 481 U.S. 465, 475 (1987)).

Moreover, courts within this district have recognized that plaintiffs have standing to bring separation of powers claims when the violation of separation of powers causes an injury to Plaintiffs' interest, as is the case here. *See Jafarzadeh v. Nielsen,* 321 F. Supp. 3d 19, 35 (D.D.C. 2018). Undoubtedly, the interference with Plaintiff Trujillo's right to vote and Plaintiff CHIRLA's members' right to vote is caused by Defendants' actions, most recently through the threats contained in the October 13, 2026, letter. Any injury would be redressed by an order from this Court enjoining Defendants' actions. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.").

**C. Plaintiffs' Case is Ripe Because Even if DOJ's Civil Suit is Unsuccessful, Plaintiffs Need Affirmative Relief to Remedy These Harms.**

Even if Los Angeles County and the state are not ordered to follow Defendants' demands and therefore continue to refuse to do so, Trujilo and other members of CHIRLA like him in Los Angeles County and elsewhere nevertheless remain at risk that their voting will be scrutinized, before, during or after the election. Their voting record may be subject to grand jury subpoenas and other criminal and civil process that Defendants have been shown to instigate utilizing Defendants' flawed lists. Further, an order denying DOJ the TRO in their case does nothing to stop Defendants from undertaking further events under the Policy. Defendants have shown they will proceed absent an enforceable order otherwise. Likewise, although the Northern District of California has found the voter list policy illegal, the relief in that case only enjoins Defendants from "[c]onducting elections-related field operations." *USA v. California et al*., No. 2:26-cv-12025 (C.D. Cal. October 15, 2026) ECF No. 87 at 18. The harms suffered by Plaintiffs and their members can only be remedied by an affirmative order of relief that they seek in this Court.

**II. Plaintiffs are Likely to Succeed on the Merits of Its Claims.**

Plaintiffs are likely to prevail on its claims that Defendants' Alleged Non-Citizen Removal Policy violates the Administrative Procedure Act and the United States Constitution.

**A. Defendants' Policy and actions exceed statutory authority and violate Congress's express commands and are arbitrary and capricious.**

Plaintiffs are likely to succeed on its claims that Defendants' Alleged Non-Citizen Removal Policy of coercing California officials to effectively remove voters Defendants have flagged by withholding ballots from voters Defendants believe are suspected non-citizens and/or order California election officials to segregate and not count ballots of alleged non-citizen voters exceeds statutory authority and violates federal law.

A federal agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Its "power to act and how [it is] to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). The APA requires this Court to "hold unlawful and set aside" final agency action that is "in excess of statutory jurisdiction, authority, or limitations," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). Similarly, reviewing courts are instructed to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted).

Defendants' actions are well beyond anything Congress has authorized, fall squarely within what Congress has forbidden, and are final agency actions the APA thus requires this Court to set aside.

*First*, no statute authorizes Defendant Blanche through the Department of Justice to compile such lists, threaten voters, coerce California election officials to remove voters from voter rolls, withhold ballots of lawfully registered voters, and/or segregate ballots from voters Defendants allege are non-citizens. The Supreme Court's order on a stay in the *League of Women Voters* case confirms a similar program was only lawful if a state voluntarily sought to participate. *League of Women Voters,* 26A308, 2026 WL 2879700, at *3. No statute gives any authority to the DOJ to demand and/or force state and local officials to remove voters or withhold or segregate ballots from lawfully registered voters. Moreover, no statute authorizes DHS to generate lists of registered voters it considers non-citizens and to direct, require, or induce States to use those lists to remove voters from their voter rolls. Congress has comprehensively regulated voter list

maintenance for federal elections in the NVRA, 52 U.S.C. §§ 20501–20511 and has left voter registration and list maintenance to state and local officials.

*Second*, the NVRA prohibits Defendants' demands to engage in voter roll list maintenance within 90 days of a federal election. Agency action "not in accordance with law" means action contrary to "*any* law, [] not merely those laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). DOJ's letter demands, under federal penalties, that California election officials violate the NVRA moratorium. *See* 52 U.S.C. § 20507(c)(2)(A). Defendants' actions exceed limits Congress placed on them. Thus, Defendants' Alleged Non-Citizen Removal Policy violates the APA based on conflict with the NVRA.

*Third,* Defendants' generation and transmission of their non-citizen list to California officials for the purpose of removing voters and/or effectively preventing lawfully registered voters from voting by placing additional burdens on these voters to provide proof of citizenship within the 90-day period before the November 3, 2026, General Election, are final agency action within the meaning of 5 U.S.C. § 704. They mark the consummation of Defendants' decision-making process and are actions from which legal consequences flow. Agency action is final when it "mark[s] the consummation of the agency's decisionmaking process" and is one "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). The inquiry is "pragmatic," *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016), and an unwritten policy reflected in agency statements and practice is reviewable, *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015). Indeed, "[a] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'" *See R.I.L-R*, 80 F. Supp. 3d at 184 (quoting *Grand Canyon Trust v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d

1249, 1252 (D.N.M. 2003)). Plaintiffs challenges two particularized agency actions: (1) Defendants' policy authorizing their coercion of state and local officials to violate the NVRA by removing qualified voters from the rolls or segregating voters' ballots who the Defendants allege are non-citizens and (2) the execution of said Policy in California where Plaintiff Trujillo votes and where Plaintiff CHIRLA's members are voters. Defendants' Policy and execution thereof are independently final agency action that violate the APA and must be "h[e]ld unlawful and set aside." 5 U.S.C. § 706(2).

Finally, Defendants' actions are arbitrary and capricious in their timing and execution. Defendants' October 13, 2026 letter sent on the eve of the election demonstrates an arbitrary, even bad faith, attempt on their part to interfere with California elections. Despite knowing since at least July 16, 2026, of alleged "numerous noncitizens registered to vote" in California, Defendants, by their own admission, did not supply state or local elections officials with further information until yesterday, less than three weeks before the election, and demanded action be taken within 48 hours of receipt of the letter. See Ex. A. Such action is plainly arbitrary and capricious. Plaintiffs are therefore likely to succeed on the merits of their APA claims.

**B. Defendants' Policy and actions are ultra vires.**

Defendants' Policy and actions are ultra vires for the same reasons. Independent of the APA, federal courts have long had equitable power to enjoin federal officers "acting in excess of [their] authority or under authority not validly conferred." *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 691 (1949); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). Sovereign immunity is no bar. "The APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Reich*, 74 F.3d at 1328. Nor does ultra vires review require final agency action; that requirement comes from § 704 of the APA and limits only claims brought

under the APA itself. *See Trudeau v. F.T.C.*, 456 F.3d 178, 188-90 (D.C. Cir. 2006); *see also Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 193 (D.D.C. 2024) ("*Ultra vires* review is available to challenge both agency action and inaction.").

In this Circuit, ultra vires review lies where an agency acts "'in excess of its delegated powers and contrary to a specific prohibition' in the law." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broadcasting Board of Governors,* 589 F. 3d 445, 449 (D.C. Cir. 2009)). The doctrine is reserved for "extreme" agency error that violates "some specific command of a statute" and so "warrant[s] the immediate intervention of an equity court." *Id.* at 764 (citations omitted).

That doctrine is properly applied here. Federal law expressly bars systematic removal of voters from voter rolls this close to an election. Defendants themselves had admitted so. Opposition to Application for Stay, at 47, *League of Women Voters,* 26A308, 2026 WL 2879700. The United States Supreme Court agreed. *See League of Women Voters,* 26A308, 2026 WL 2879700, at *3. ("To be sure, that moratorium [NVRA] limits the potential impact of staying the District Court's order in this case."). While individualized inquiries are allowed if a state voluntarily participates, that is not the case here. Defendants sent a list of suspected non-citizen voters and ordered state and local election officials to take action to interfere with their ability to vote. *Id.*

Adopting and executing a policy that violates federal law is as extreme and plain an excess of delegated power as there is. Defendants' actions are thus ultra vires and warrant this Court's immediate equitable intervention.

**C. Defendants' Policy and actions violate the Constitution.**

Defendants' Policy violates multiple provisions of the U.S. Constitution that assign authority over federal elections to the States and Congress, not to the Executive Branch.

The Elections Clause commits the "Times, Places and Manner of holding Elections for Senators and Representatives" to the States, subject to alteration only by Congress. U.S. Const. art. I, § 4, cl. 1; *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013). That grant is "comprehensive," reaching "supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers," and every other "procedure and safeguard[]" needed to conduct an election. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). The Voter Qualifications Clause and the Seventeenth Amendment likewise commit the qualifications of federal voters to the States. U.S. Const. art. I, § 2, cl. 1; *id.* amend. XVII; *Inter Tribal Council*, 570 U.S. at 16-17. The Executive Branch appears nowhere in this allocation. It has no independent constitutional authority over the conduct of elections or the eligibility of voters and may act in this domain only as Congress directs. When Congress has chosen to regulate federal elections, "it has done so by positive and clear statutes," and it has otherwise "le[ft] the conduct of the election of its members to state laws, administered by state officers." *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

California has exercised its constitutional authority over federal elections. It has assigned the administration of state and federal elections to California county officials. California also has requirements on when a voter can be removed from the voter roll and/or when their ballot must be segregated. *See* Cal. Elec. Code § 2213; and Cal. Code Regs. tit. 2, § 19061. The state's process for challenging the registration of a voter must be honored by the federal defendants under the

Tenth Amendment to the U.S. Constitution. Federal officials may not commandeer state officials in this manner.

No source of law supports Defendants' actions or Policy. The Executive Branch's power "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution gives the Executive no role in administering elections, and Congress, far from authorizing the purging of voters within 90 days of a federal election. Defendants are therefore acting against the "express [and] implied will of Congress" in a field the Constitution reserves to the States and Congress—*i.e.*, where executive power is "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Defendants' Policy therefore violates the separation of powers and federalism limits imposed by the Elections Clause, the Voter Qualifications Clause, and the Seventeenth Amendment. Defendants' Policy, because it is more likely to impact naturalized voters, also violates the Equal Protection Clause of the Fifth Amendment. And because Defendants' Policy are contrary to the Constitution, they likewise violate Section 706(2)(B) of the APA. For these reasons, Defendants' actions must be declared unconstitutional, set aside, and enjoined.

**III. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.**

Plaintiffs will suffer irreparable harm if Defendant Blanche is permitted to continue the Policy. "[A] litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014). "The movant must demonstrate that it faces an injury that is 'both certain and great; it must be actual and not theoretical,' and of a nature 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Vote Forward*, 490 F. Supp. 3d at 129 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs easily satisfy this high bar. The Alleged Non-Citizen Removal Policy forces state officials to violate federal and state law, violating Plaintiff Trujillo and Plaintiff CHIRLA's members' right to vote. Actions that restrict the right to vote constitutes are an irreparable injury. *See Elrod v. Burns*, 427 U.S. 347 (1976); *Richardson v. Trump*, 496 F. Supp. 3d 165, 187 (D.D.C. 2020). The federal government's threats based on the Policy are having real and concrete harms on voter participation and on organizations like CHIRLA who would be spending their resources on generic, pre-planned get out the vote efforts and instead must spend those resources on combating the harms of the Policy. *See generally* Exhibit 5.

Additionally, the harm faced by Plaintiffs is irreparable because the Alleged Non-Citizen Removal Policy interferes with the administration of the 2026 election and discourages voting (Exhibit 5 at ¶ 16); and, once voting passes, there can be "no do-over and no redress." *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 200–01 (D.D.C. 2025) (quoting *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)) (finding that plaintiffs showed a strong likelihood that an executive order that required changes to be made to the federal voter registration form would cause irreparable harm to plaintiffs because it would increase voter confusion and interfere with ongoing voter registration efforts).

Moreover, Defendants' Policy directly interferes with the electoral process and risks distorting the fundamental right to the franchise. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 66 (D.C. Cir. 2024) ("Ensuring the integrity of elections and avoiding improper interference and misinformation are undoubtedly paramount public interests, and a substantiated risk of distorting the electoral process would amount to irreparable harm."). As such, this factor strongly supports granting preliminary relief.

## IV. Balance of Equities and Public Interest Favor an Injunction.

The balance of the equities and public interest favor an injunction. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). As stated above, the balance of the equities and public interest factors "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022).

In *Richardson v. Trump*, 496 F. Supp. 3d 165, 188-89 (D.D.C. 2020), the district court found that the balance of the equities favored plaintiffs who challenged restrictions on mail voting by the executive branch and USPS because "[t]he public interest ... favors permitting as many qualified voters to vote as possible." *Id.* (internal quotations omitted). In *D.C. v. Trump*, 810 F. Supp. 3d 19, 64 (D.D.C. 2025), the district court found that the balance of the equities and the public interest favored the District of Columbia and granted an injunction to end the unlawful action of the National Guard deployment by the Department of Defense and the President. In doing so, the court recognized that "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.*

Here, the public has a strong interest in allowing a safe, unimpeded exercise of the right to vote and ensuring that as many qualified voters are able to vote as possible. *See Newby*, 838 F.3d at 12 (noting the public "has a strong interest in exercising the fundamental political right to vote… a right that is preservative of all rights…and of the most fundamental significance under our constitutional structure.") (cleaned up) (internal citations omitted).

Further weighing in Plaintiffs' favor is Defendants' direct violation of the Constitution and numerous federal laws that prohibit interference with or actions affecting the nomination or the election of federal offices by employees of the federal government and/or depriving a citizen of a

constitutional right. *See* 18 U.S.C. § 595; 18 U.S.C. § 242. "There is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12.

Defendants cannot identify any equitable reason why the Alleged Non-Citizen Removal Policy should continue *now* after California has already mailed ballots to voters and the election is underway. Congress has not delegated to Defendants any purpose in policing voter qualifications and election administration. Instead, Congress has directed such systematic activities should not take place within 90 days of the election. Nothing in federal law provides Defendants with the authority to inject themselves into the mechanics of an ongoing election. And even if they could, Defendants would suffer no harm if the Alleged Non-Citizen Removal Policy was temporarily enjoined because "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (quoting *R.I.L-R*, 80 F. Supp. 3d at 191).

The equities and public interest also favor a temporary restraining order and/or injunctive relief because Defendants seek to disrupt an ongoing election and the Alleged Non-Citizen Removal Policy will result in citizens being disenfranchised during *this* election. There is a "strong interest in exercising the fundamental political right to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (internal quotation marks omitted). Defendants' actions implicate the right to vote, which is "of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). Plaintiffs have a stronger interest in their right to vote than Defendants do in unlawfully implementing the Policy including coercing California state officials into segregating ballots of qualified voters and effectively removing voters from the voter roll. *See Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 727 (W.D. Tex. 2026). Because "[t]he public interest therefore favors permitting as many qualified voters to vote

as possible," any federal action that jeopardizes the right to vote, including the ability of a local government to fairly administer elections, is against the public interest and disfavors Defendants. *See Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court grant its Motion and issue a temporary restraining order and preliminary injunction against Defendants.

Dated: October 22, 2026

Respectfully Submitted,

/s/ Chad W. Dunn
Chad W. Dunn (DC Bar No. 987454)
Sonni Waknin*
Bernadette Reyes*
UCLA Voting Rights Project
3250 Public Affairs Building
Los Angeles, CA 90095
Telephone: 310-400-6019
chad@uclavrp.org
sonni@uclavrp.org
bernadette@uclavrp.org

Xavier Becerra**
Senior Advisor and Voting Rights Counsel
108 W. 2nd Street, #310
Los Angeles, CA 90012
Telephone: 310-924-9310
Scheduling.becerra@gmail.com

COALITION FOR HUMANE IMMIGRANT RIGHTS
Carl Bergquist (D.C. Bar No. 1720816)
2351 Hempstead Road
Ottawa Hills, OH 43606
Telephone:310-279-6025
cbergquist@chirla.org

Adam Reese*
2533 West Third Street, Suite 101 Los Angeles, CA 90057
Tel: 213-353-1333
areese@chirla.org

*Licensed in the State of California, *Motion to appear pro hac vice* granted

**Licensed in the State of California, *Motion to appear pro hac vice*, forthcoming

## CERTIFICATE OF SERVICE

I certify that on October 22, 2026, a true and correct copy of the foregoing was filed via the CM/ECF filing system and thereby furnished to counsel of record via email in the service list below:

Andrew I Warden, Esq.
andrew.warden@usdoj.gov
Ty Trejo, Esq.
ty.trejo@usdoj.gov

*Counsel for Defendants*

*s/ Chad W. Dunn*
Chad W. Dunn