**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COALITION FOR HUMANE IMMIGRANT RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>Defendants. | Civil Action No. 1:26-cv-3072- JEB |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. Factual Background ........ 3

B. United States v. California ........ 4

C. Procedural History ........ 5

III. Legal Standard ........ 5

IV. Argument ........ 6

A. Plaintiffs Cannot Establish Standing ........ 6

1. Plaintiff Trujillo Cannot Demonstrate Individual Standing ........ 9

2. Plaintiff CHIRLA Cannot Establish Associational Standing ........ 10

3. Plaintiff CHIRLA Cannot Establish Organizational Standing ........ 14

B. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits ........ 19

1. Plaintiffs Fail To Establish Final Agency Action Reviewable Under the APA. ........ 20

2. Defendants' Challenged Actions Are Not Arbitrary and Capricious ........ 24

3. Defendants' Challenged Actions Are Not Ultra Vires ........ 25

4. Defendants' Challenged Actions Do Not Violate the Elections Clause or the NVRA ........ 26

a. Elections Clause. ........ 26

b. Aiding and Abetting. ........ 28

c. States' Article I Powers ........ 30

d. NVRA ........ 32

C. Plaintiffs Cannot Establish A Risk of Irreparable Harm ........ 33

D. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief ........ 36

E. The Proposed Injunction Is Vague, Unworkable, and Violates the Separation of Powers. .......... 38

CONCLUSION .......... 43

# TABLE OF AUTHORITIES

## Cases

*Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*,
878 F. Supp. 2d 42 (D.D.C. 2012) ........ 33

*Allen v. Milligan*,
608 U.S. 511 (2026) ........ 32

*Am. Library Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005) ........ 10

Anderson v. United States*,*
417 U.S. 211 (1974) ........ 30, 35

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ........ 11, 31

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ........ 15

*Arizona v. Inter Tribal Council of Ariz.*,
570 U.S. 1 (2013) ........ 31

*Arizona v. United States*,
567 U.S. 387 (2012) ........ 26, 27, 28

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ........ 13

*Bd. of Governors of the FRS v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) ........ 25

*Bennet v. Spear*,
520 U.S. 154 (1997) ........ 20

*Biden v. Texas*,
597 U.S. 785 (2022) ........ 20

*Bird v. Barr*,
No. 19-CV-1581 (KBJ), 2020 U.S. Dist. LEXIS 130277 (D.D.C. July 23, 2020) ........ 7

*Bluman v. FEC*,
800 F. Supp. 2d 281 (D.D.C. 2011), aff'd, 565 U.S. 1104 (2012) ........ 27

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ........ 24

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ........ 35

*Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Express and Station Emps.v. Assoc. for Benefit of Noncontract Emps.*,
380 U.S. 650 (1965) ........ 25

*Burroughs v. United States*,
290 U.S. 534 (1934) ........ 27

*Bush v. Gore*,
531 U.S. 98 (2000) ........ 30

*California v. Texas*,
593 U.S. 659 (2021) ........ 1, 11, 16

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) ........ 10, 12

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........ 32, 33

*Chavez-Perez v. Ashcroft*,
386 F.3d 1284 (9th Cir. 2004) ........ 26

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ........ 28

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ *passim*

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) ........ 32

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ........ 23

*Comm'n v. Texas*,
605 U.S. 665 (2025) ........ 24, 25

*Common Cause v. U.S. Dep't of Just.*,
No. 26-cv-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ........ 19

*Common Cause v. Nuclear Regul. Comm'n*,
674 F.2d 921 (D.C. Cir. 1982) ........ 37

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) ........ 35

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ........................................................................................ 29

*Ctr. for Taxpayer Rts. v. IRS*,
2026 U.S. App. LEXIS 27506 (D.C. Cir. Sept. 8, 2026) ........................................ 17

*D.A.M. v. Barr*,
474 F. Supp. 3d 45 (D.D.C. 2020) .................................................................. 5, 6, 33

*Dep't of Homeland Sec. v. League of Women Voters*,
2026 WL 2879700 (U.S. Sept. 25, 2026) ........................................... 32, 36, 39, 40

*Doe v. Blanche*,
172 F.4th 901 (D.C. Cir. 2026) ........................................................................... 5

*Doe v. Off. of Pers. Mgmt.*,
No. 25-cv-234, 2025 WL 513268 (D.D.C. Feb. 17, 2025) ...................................... 33

*DSCC v. Trump*,
834 F. Supp. 3d 19 (D.D.C. 2026) ................................................................. 33, 34

*Elend v. Basham*,
471 F.3d 1199 (11th Cir. 2006) .......................................................................... 39

*Evergreen Shipping Agency Corp. v. Fed. Mar. Comm'n*,
174 F.4th 169 (D.C. Cir. 2026) .......................................................................... 24

*Evergreen Shipping Agency Corp. v. FMC*,
106 F.4th 1113 (D.C. Cir. 2024) ........................................................................ 24

*F.T.C. v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ................................................................................... 21, 22

*Fanning v. United States*,
346 F.3d 386 (3d Cir. 2003) .............................................................................. 21

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................................... *passim*

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ............................................................................ 26

*Food & Water Watch, Inc. v. Vilsak*,
808 F.3d 905 (D.C. Cir. 2015) ............................................................ 6, 7, 12, 19

*Friends of the Everglades, Inc. v. Sec'y of the United States Dep't of Homeland Sec.*,
174 F.4th 822 (11th Cir. 2026) .......................................................................... 19

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987) ........................................................................................ 22

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .......................................................................................... 5

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ........................................................................................................ 27

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .................................................................................................. 18, 19

*Hearth, Patio & Barbecue Ass'n v. EPA*,
11 F.4th 791 (D.C. Cir. 2021) .......................................................................................... 10

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......................................................................................................... 27

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ......................................................................................... 20

*Indep. Mkt. Monitor for PJM v. FERC*,
162 F.4th 1167 (D.C. Cir. 2025) ...................................................................................... 17

*Indus. Energy Consumers of Am. v. FERC*,
125 F.4th 1156 (D.C. Cir. 2025) ...................................................................................... 13

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
389 U.S. 64 (1967) .......................................................................................................... 38

*Iowaska Church of Healing v. Werfel*,
105 F.4th 402 (D.C. Cir. 2024) ........................................................................................ 13

*League of Women Voters of the U.S. v. Harrington*,
560 F. Supp. 3d 177 (D.D.C. 2021) .................................................................................. 25

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................................... 36, 37

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...................................................................................................... 6, 13

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................... 20, 22, 23

*LULAC v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .................................................................................. 19

*Mich. Canners and Freezers Ass'n, Inc. v. Agric. Marketing and Bargaining Bd.*,
467 U.S. 461 (1984) ... 28

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) ... 6

*Murthy v. Missouri*,
603 U.S. 43 (2024) ... 6, 41

*N.Y. Rehab. Care Mgmt., LLC v. NLRB*,
506 F.3d 1070 (D.C. Cir. 2007) ... 24

*Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.*,
No. 26-5257, 2026 WL 2168004 (D.C. Cir. July 17, 2026) ... 36

*Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) ... 12

*Nken v. Holder*,
556 U.S. 418 (2009) ... 35

*North Carolina v. Covington*,
581 U.S. 486 (2017) ... 37

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ... 20, 21

Norwood v. Harrison,
413 U.S. 455 (1973) ... 28, 29

*Obama v. Klayman*,
800 F.3d 559 (D.C. Cir. 2015) ... 6

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
930 F.3d 519 (D.C. Cir. 2019) ... 34

*Osborn v. Visa Inc.*,
797 F.3d 1057 (D.C. Cir. 2015) ... 6

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) ... 18

*Privacy Info. Ctr. v. U.S. Dep't of Com.*,
928 F.3d 95 (D.C. Cir. 2019) ... 6

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007) ... 7

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 29, 35

*Reid v. Buttigieg*,
No. CV 20-1262 (TJK), 2023 WL 2184549 (D.D.C. Feb. 23, 2023) .......... 38

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
324 F.3d 726 (D.C. Cir. 2003) .......... 19, 21

*Rodriguez v. U.S. Dep't of the Air Force*,
387 F. Supp. 3d 130 (D.D.C. 2019) .......... 22

*Rwy. Labor Execs.' Ass'n v. U.S. R.R. Ret. Bd.*,
749 F.2d 856 (D.C. Cir. 1984) .......... 24

*Schmidt v. Lessard*,
414 U.S. 473 (1974) .......... 37

*Sibley v. Alexander*,
916 F. Supp. 2d 58 (D.D.C. 2013) .......... 33

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 27

*South Carolina v. United States*,
898 F. Supp. 2d 30 (D.D.C. 2012) .......... 35

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 41

*Taylor v. Trump*,
788 F. Supp. 3d 1 (D.D.C. 2025) .......... 33

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) .......... 36

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 36, 39, 40, 41

*TVA v. Hill*,
437 U.S. 153 (1978) .......... 36

*U.S. Army Corp. of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 20

*United States v. California,*
No. 2:26-cv-12025 (C.D. Cal. Oct. 15, 2026) .......... 4, 32

*United States v. City of Jackson*,
318 F.2d 1 (5th Cir. 1963) ........................................................................................ 28

*United States v. Knight*,
490 F.3d 1268 (11th Cir. 2007) ................................................................................ 26

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001)................................................................................................. 36

*United States v. Raines*,
362 U.S. 17 (1960)................................................................................................... 27

*Vote Forward v. DeJoy*,
490 F. Supp. 3d 110 (D.D.C. 2020)........................................................................... 18

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008)................................................................................................... 5, 6

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)............................................................................ 33, 34

**U.S. Constitution**

U.S. Const. art. I, § 4, cl. 1.......................................................................................... 26

**Statutes**

5 U.S.C. § 551(4)............................................................................................... 20, 21

5 U.S.C. § 551(6)............................................................................................... 20, 21

5 U.S.C. § 551(8)............................................................................................... 20, 21

5 U.S.C. § 551(10)............................................................................................. 20, 21

5 U.S.C. § 551(11)............................................................................................. 20, 21

5 U.S.C. § 551(13)............................................................................................. 20, 21

5 U.S.C. § 704.............................................................................................. 20, 22, 23

8 U.S.C. § 1373...................................................................................................... 40

18 U.S.C. § 611................................................................................................ *passim*

28 U.S.C. § 533...................................................................................................... 26

52 U.S.C. § 20507............................................................................................ *passim*

**California Statutes**

Cal. Elec. Code § 2188 .......... 40

Cal. Elec. Code § 3000.5 .......... 28

**Rules**

Fed. R. Civ. P. 65(d)(1) .......... *passim*

**Regulations**

Cal. Code Regs. tit. 2, § 20363 .......... 32

**Other Authorities**

California's 13th Congressional District Election, 2024, Ballotpedia, (last visited Oct. 18, 2026), https://perma.cc/QJ73-PR6N .......... 30

Mark Osborne, *1,500 noncitizens may have been registered to vote in California DMV error*, ABC News (Oct. 9, 2018),https://perma.cc/9RM4-THZX .......... 30

Nat'l Conf. of State Legislatures, Access to and Use of Voter Registration Lists, (last visited Oct. 26, 2026),www.ncsl.org/elections-and-campaigns/access-to-and-use-of-voter-registration-lists .......... 32

## I. INTRODUCTION

Plaintiffs lack standing to bring this suit. And here, they have not met their high burden of demonstrating a substantial likelihood of standing to warrant a preliminary injunction. Since that is required to issue the extraordinary remedy of an injunction, this Court should deny Plaintiffs' emergency application.

Even after an opportunity to amend their motion, Plaintiffs still fail to cure their deficient standing. Plaintiffs' theory remains that they are somehow harmed by the Department of Justice's (DOJ) demand letters to California to comply with federal law and/or its lawsuit against California to compel the state to address credible evidence of likely noncitizen voting in the upcoming federal election. Not so. First, individual plaintiff Pedro Trujillo and individual associational member of the Coalition for Humane Immigrant Rights (CHIRLA), Ericka Schwerdt, are *not* included in the Department of Homeland Security's (DHS) list of likely noncitizen voters it sent to California. That is because Mr. Trujillo and Ms. Schwerdt are accurately reflected in DHS records as recently naturalized citizens. So there is no risk of harm as to them. Second, it is undisputed that California has not complied with the DOJ's demands and the state is actively litigating the suit. Thus, there is no imminent possibility that remaining organizational Plaintiff CHIRLA or its members will suffer any qualifying harm absent intervening action by a third-party (the California court). The Supreme Court has made it clear that it is substantially more difficult to establish standing when it depends upon decisions of an independent third party. *See California v. Texas*, 593 U.S. 659, 675 (2021).

What is more, Plaintiffs' alleged and unfounded harm of living in "fear" of criminal prosecution or being targeted as recently naturalized citizens is so attenuated and speculative as to be non-redressable by this Court. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Defendants' challenged actions in California seek only the remedy of ballot segregation, with votes counted once citizenship is confirmed. Therefore, if Plaintiffs' relevant associational members are citizens—as they assert—there is no remote possibility of harm. That renders Plaintiffs' Fifth Amendment Equal Protection Clause claim meritless. Plaintiffs' associational standing arguments fail for the same reasons. And their organizational standing claim, based on expenditures and diverted resources, was expressly foreclosed by *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).

On the merits, Plaintiffs have not demonstrated the requisite likelihood of success. To start, neither the DOJ demand letters nor the California suit represent final agency action under the Administrative Procedure Act (APA); the DOJ demand letters are not arbitrary or capricious on their face; and Plaintiffs' ultra vires claim for those challenged actions does not rise above the Supreme Court's strict scope of review for ultra vires claims. And despite states' traditional authority in managing elections, Congress expressly directed the Federal Government in 18 U.S.C. § 611 to ensure that noncitizens do not vote in federal elections. Thus, Defendants' challenged actions are supported by the double font of constitutional and statutory authority, making *Defendants'* likelihood of success on the merits strong.

Finally, the balance of equities and public interest tips decisively in favor of the government. The government's compelling interest in combating voter fraud significantly outweighs Plaintiffs' speculative and non-existent injuries. Further, Plaintiffs' proposed injunction is legally unsound, practically unworkable, violates fundamental prohibitions against universal relief, and fails to specify the conduct that would be restrained.

For those reasons, as further explained below, this Court should deny Plaintiffs' defective emergency application for a temporary restraining order and preliminary injunction.

## II. BACKGROUND

### A. Factual Background

On July 16, 2026, Secretary of Homeland Security Mullin issued a letter to the State of California indicating that a "[p]reliminary review" of California records revealed that there may be as many as 190,832 noncitizens registered to vote in California. Exhibit A, July 16, 2026, Letter from DHS Secretary Mullin to California Secretary of State Weber. The Secretary requested collaboration with California "to ensure the accuracy of [the] findings." *Id*. On July 23, 2026, California Secretary of State Shirley N. Weber declined to take the requested actions in Secretary Mullin's letter and requested additional information from DHS. Exhibit B, July 23, 2026, Letter from Secretary Weber to Secretary Mullin.

On October 13, 2026, Acting Deputy Attorney General Trent McCotter sent letters to Secretary Weber and the Los Angeles County Clerk requesting that they confirm within 48 hours the eligibility of a list of over 20,000 individuals the Federal Government believes are highly likely noncitizens who were sent a vote-by-mail ballot to participate in the November 2026 federal election, and segregate the ballots until their citizenship was confirmed. Exhibit C, October 13, 2026, Letter from R. Trent McCotter to Dean C. Logan; October 13, 2026, Letter from R. Trent McCotter to Shirley N. Weber, ECF No. 34-7.

On October 15, 2026, Secretary Weber and Los Angeles County responded to the letters declining to take the requested actions and asserting that the request was unlawful. October 15, 2026, Letter from Shirley N. Weber to R. Trent McCotter, ECF No. 22-2; Exhibit D, October 15, 2026, Letter from Peter Bollinger to R. Trent McCotter.

### *B. United States v. California*

On October 15, 2026, the Department of Justice brought suit against California and the election officials of the state and Los Angeles County requesting that the court "order California

(1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status (beyond relying on unverified statements of citizenship necessary to registering) before tabulating their vote-by-mail ballot." *United States of America v. California*, No. 2:26-cv-12025 (C.D. Cal.), Complaint ECF No. 1 ¶ 6. On October 19, the United States moved for an emergency TRO and order for why a preliminary injunction should not issue. *Id.*, ECF No. 22. The district court set a hearing for the following Tuesday, October 27. *Id.*, ECF No. 64. Because harm was ongoing and irreversible with highly likely non-citizen mail-in ballots being tabulated, the United States requested an expedited ruling on the emergency TRO by the following day, October 22. *Id.*, ECF No. 67. The district court did not rule on the TRO. The United States appealed shortly thereafter, interpreting the district court's failure to rule on the emergency TRO as a constructive denial under *A.A.R.P. v. Trump*, 605 U.S.___ (2025). *Id.*, ECF No. 74. The United States then moved for an injunction pending appeal in the Ninth Circuit on October 23. *United States v. California*, No. 26-7070 (9th Cir.), Dkt. 5.1 The Ninth Circuit then held remote oral argument on the government's motion on Sunday afternoon, October 25. On October 26, 2026, on the eve of this filing, the Ninth Circuit panel concluded that it lacked jurisdiction over the Government's appeal and denied as moot the United States' emergency motion for relief.[1] *United States v. California,* No. 26-7070 (9th Cir. October 26, 2026) (per curiam), Dkt. 63.1.

### C. Procedural History

On September 2, 2026, Plaintiffs filed this lawsuit bringing various causes of action against the Defendants premised on DHS's action in identifying potentially ineligible voters and sending

[1] Judge Bumatay dissented, held that the Ninth Circuit had appellate jurisdiction, that the Federal Government had standing to use, and that California's state action is likely preempted because the state frustrates federal law by commingling citizen and noncitizen ballots alike. *United States v. California*, No. 26-7070 (9th Cir.) (Bumatay, J., dissenting), Dkt. 63.1. Judges Bennett and Sanchez each filed their own concurrences with the judgment.

the July 16, 2026, Letter to California. *See* Compl. ECF No. 1, ¶¶ 49-53. The Complaint seeks, *inter alia*, for the Court to enjoin "the list matching exercise/voter purge on the State of California and its local election officials" and to "[o]rder Defendant Mullin to rescind the letter directed at the State of California." *Id.* Demand for Relief.

On October 15, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction, alleging that they face an immediate threat of harm stemming from the October 13, 2026, letters. *See* ECF No. 21. Following a scheduling conference, at the Court's direction, Plaintiffs filed an amended motion for preliminary injunctive relief on October 22. *See* ECF No. 34 ( Pls.' TRO Mot.). The amended motion asks the Court to (1) enjoin the so-called "Alleged Non-Citizen Removal Policy"; (2) prohibit federal officials from taking action "to induce California election officials" to violate 52 U.S.C. § 20507(c)(2)(A)); and (3) stop federal officials from "impos[ing] themselves upon election administration procedures that the Constitution and federal law assign to the States[.]" Pls.' TRO Mot. at 3.

## III. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)); *see also, e.g., D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 (D.D.C. 2020) ("A TRO is an extraordinary remedy and should be granted sparingly.") (citation omitted). A plaintiff seeking a preliminary injunction bears the burden of establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Doe v. Blanche*, 172 F.4th 901, 911 (D.C. Cir. 2026) (quoting *Winter*, 555 U.S. at 20). "The same standard applies to both

temporary restraining orders and to preliminary injunctions." *D.A.M.*, 474 F. Supp. 3d at 55-56 (citation omitted).

## IV. Argument

### A. Plaintiffs Cannot Establish Standing

"In order to obtain a preliminary injunction, a party must show, among other things, 'a substantial likelihood of success on the merits.'" *Food & Water Watch, Inc. v. Vilsak*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Id.* (quoting *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015)). Because standing is an essential element of jurisdiction, "a party who seeks a preliminary injunction 'must show a substantial likelihood of standing.'" *Id.* (quoting *Klayman*, 800 F.3d at 568); *see also, e.g., D.A.M.*, 474 F. Supp. 3d at 56 ("[A] party who fails to show a substantial likelihood of standing is not entitled to a temporary restraining order.") (citation omitted).

The burden of "substantial likelihood of standing" is meaningfully heavier than the burden on a motion to dismiss. When a plaintiff moves for preliminary relief, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). Plaintiffs "cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see Elec. Privacy Info. Ctr. v. U.S. Dep't of Com. ("EPIC")*, 928 F.3d 95, 104 (D.C. Cir. 2019) ("[Standing] must be evaluated 'under the heightened standard for evaluating a motion for summary judgment' in 'determining whether or not to grant the motion for preliminary injunction.'") (quoting *Food & Water Watch*, 808 F.3d at 912).

To establish standing, plaintiffs "must show (i) they have 'suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision.'" *Food & Water Watch*, 808 F.3d at 914 (quoting *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015)). An injury in fact must be "(1) concrete, (2) particularized, and (3) actual or imminent." *Id.* (quoting *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007)). "An actual or imminent injury is 'certainly impending and immediate – not remote, speculative, conjectural, or hypothetical.'" *Id.* (quoting *Public Citizen*, 489 F.3d at 1293).

Plaintiffs here cannot establish standing because their alleged injuries are not imminent and the possibility that they will ever suffer any qualifying harm is too attenuated and speculative.

Plaintiffs allege standing in three ways: (1) individual standing for Pedro Trujillo, (2) associational standing for CHIRLA, and (3) organizational standing for CHIRLA. While some of the allegations are newly asserted in this emergency motion,[2] Mr. Trujillo argues specifically that he "is at heavy risk of being placed on the list of purported noncitizens" and "suffers the harm of fear and emotional distress that he will be removed from the voter lists or might otherwise be persecuted or prosecuted for simply exercising his legal right to vote." Pls.' TRO Mot. at 22. He further alleges that he "must also now take affirmative steps and possibly spend money, in addition to time and effort, to ensure that Defendants' actions do not harm his ability to vote this year." *Id.*

[2] Apart from the allegations undergirding this emergency motion, Plaintiffs' allegations for preliminary relief are similar but not identical to the harms listed in their Complaint. Defendants dispute that Plaintiffs have standing to bring any of the claims in their Complaint, but do not simultaneously move to dismiss in this motion. Defendants assert that Plaintiffs' instant motion is procedurally deficient to the extent some claims lack a sufficient nexus to the allegations and causes of action contained in the original Complaint. *See Bird v. Barr,* No. 19-cv-1581 (KBJ), 2020 U.S. Dist. LEXIS 130277, at *8 (D.D.C. July 23, 2020) (concluding that a court lacks authority to grant a preliminary injunction where there is "a disconnect between the underlying claims in the lawsuit and the alleged basis for preliminary relief").

Plaintiff CHIRLA alleges that it also suffers injury because "it is likely its members have been placed on the list of purported non-citizens" at issue and its members "fear that they will be unable to confirm their citizenship if the Defendants' Policy is permitted to move forward." *Id.* at 20. CHIRLA further claims that "the demand made by Defendants requires CHIRLA and its members to spend time, money and effort to take additional steps to ensure they are not on the list and, if they are, take steps to ensure their voting rights are not impeded." *Id.* at 18. And that "these most recent threats by Defendants . . . directly impact CHIRLA members, serving as constant intimidation of their exercise of their legally protected right to vote, causing them fear and emotional distress in their personal safety voting and can chill members' election participation." *Id*. at 21.

Each of Plaintiffs' standing arguments are easily rejected by the undisputed fact that ballots are not presently being segregated. California and Los Angeles County have expressly denied (in both letters and court papers) undertaking the actions requested by DOJ that form the basis of this motion for preliminary relief. For example, in her October 15, 2026, letter response, Secretary Weber, who is California's chief elections official, explicitly declined to comply with DOJ's request. *See generally* ECF No. 22-2. Los Angeles County responded similarly. *See* Ex. D. Based on those responses, DOJ filed a lawsuit and moved for a TRO asking the Central District of California and the Ninth Circuit to order California and Los Angeles County to comply with the requests in its letters. *See supra* at 5. California and Los Angeles County have vigorously opposed DOJ's motions. *See California* (C.D. Cal.), ECF Nos. 32-1; California (9th Cir). ECF Nos. 32, 34, 36.

Plaintiffs' alleged harms are contingent upon California's compliance with DOJ's requests and are therefore highly speculative. Given California's public position of noncompliance, there

is no genuine risk that such actions will be undertaken unless and until a court order requires it. In other words, because California and Los Angeles County steadfastly refuse to comply—and may never comply—with DOJ's requests, Plaintiffs fail to allege any harms that are "certainly impending and immediate" and therefore do not come close to establishing standing with the level of proof required for a preliminary injunction. And even if California and Los Angeles County were ordered to segregate ballots, only noncitizens voting in violation of federal law would be impacted.

Aside from those fatal facts, Plaintiffs' allegations suffer from other defects that separately preclude standing.

**1. Plaintiff Trujillo Cannot Demonstrate Individual Standing**

First, Mr. Trujillo alleged that his harms arise from a fear that he is included on DOJ's list of potentially ineligible voters. But he is not included on that list. *See* Exhibit E, Declaration of Nicolas Bartell. Thus, even if DOJ were to prevail in its affirmative lawsuit and California were to take the requested actions before the upcoming election, Mr. Trujillo would not be impeded in his ability to vote on that basis.

Otherwise, Mr. Trujillo's alleged harms not linked to the challenged list and requested state actions are unexplained, conclusory, and speculative. Plaintiffs provide no explanation or supporting facts for his alleged fear that he may "otherwise be persecuted or prosecuted" for voting. Pls.' TRO Mot. at 22. Those allegations are insufficient to establish standing under any standard, but certainly insufficient to meet the heightened standard for a preliminary injunction. Similarly, Mr. Trujillo cannot establish standing based on an alleged violation of the separation of powers, *see id.*, both because he cannot establish any potential injury to himself and because Plaintiffs have not alleged any separation of powers violation on the merits as discussed below.

### 2. Plaintiff CHIRLA Cannot Establish Associational Standing

Similarly, Plaintiff CHIRLA fails to establish associational standing. "An organization can assert associational standing on behalf of its members if: '(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.'" *EPIC*, 928 F.3d at 101 (quoting *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005)). CHIRLA fails to establish that even one member of its organization has standing to sue primarily because (1) there is no impending and immediate threat of concrete harm to any California voter based on DOJ's requests, *see supra*, and (2) there is no possibility of any harm to either alleged member identified by CHIRLA.

As noted above, named Plaintiff Mr. Trujillo does not appear on the challenged list. Ex. E, Bartell Decl. ¶ 7. Plaintiffs have also identified Ms. Erika Schwerdt as a member of CHIRLA who alleges "intimidation of [her] exercise of [her] legally protected right to vote, causing [her] fear and emotional distress in [her] personal safety voting." *See* Pls.' TRO Mot. at 21; Declaration of Erika Schwerdt, ECF No. 34-8 ¶¶ 8-10. Ms. Schwerdt also does not appear on the challenged list. Ex. E, Bartell Decl. ¶ 7.

When a Plaintiff "claims associational standing, it is not enough to aver that unidentified members have been injured." *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021). The D.C. Circuit has recently held that this rule applies more strictly during the merits stage because "the question on a motion for a preliminary injunction is whether [a plaintiff] is *likely* to be able to establish standing later in the case." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1229 (D.C. Cir. 2026) (emphasis added). But as explained, the test for "likelihood" of standing in a preliminary injunction posture is whether Plaintiffs have made a clear

evidentiary showing sufficient to survive summary judgment. Here, CHIRLA's only identified members, Mr. Trujillo and Miss Schwerdt, are confirmed U.S. citizens not included on the challenged list, *see* Ex. E, Bartell Decl. ¶¶ 7-9, and are thus not at any risk for injury. CHIRLA therefore cannot supply the necessary factual support to meet its burden on the basis of these individuals' allegations.

CHIRLA is similarly unlikely to establish that any of its unidentified members have standing because no California voter is presently at risk of "hav[ing] their ballots undelivered or uncounted" pursuant to DOJ's challenged requests. Pls.' TRO Mot. at 21. Nor for the same reason are any naturalized citizen members likely to be unable "to register to vote." *Id*. at 20. Plaintiffs rely on *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014), for the proposition that CHIRLA's members are likely injured because it is foreseeable that they "might be flagged as [] non-citizen[s] by the government because of their status as a naturalized citizen[,]" and therefore removed from the voting rolls, Pls.' TRO Mot. at 20. But *Arcia* is distinguishable. In that case, the State sought to remove ineligible voters from its own rolls and could do so directly, *see Arcia*, 772 F.3d at 1339-40; here, Defendants can only request action by California, which California has declined to undertake. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"); *California v. Texas*, 593 U.S. 659, 675 (2021) (stating that standing is "substantially more difficult to establish" where "a causal relation between injury and challenged action depends upon the decision of an independent third party").

Absent the issuance of a court order requiring California to take action, CHIRLA's unidentified individual members' alleged "fear that they will be unable to confirm their citizenship

if the Defendants' Policy is permitted to move forward," Pls.' TRO Mot. at 20, is speculative and unfounded.

For the same reason, they cannot establish the necessary injury-in-fact based on their contention that they "have been actively discouraged from voting in this upcoming election" or "intimidate[ed] [in] their exercise of their legally protected right to vote" by the challenged actions which have not and presently cannot be effectuated. *Id.* at 20-21; Declaration of Angelica Salas, ECF No. 34-5 ¶ 16.[3] "[P]laintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending' because such injuries 'are not fairly traceable' to the conduct creating that fear." *Food & Water Watch*, 808 F.3d at 919 (quoting *Clapper*, 568 U.S. at 416); *see also Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (stating that "self-inflicted harm doesn't satisfy the basic requirements for standing" and such "harm does not amount to an 'injury' cognizable under Article III").

Even setting aside those problems, all of Plaintiffs' allegations as to their unidentified members are highly speculative and lack the necessary detail to demonstrate a likelihood that they would have standing at summary judgment. *See Centro de Trabajadores Unidos*, 167 F.4th at 1229 (describing the detailed allegations provided by the plaintiff organization as to unidentified members in support of its preliminary injunction motion). In particular, Plaintiffs' assertion that "it is likely [CHIRLA's] members have been placed on the list of purported non-citizens" because

---

[3] Plaintiffs' Declaration specifies that CHIRLA's members have been "discouraged from even registering to vote" by "DOJ's arrests of persons alleged to have registered to vote and/or vote illegally." Salas Decl. ¶ 16. However, Plaintiffs do not challenge the legality of such arrests nor do those arrests arise out of the Defendants' actions challenged in this matter. The persons arrested are charged with election-related crimes as noncitizens in past elections, and are not similarly situated to Plaintiffs' alleged naturalized citizen members. Thus, Plaintiffs' members alleged chill premised on those arrests cannot be the basis for associational standing.

they are "newly registered naturalized citizen voters," relies exclusively on the self-serving, completely unsupported speculation of one of CHIRLA's officers. Pl's Mot. At 6; Salas Decl. ¶¶ 7, 16 (stating without citation that CHIRLA's members "face significant risk of appearing on Defendants' lists and being swept up in Defendants' investigative activities."). Such baseless allegations are insufficient as a matter of law to support a preliminary injunction. *See supra* at 6-7.

It is well-established that "[w]hen considering any chain of allegations for standing purposes, [the Court] may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)…." *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 413 (D.C. Cir. 2024) (quoting *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015)). Plaintiffs rely on nothing more than a speculative chain of possibilities in support of associational standing.

For Plaintiffs' members to actually face an impediment to their ability to vote, they would, before the election on November 3, 2026: (1) need to in fact be named on DOJ's list as ineligible, (2) that listing would need to be incorrect, (3) the Court in the Central District of California (or a higher court) would need to grant the government's TRO motion, (4) California would then need to act to segregate the ballots of suspected ineligible voters including Plaintiffs' members, (5) and California would need to fail to accurately confirm that Plaintiffs' members were actually eligible to vote. That is a classic example of "'highly attenuated chain of possibilities' predicated on 'guesswork as to how independent decisionmakers will exercise their judgment'" which cannot satisfy Article III standing. *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1163 (D.C. Cir. 2025) (quoting *Clapper*, 568 U.S. at 413); *see also Clapper*, 568 U.S. at 414 n.5 (quoting

*Lujan*, 504 U.S. at 562) ("Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the courts.'").

Indeed, this case demonstrates why speculation defeats standing. California, as the third-party, already broke the chain of contingencies by refusing to act on DOJ's request. Now, Plaintiffs' alleged injuries will not result unless yet another third party—the Central District of California or the Ninth Circuit—independently act. The Supreme Court in *Clapper* emphasized that introducing independent decisions of Article III judges into the chain of causation renders any alleged injury "highly speculative." 568 U.S. at 410 (concluding that plaintiffs' "highly speculative fear" rests on, *inter alia*, speculation that "the Article III judges…will conclude that the Government's proposed surveillance procedures" are lawful).

**3. Plaintiff CHIRLA Cannot Establish Organizational Standing**

Organizations may "sue on their own behalf for injuries they have sustained[,]" but, like all litigants, they must "satisfy the usual standards for injury in fact, causation, and redressability." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024). CHIRLA relies primarily on cases decided before *Alliance for Hippocratic Medicine* for its organizational standing, which is irreconcilable with current law. *Id.* (rejecting the diversion-of-resources standing theory Plaintiffs press here).

Specifically, CHIRLA alleges that Defendants have "frustrated its mission" to "'protect[] and advance[] lawful electoral participation among immigrants, Latinos, English learners and new voters.'" Pls.' TRO Mot. at 17 (quoting Declaration of Carl Bergquist, ECF No. 34-9 ¶ 2). CHIRLA says that it "has had to develop and implement new programs to reach their members" including "divert[ing] time to reaching members and other voters" that fear leaving their homes and "start[ing] to develop a new program and create infrastructure meant to connect CHIRLA

members…with legal assistance related to possible criminal defense connected to DOJ and DHS's voting-related actions." *Id.* It also alleges that it has implemented "unprecedented" "mobilization efforts" including "staff putting in hundreds of additional hours that the organization would not have expended in efforts to combat the fear and confusion that DOJ and DHS have caused in California." *Id.* at 18. Additionally, Plaintiffs allege that the October 13, 2026, "demand made by Defendants requires CHIRLA and its members to divert resources and spend time, money and effort to take additional steps to ensure they are not on the list and, if they are, take steps to ensure their voting rights are not impeded." *Id.*

None of those allegations establish organizational standing.

*First*, Plaintiffs' suit is a challenge against the use of lists of suspected ineligible voters compiled by Defendants; and against Defendants' request that California election officials segregate ballots of suspected noncitizens until citizenship can be confirmed. Pls.' TRO Mot. at 2-3 (stating the relief sought in this motion); *id.* at 19 (alleging that Plaintiffs' injuries arise from Defendants "using inaccurate and flawed database matches and queries to create large lists of suspects, [and] demand[ing] state and county officials work that list of suspects or else be criminally prosecuted…."). As explained above, no action to effectuate DOJ's request has occurred; nor can it reasonably be anticipated to occur absent judicial intervention. Thus, any expenditures premised on that possibility are unjustified, self-inflicted, and not fairly traceable to the challenged conduct of the Defendants. *See Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 634 (9th Cir. 2026) (en banc) (quoting *All. for Hippocratic Med.*, 602 U.S. at 390) (holding that potential expenditures to mitigate the hypothetical impact of a challenged action "cannot support standing" when the alleged impact "lacks record support and is highly speculative."). It is no less fatal to Plaintiffs' alleged organizational standing than to individual or associational standing that

there is no imminent threat that California will take the actions requested in Defendants' challenged letters.

*Second*, Plaintiffs similarly cannot ground their organizational standing in expenditure allegations based on fears created by the independent (and unchallenged) law enforcement actions of the DOJ. Any resources Plaintiffs have expended in response to fears generated by the "recent surge of arrests of legal permanent residents," Pls.' TRO Mot. at 17, or DOJ "charging 28 alleged noncitizen voters," *id.* at 18, are simply not traceable to the alleged agency action actually challenged in this case. It is beyond dispute that an alleged injury must issue from the actually challenged conduct in order to form the basis for standing. *Texas*, 593 U.S. at 669 (finding no standing where the "injury is not fairly traceable to any allegedly unlawful conduct of which the plaintiffs complain") (internal quotations omitted).

Moreover, Plaintiffs' asserted expenditure/diversion of resources theory has been squarely rejected by the Supreme Court. In *Alliance for Hippocratic Medicine*, four associations challenged actions by the Food and Drug Administration (FDA) relaxing "regulatory requirements for mifepristone, an abortion drug." 602 U.S. at 372–73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (quotation omitted). Thus, the associations asserted that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in

public advocacy and public education." *Id.* (quotation omitted). Those activities, the associations asserted, had required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (quotation omitted).

But the Supreme Court unanimously held that associations "cannot spend [their] way into standing[.]" *Id.* The generic setback to associations' missions without any actual "impediment to [their] advocacy businesses" does not support Article III standing. *Id.* at 395. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394–95. So too here.

Plaintiffs allege precisely that (and only that) type of harm. CHIRLA's expenditures allegedly undertaken in response to Defendants' challenged actions are not meaningfully distinguishable from their typical voter support activities, and therefore are not a cognizable harm. Defendants' challenged actions may make Plaintiffs' core mission objectives, such as voter mobilization, less likely to succeed, but even so, they have not alleged—nor could they allege—that Defendants' challenged actions actually interfere with CHIRLA's ability to pursue activities like voter mobilization. "[A]n organization may not establish standing simply by spending money 'opposing those policies' that it 'dislike[s].'" *Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, __ F.4th __, 2026 U.S. App. LEXIS 27506, at *14-15 (D.C. Cir. Sept. 8, 2026) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). It is only when "a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'diverted its resources' *to continue pursuing those activities*, [that] such concrete harm to the organization's activities supports standing to sue." *Id.* (emphasis added); *see also, e.g., Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1173-74 (D.C. Cir. 2025) (cleaned

up) (finding plaintiff might have demonstrated organizational standing had it alleged defendant's actions "deprived it of the information it depends on to carry out its monitoring functions" and also showed "how it used its resources to counteract the injury.").

No such direct interference with CHIRLA's core business activities is at issue here. This case is nothing like *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). That case stands for the proposition that an organization has standing to challenge an agency action when it *directly interferes* with the organization's existing programs or investments in a manner that satisfies Article III's requirements. *See All. For Hippocratic Med.*, 602 U.S. at 395 (describing *Havens* as a case in which the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities"). As the Supreme Court has since recognized, however, *Havens* was an "unusual case" where the defendant's actions plainly caused an organization direct harm. *Id.* at 396. There, the defendant—who owned and operated apartment complexes—had provided the plaintiff (who operated a housing counseling service) with false information about apartment availability. *Id.* at 395 (describing *Havens*). "In other words, Havens's actions directly affected and interfered with [the plaintiff's] core business activities." *Id.*; *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1104 (D.C. Cir. 2015) (Millet, J., dubitante). Plaintiffs here have not established any equivalent direct injury to their core mission

Plaintiffs' arguments to the contrary rely on inapplicable standards and fail to allege the elements of organizational standing with the necessary degree of proof. Plaintiffs rely on multiple cases that predate *Alliance for Hippocratic Med.* which are inconsistent with the standard explained above and are therefore no longer good law. *See, e.g.,* Pls.' TRO Mot. at 16-17 (contending wrongly that *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110 (D.D.C. 2020) permitted organizational standing "because the redirecting of the organizations limited resources

and spending of additional funds…directly conflicted Vote Forward's mission and made Vote Forward activities more difficult….”). To the extent Plaintiffs rely on recently decided D.D.C. cases for an inconsistent organizational standing standard, *see* Pls.' TRO Mot. at 16, 19 (citing *Common Cause v. U.S. Dep't of Just.*, No. 26-cv-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026), and *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 190 (D.D.C. 2025)), those cases improperly rely on outdated precedent, are factually distinguishable, and/or extend the application of *Havens Realty Corp.* beyond its facts despite the Supreme Court's admonition, *see Alliance for Hippocratic Med.*, 602 U.S. at 396. They are wrongly decided and inapposite.

Consequently, all three of Plaintiffs' theories fail to establish standing to pursue emergency relief, and their motion should be denied.

### B. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

In addition to lacking standing, Plaintiffs also fail to demonstrate a substantial likelihood of success on the merits for multiple reasons. *See Food & Water Watch*, 808 F.3d at 913 (“In order to obtain a preliminary injunction, a party *must show*, among other things, a substantial likelihood of success on the merits.”) (citation omitted) (emphasis added).

#### 1. Plaintiffs Fail To Establish Final Agency Action Reviewable Under the APA.

Plaintiffs' APA claims fail at the threshold because they have not identified a final agency action subject to judicial review. Plaintiffs' motion complains about demand letters sent by DHS and DOJ to the State of California requesting the State take action to verify individuals the government reasonably believes are noncitizens registered to participate in the upcoming federal election. *See* Pls.' TRO Mot. at 25. But an agency's “request for voluntary corrective action . . . do[es] not constitute final agency action.” *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003); *Friends of the Everglades, Inc. v. Sec'y of*

*the United States Dep't of Homeland Sec.*, 174 F.4th 822, 830–31 (11th Cir. 2026) (holding that "an agency request is not a final agency action").

The APA does not allow a court to "exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (cleaned up). The APA instead permits review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

For an "agency action" to be reviewable under the APA, it must be one of the "circumscribed, discrete" actions identified in the statutory definition of that term, *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004)—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief"). A plaintiff seeking judicial review under the APA must therefore challenge a "specific" agency action falling within one of these discrete categories, rather than attempt to challenge an "abstract" policy or decision divorced from a concrete action, *Biden v. Texas*, 597 U.S. 785, 809 (2022), or "at a high[] level of generality" an agency "operation" or "program," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990); *accord SUWA*, 542 U.S. at 64 (the APA's discrete-action "limitation . . . precludes . . . broad programmatic attack[s]");

Additionally, judicial review under the APA is available only to challenge an agency action that is "final." 5 U.S.C. § 704. Agency action is final if two conditions are satisfied. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corp. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citing *Bennet v. Spear*, 520 U.S. 154, 177-78 (1997)). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will

flow." *Id.* (quoting *Bennett*, 520 U.S. at 178). None of the requirements for final agency action are present here.

First, the DHS and DOJ demand letters are nothing like the "circumscribed, discrete" actions identified in the statutory definition of "agency action" in the APA, *SUWA,* 542 U.S. at 62 (2004)—*i.e.*, "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof[.]" 5 U.S.C. § 551(13); *see also id.* § 551(4), (6), (8), (10), (11) (defining "rule," "order," "license," "sanction," and "relief").

Second, the letters do not conclusively resolve anything. They simply ask California and its counties to work together with the federal government to help protect against vote dilution and promote election integrity. *See* ECF No. 22-2; Ex. C. The lack of finality is evident on the face of the DOJ letters, which specifically states that further action may be necessary if they refuse to cooperate with the federal government's request. *See* ECF No. 22-2 (stating that the United States "will have no choice but to seek emergency relief" if California does not implement the requested verification process);. [D]emand letters, although harsh in their terms and probably unsettling to their recipients," are not "final agency action from which they can seek judicial review." *Fanning v. United States*, 346 F.3d 386, 401 (3d Cir. 2003)

Third, an agency's request for corrective action does not determine rights or legal obligations. *Reliable Automatic Sprinkler Co.*, 324 F.3d at 731-32. "No legal consequences flow from [an] agency's" request for voluntary compliance, as there has been no compulsory order from DHS or DOJ that legally compels California or its counties to do anything. *Id.* at 732. Even when an agency notifies an opposing party of an upcoming lawsuit, and even when it files that lawsuit, it is non-reviewable, non-final agency action. For example, in *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242-43 (1980), the Supreme Court held that even the filing of an administrative

complaint does not constitute final agency action. *See id.* at 242 (stating that the "issuance of the complaint had [no] such legal or practical effect, except to impose upon [a company] the burden of responding to the charges made against it"). Accordingly, there is no basis to conclude that the demand letters or the recent lawsuit filed in the Central District of California is final agency action subject to APA review.

Plaintiffs cannot overcome the lack of final agency action by vaguely alleging the existence of a "Alleged Non-Citizen Removal Policy." *See* Pls.' TRO Mot. at 1. Plaintiffs' motion contains no evidence that suggests this so-called policy even exists, much less that it is embodied in discrete agency actions capable of judicial review. Plaintiffs' "nebulous assertion of the existence of a 'policy'" does not establish that final agency action subject to APA review actually exists. *Rodriguez v. U.S. Dep't of the Air Force*, 387 F. Supp. 3d 130, 135 (D.D.C. 2019) (quoting *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987)).

Furthermore, to the extent Plaintiffs challenge a "generalized" policy or aggressive voter fraud enforcement under federal law, such a claim is not cognizable under the APA. A plaintiff cannot seek "wholesale improvement" of a federal agency's operations "by court decree." *Lujan*, 497 U.S. at 891. The federal government's efforts to improve the security and integrity of the Nation's elections are not "'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704." *Id.* at 890.

The Supreme Court's decision in *Lujan* squarely forecloses Plaintiffs' request for judicial review of this alleged "policy." In that case, the National Wildlife Federation brought a challenge to what it called the Bureau of Land Management's "land withdrawal review program." 497 U.S. at 875. That "program" consisted of thousands of various actions, such as public land status determinations, that BLM undertook pursuant to the directives of the Federal Land Policy and

Management Act *Id.* at 877, 890. The Supreme Court held that the "so-called 'land withdrawal review program'" was "not an 'agency action' within the meaning of § 702" because it did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id*. at 890.

Likewise here, Plaintiffs' motion suffers from the same flaw. They attempt to claim that various discrete acts—demand letters, statements at press conferences and social media, the filing of criminal charges, grand jury subpoenas—constitute unified final agency action. The APA does not permit such a lawsuit. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA," and a court's "jurisdiction does not extend to reviewing generalized complaints about agency behavior." (citation omitted)).

Finally, Plaintiffs ignore the APA's requirement that they have "no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiffs speculate that they may be subject to "grand jury subpoenas and other criminal and civil process," Pls.' TRO Mot. at 23, but they do not dispute that if such actions were to be initiated against them, they will have an adequate remedy in court. In fact, they would be free to raise all the same arguments here as defenses or in opposition to the federal government's request for relief—just as the State of California and Los Angeles County are doing now.

**2. Defendants' Challenged Actions Are Not Arbitrary and Capricious**

Plaintiffs also contend that "Defendants' actions are arbitrary and capricious in their timing and execution." *Id.* They say that a "letter sent on the eve of the election demonstrates an arbitrary, even bad faith, attempt on their part to interfere with the California elections." *Id*. Those allegations have no relationship, however, to the standard for assessing agency action in this Circuit.

The D.C. Circuit's "review in an arbitrary and capricious challenge is 'deferential.'" *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 174 F.4th 169, 178 (D.C. Cir. 2026) (quoting *Evergreen Shipping Agency (Am.) Corp. v. FMC*, 106 F.4th 1113, 1117 (D.C. Cir. 2024)). "[A]gency action is arbitrary and capricious if the agency has: 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* Plaintiffs do not allege any of those standard elements and have therefore forfeited that argument. *See, e.g., N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (cleaned up) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."); *Rwy. Labor Execs.' Ass'n v. U.S. R.R. Ret. Bd.*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984) ("We decline to resolve this issue on the basis of briefing which consisted of only three sentences . . . and no discussion of the relevant . . . case law."). Regardless, the demand letters reasonably explain the factual basis for their requests for cooperation and requested compliance with federal law.

**3. Defendants' Challenged Actions Are Not Ultra Vires**

Plaintiffs also cannot establish that the challenged action of the Defendants is ultra vires. The Supreme Court has "strictly limited" the scope of ultra vires review, otherwise "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (noting than an ultra vires claim "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds" (citation omitted)). Thus, ultra vires claims must fit within "painstakingly delineated procedural boundaries"; and such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition'" in a statute. *Id.* (first quoting *Boire*

*v. Greyhound Corp*., 376 U.S. 473, 481 (1964), then quoting *Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Express and Station Emps. v. Assoc. for Benefit of Noncontract Emps.*, 380 U.S. 650, 660 (1965)).

Here, Plaintiffs simply "dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n*, 605 U.S. at 682. While "[t]hat is a fairly common maneuver," the Supreme Court has squarely rejected it. *Id.*

Plaintiffs themselves concede that a repackaged version of their APA claims is exactly what they argue. *See* Pls.' TRO Mot. at 26 (submitting that "Defendants' Policy and actions are ultra vires for the same reasons" that they are arbitrary and capricious and in excess of statutory authority under the APA). Plaintiffs' ultra vires claim therefore fails on its face.

Even if the Court views Plaintiffs' ultra vires claim in isolation, it would nevertheless fail for at least two separate reasons. First, ultra vires review is unavailable if, "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors of the FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Plaintiffs specifically argue that Defendants' challenged actions are ultra vires because they violate a provision of the NVRA. Pls.' TRO Mot. at 27. Although Plaintiffs fail to meet the requirements to bring such a cause of action here, *see infra*, it is undisputed that challenges to final agency action allegedly in violation of the NVRA can be brought under the APA. *See, e.g., League of Women Voters of the U.S. v. Harrington*, 560 F. Supp. 3d 177, 180 (D.D.C. 2021) (granting summary judgment on APA claims challenging non-compliance with requirements of the NVRA). Given that "alternative path to judicial review," an ultra vires claim is not available. *Nuclear Regul. Comm'n*, 605 U.S. at 682.

Second, as here, "if [] plaintiff's claims [fail] under the APA, then those same claims necessarily could not succeed under *ultra vires* review, which has an even narrower scope."' *Fed. Express Corp. v. U.S. Dep't of Com.,* 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified).

**4. Defendants' Challenged Actions Do Not Violate the Elections Clause or the NVRA**

a. Elections Clause. The Elections Clause in Article I of the Constitution provides that "Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Otherwise, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" *Id.*

As Plaintiffs concede, the Executive Branch may "act in this domain only as Congress directs." Pls.' Mot. at 28. And, acting under its plenary authority over immigration law, Congress passed 18 U.S.C. 611(a)—the law undergirding the federal government's actions in California. *See Arizona v. United States*, 567 U.S. 387, 394 (2012) (stating that the Federal Government "has broad, undoubted power over the subject of immigration and the status of aliens"); *see also Chavez-Perez v. Ashcroft*, 386 F.3d 1284, 1292 (9th Cir. 2004) ("[f]ederal authority in the areas of immigration and naturalization is plenary").

Since at least 1996, Congress has made it "unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner[.]" 18 U.S.C. § 611(a). A noncitizen who violates the voting ban may be fined or imprisoned. *See id.*; *United States v. Knight*, 490 F.3d 1268, 1271 (11th Cir. 2007) (finding 18 U.S.C. § 611 to be a general intent crime where the government needs only to "prove that the defendant knowingly engaged in the conduct

prohibited" (citation omitted)). And Congress has vested the Attorney General with broad authority "to detect and prosecute crimes against the United States." 28 U.S.C. § 533.

Section 611 falls within those broad grants of authority as it regulates the conduct of noncitizens within the sphere of federal elections and allows for the "maintenance of a republican form of government" by ensuring only citizens can vote in federal elections. *See Smiley v. Holm*, 285 U.S. 355, 366–67 (1932) ("In exercising [its Elections Clause] power, the Congress may supplement the[] state regulations….It may impose additional penalties for the violation of the state laws."); *Burroughs v. United States*, 290 U.S. 534, 547 (1934) ("The power of Congress to protect the election of President and Vice President from corruption [is] clear[.]"); *Bluman v. FEC*, 800 F. Supp. 2d 281, 283 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012) (upholding federal statute banning certain aliens from engaging in election-related expenditures, on the ground that "[t]he Supreme Court has long held that the government (federal, state, and local) may exclude foreign citizens from activities that are part of democratic self-government in the United States").

Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952); *accord Arizona*, 567 U.S. at 395 (recognizing that it is "fundamental that foreign countries" confer with "one national sovereign" on immigration issues). That naturally includes authority over the statuses of noncitizens and "regulation of the conduct of an alien before naturalization." *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Thus, "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.'"

*Id*. That is all true even if there are some unconstitutional applications of the law. *See United States v. Raines*, 362 U.S. 17 (1960). In this case, however, Section 611(a) constitutionally applies to situations where noncitizens are voting in a federal election. 18 U.S.C. § 611(a).

In sum, the challenged actions here are not "contrary to the Constitution" but rather supported by both the Constitution and statute. Pls.' TRO Mot. at 29.

**b.** Aiding and Abetting. Since 18 U.S.C. § 611 represents Congress' constitutional prerogative to regulate federal elections, "a state may [therefore] not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). State action—as reflected here in California's refusal to verify whether the identified 20,000+ voters are U.S. citizens—must "give way" when it conflicts with "a considered judgment" embodied in federal law. *Arizona*, 567 U.S. at 399, 405. When a State "authorizes [persons] to engage in conduct that the federal [law] forbids, it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mich. Canners and Freezers Ass'n, Inc. v. Agric. Marketing and Bargaining Bd.*, 467 U.S. 461, 478 (1984) (citation omitted).

Just as preemption applied when state officials acted to "encourag[e] racial segregation" in violation of the Equal Protection Clause, *United States v. City of Jackson*, 318 F.2d 1, 3–4 (5th Cir. 1963), so too is it likely to apply to California's actions as to likely noncitizen voters identified by the Federal Government. Preemption also applies when local authorities are merely "passive participant[s]" in unlawful behavior. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (applying *Norwood*'s "induce, encourage or promote" principle, 413 U.S. at 465, to scenario where a local government "had essentially become a 'passive participant' in a system of racial exclusion").

That is precisely what California is doing. Its actions directly conflict with Federal law. The Federal Government notified California months ago that many noncitizens may be registered to vote there. Despite knowing that it must send vote-by-mail ballots to every registered voter, Cal. Elec. Code § 3000.5, California and L.A. County made no serious attempt to cooperate with the Federal Government or otherwise determine whether noncitizens are registered to vote.

The Federal Government then provided California with a list of over 20,000 manually reviewed individuals who DHS believes are likely noncitizens. *See United States of America v. California*, No. 26-cv-12025, Declaration of Nicholas Bartell, ECF No. 34-4. Despite being presented with such credible evidence, and despite California's (largely illusory) signature verification requirements which require it to count nearly every vote-by-mail ballot, the state refused to verify the citizenship of people included on the list. Neither did the state or county take any action whatsoever to address the threat of noncitizens unlawfully voting in a federal election. California officials are now on notice that over 20,000 California residents are highly likely to be noncitizens registered to vote and yet they are poised to tabulate the votes of those persons—even persons on the list now charged with federal election crimes.

It "is simply implausible that Congress would have" criminalized voting by noncitizens "if it had been willing to" let states "compromise [the] effectiveness" of that law by participating in its violation. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000). And California's systematic defiance of Federal law is all the more egregious because "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

Further, while a State is not required to help the Federal Government investigate and prosecute crimes, facilitating the commission of such crimes unlawfully hampers such efforts. It

is not practicable or feasible for the Federal Government to prosecute thousands, let alone tens of thousands, of individuals that two federal investigative offices have identified as likely noncitizens. That necessarily, and unlawfully, frustrates federal objectives in enforcing the law. *See Norwood*, 413 U.S. at 465.

And Plaintiffs' complaint inaccurately labels the Federal Government's request to California as an unlawful voter purge, *see* Compl. ECF No. 1, ¶¶ 49-53; the Government's request is simply to set aside ballots momentarily to allow for confirmation of citizenship and compliance with Federal (and even California State) law, *see* ECF 34-2 at 7, 13.

**c.** States' Election Powers. Moreover, the challenged actions do not impinge on states' Article I authority to prescribe the "Times, Places and Manner" of holding federal elections. The federal government seeks only to temporarily segregate unsolicited vote-by-mail ballots where there is credible evidence showing that the ballots may be tied to noncitizens; and such segregation is only to ensure an accurate vote count pending citizenship verification. The relief sought in the *California* case does not require California to systematically remove anyone from voter rolls. Instead, Defendants' narrowly requested relief seeks only to root out the fundamental unfairness of a vote cast by a noncitizen canceling a vote by a citizen. *See Anderson v. United States*, 417 U.S. 211, 227 (1974) ("Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes.").

Plaintiffs say that the government's list is inaccurate and therefore puts Plaintiffs "at heavy risk of being placed on the list of purported noncitizens." Pls.' TRO Mot. at 22. Not so. Aside from verifying that the named plaintiff and additional alleged CHIRLA member are properly *not* on the list, the Federal Government has submitted detailed declarations explaining its process for

compiling that data and why it is reliable. *See* Exhibit E; Dkt. 34-2, 34-3. Those explanations are more than enough to overcome skepticism—particularly given that California has admitted to having many noncitizens on its voter rolls in the past. *See* Mark Osborne, *1,500 noncitizens may have been registered to vote in California DMV error*, ABC News (Oct. 9, 2018), available at https://perma.cc/9RM4-THZX (California "admitted . . . a mistake caused as many as 1,500 noncitizens being registered to vote in the state[,]" which the DMV discovered only when "a Canadian citizen . . . went to the Los Angeles Times to tell them about receiving a piece of mail from the DMV saying he was registered to vote."). That number of noncitizen registered voters alone (1500) could change the outcome of an election. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98 (2000) (100s of votes); *California's 13th Congressional District, 2024*, Ballotpedia, *available at* https://perma.cc/QJ73-PR6N (187 votes). And even if that number were less, "'[t]he deposit of [fraudulent] ballots in the ballot boxes, *no matter how small or great their number*, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial.'" *Anderson*, 417 U.S. at 226 (emphasis added).

Plaintiffs also make the unsupported claim that the relevant list of noncitizen voters sent to California "is more likely to impact naturalized voters[.]" Pls.' TRO Mot. at 29. Indications thus far evince otherwise. For example, dozens of Californian noncitizen voters—all on the list—were charged with election-related crimes shortly after the list was delivered. Dkt. 34-2 at 1. And, as explained earlier, the named plaintiff here, Pedro Trujillo, along with alleged CHIRLA member Ericka Schwerdt, were both confirmed by USCIS to be naturalized citizens and were correctly not included on the list. *See* Ex. E, Bartell Decl. ¶ 8-9. Thus, Plaintiffs' stated fears surrounding voting of recently naturalized citizens are unfounded, overstated, and undermine Plaintiffs' conclusory claim that the relevant list violates the Equal Protection Clause of the Fifth Amendment.

**d.** NVRA. Finally, the challenged actions do not violate federal law prohibiting "systematically remov[ing] the names of ineligible voters from the official lists of eligible voters'" within 90 days of an election, as Plaintiffs allege. 52 U.S.C. § 20507(c)(2) ("NVRA"); *see* Pls.' TRO Mot. at 1, 27. The Federal Government is not seeking systematic or programmatic changes to any registration list or alleging that California violated the law by initially registering voters. Rather, it is about tabulating votes that California now knows likely come from noncitizens. The Federal Government seeks only standard (and temporary) ballot-handling procedures to ensure an accurate vote count pending citizenship verification. The relief sought does not require California to remove anyone from voter rolls, cancel qualified voters, or take any similar action.

And "while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, *it does not preclude States from deny[ing] registration based on information in their possession establishing the applicant's ineligibility*." *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 15 (2013) (emphasis added); *accord Arcia*, 772 F.3d at 1348 (the NVRA "does not in any way handcuff a state from using its resources to ensure that noncitizens are not listed in the voter rolls….As a result, the 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information[.]").

In fact, the Supreme Court has expressly—and recently—held that "*individualized* inquiries" into citizenship "are permitted under federal law during [the 90-day] period." *Dep't of Homeland Sec. v. League of Women Voters*, 2026 WL 2879700, at *3 (U.S. Sept. 25, 2026) (emphasis in original).[4] That is what the Federal Government is doing here as each of the 20,000

[4] Defendants also note that *League of Women Voters* concerned the use of the Systematic Alien Verification for Entitlements (SAVE) database, but that process is not at issue here. Pls.' Mot. at 6; *see United States v. California*, No. 2:26-cv-12025-DOC (C.D. Cal. October 15, 2026) (ECF

voters were manually reviewed. *See* ECF No. 34-2 at 10. To prevent the Federal Government from conducting such individualized inquiries would "inhibit[] [its] efforts to assist state and local agencies in the proper administration of the midterm elections." *League of Women Voters*, 2026 WL 2879700 at *3.

Put differently, the United States in the California lawsuit does not seek to enjoin "election rules on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (citation omitted). Far from it. The United States seeks only to force California to *conform* to federal and state election rules concerning noncitizen voting. *See* 18 U.S.C. § 611. Such relief would not cause confusion among voters or otherwise because it concerns how to handle certain ballots once cast. And California has laws and systems in place to accommodate the requested relief. *See, e.g.*, Cal. Code Regs. tit. 2, § 20363 (detailing how to resolve challenged ballots via segregation).

Consequently, Plaintiffs' claims that the Federal Government has exceeded its authority in the challenged actions fall flat and are likely to fail.

### C. Plaintiffs Cannot Establish A Risk of Irreparable Harm

Plaintiffs' motion for preliminary relief must also be denied because they do not meet their burden to establish substantial likelihood of irreparable harm. "[A] 'movant's failure to show any irreparable harm is…grounds for refusing to issue a preliminary injunction, even if the other three factors…merit such relief.'" *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see also, e.g., D.A.M.*, 474 F. Supp. 3d at 56 (The D.C. Circuit "has made clear…that an absence of irreparable injury is fatal to a plaintiff's motion" for preliminary relief.); *Taylor v.*

No. 1, n.1) ("To the best of the government's knowledge, California has not submitted any voter rolls through the Systematic Alien Verification for Entitlements (SAVE) program. Thus, USCIS' process performed here was done independent of SAVE.").

*Trump*, 788 F. Supp. 3d 1, 7-8 (D.D.C. 2025) (cleaned up) ("It is clear that a failure to show a likelihood of irreparable harm is standing alone sufficient to defeat the motion" for emergency relief.).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. For one, "the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The moving party must show the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* And of course, "the injury must be beyond remediation." *Id.* That means that even "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297-98.

First, as discussed *supra*, Plaintiffs have failed to demonstrate that they have Article III standing to bring this motion. "The irreparable-harm standard requires a more significant showing than the injury-in-fact standard." *Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*, 878 F. Supp. 2d 42, 60 (D.D.C. 2012). "Where plaintiff 'has failed to demonstrate an injury in fact sufficient to establish standing, he has also failed to demonstrate irreparable harm warranting a preliminary injunction.'" *DSCC v. Trump*, 834 F. Supp. 3d 19, 40-41 (D.D.C. 2026) (quoting *Sibley v. Alexander*, 916 F. Supp. 2d 58, 63 (D.D.C. 2013)). Here, Plaintiffs "'fail[] to carry their burden with respect to establishing that they have a substantial likelihood of standing,'" so "they have also failed to show that those injuries are 'certain enough and great enough to warrant preliminary injunctive relief.'" *Id.* at 41 (quoting *Doe v. Off. of Pers. Mgmt.*, No. 25-cv-234,

2025 WL 513268, at *4 (D.D.C. Feb. 17, 2025)).[5]

Second, even if standing were not at issue, Plaintiffs' allegations do not establish the necessary threat of irreparable harm. Plaintiffs allege that they face irreparable harm because Defendants' challenged requests "force[s] state officials to violate federal and state law, violating Plaintiff Trujillo and Plaintiff CHIRLA's members' right to vote[,]" and interference with voting cannot be remedied once an election has passed. Pls.' TRO Mot. at 30. However, as explained in detail *supra*, there is no present possibility that California's state officials will act to interfere with Plaintiffs' voting rights based on Defendants' requests. *See DSCC*, 834 F. Supp. 3d at 41 (quoting *Wis. Gas. Co.*, 758 F.2d at 674 ) ("[G]iven …that no agency has yet acted pursuant to the Order in a way that could harm Plaintiffs, they have not suffered any harm at present, much less harm that is 'certain,' 'great,' and imminent."); *id.* at 31 (quoting *Clapper*, 568 U.S. at 409) ("[T]he Supreme Court has repeatedly said that 'allegations of *possible* future injury' are not sufficient to establish injury in fact."). The indisputable fact that California is not acting on DOJ's requests also breaks the necessary causal chain for the less specific harms alleged by Plaintiffs including "interfere[nce] with the administration of the 2026 election and discourag[ment of] voting" as well as "interfere[nce] with the electoral process and risks [of] distorting the fundamental right to the franchise." Pls.' TRO Mot. at 30. In the absence of any immediate threat of the allegedly irreparable harm, Plaintiffs fail to satisfy this prong of the preliminary injunction analysis. *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019).

**D. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief**

[5] Plaintiffs' generic allegations that "threats based on the Policy are having real and concrete harms on voter participation and on organizations like CHIRLA" who are spending resources in response to the policy also fail on standing grounds. Pls.' Mot. at 30. Plaintiffs obviously do not have standing to represent the interests of the general voting population or other unrelated organizations, and they have already failed to demonstrate their own standing.

The Court need not reach the remaining preliminary injunction factors, but if it does, neither factor favors Plaintiffs' request for preliminary relief.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government has a compelling interest in combating voter fraud. *See Anderson*, 417 U.S. at 227 ("Every voter in a federal primary election…has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell*, 549 U.S. at 4. "Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Id.* "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*; *see South Carolina v. United States*, 898 F. Supp. 2d 30, 43 (D.D.C. 2012) (three-judge panel) (Kavanaugh, J.) (stating that "there 'is no question about the legitimacy or importance' of the interest in deterring voter fraud and that there is 'independent significance' in enhancing public confidence in the electoral system") (quoting *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196–97 (2008)).

As the Supreme Court has explained, "'[t]he deposit of [fraudulent] ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial.'" *Anderson*, 417 U.S. at 227. Accordingly, the government is permitted to "take action to prevent election fraud" before it has occurred. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

Congress's enactment of 18 U.S.C. § 611 reflects an express mandate to protect those interests by authorizing the Executive Branch to enforce the prohibition on noncitizens voting in federal elections. A court deciding whether to issue an injunction is not free to disregard that

legislative "order of priorities." *TVA* v. *Hill*, 437 U.S. 153, 194 (1978). "Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." *United States* v. *Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001).

Here, where Plaintiffs seek an injunction prohibiting the government from carrying out its responsibilities under a "statute[ ] enacted by representatives of [the] people," "it suffers a form of irreparable injury." *Trump* v. *CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted). The Supreme Court emphasized that point recently in staying two lower court injunctions that interfered with the federal government's ability to enhance election integrity. *See Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) (holding that the government was "likely to suffer irreparable harm" from an injunction that, *inter alia*, prohibited DHS "from trying to compile Citizenship Lists" and "deal[t] 'a serious setback' to the Executive's 'goals'"); *League of Women Voters*, 2026 WL 2879700, at *2-3 (holding that the government was "likely to suffer irreparable harm" from an order that "set aside and vacated" improvements to the DHS system that verifies citizenship and immigration status of noncitizens). Because Plaintiffs' requested injunction would similarly prohibit Defendants from taking appropriate action to ensure voter integrity in advance of the upcoming November 2026 election, those harms are irreparable. *California*, 2026 WL 2473573, at *4; *see Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.*, No. 26-5257, 2026 WL 2168004, at *1 (D.C. Cir. July 17, 2026) (finding the federal government demonstrated irreparable harm because "'there can be no do over' once the election occurs") (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).

Americans benefit from an electoral process that prevents tabulation of illegal votes. Plaintiffs' requested injunction would undermine that important goal and frustrate the purpose of

18 U.S.C. § 611 to prevent noncitizen voting. The public interest and equities strongly tip in Defendants' favor and outweigh Plaintiffs' speculative and presently non-existent injuries.

**E. The Proposed Injunction Is Vague, Unworkable, and Violates the Separation of Powers.**

In assessing whether to grant injunctive relief, the Court must consider "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citation omitted). Plaintiffs' proposed injunction is vague, unworkable, and infringes on the separation of powers.

Rule 65(d)(1) requires that "[e]very order granting an injunction" must "state its terms specifically[,]" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). As the Supreme Court has explained, "the specificity provisions of Rule 65(d) are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Instead, "[t]he Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.* After all, "[s]ince an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.; see, e.g.*, *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982).

Plaintiffs' three-part injunction violates the specificity requirements of Rule 65(d) by leaving Defendants guessing about what specific conduct would be enjoined. *See* Pls.' TRO Mot. at 3. First, Plaintiffs ask the Court to enjoin the so-called "Alleged Non-Citizen Removal Policy," but as explained above, Plaintiffs have not established the existence of any such policy. An injunction prohibiting Defendants from taking "any action under the Policy" is devoid of any substance and fails to specify what specific conduct is prohibited. *Id.* at 1, 3. Are government

officials restricted from making public statements about non-citizens voting in federal elections? May government officials communicate with state and local governments about potential voter fraud? Must the Department of Justice stop litigating the *California* case or recently filed voter fraud criminal cases in the Central District of California? Does the injunction collaterally prohibit grand jury subpoenas for voter records? Those are just a few of the myriad questions that Plaintiffs' requested injunction leaves unanswered. And Plaintiffs remarkably appear to suggest that *all* of those activities would be enjoined. *See* Pls.' TRO Mot. at 11-12 (arguing that social media posts from the President, letters sent to California state officials, and the filing of criminal charges against other people allegedly "instill fear in Plaintiffs" and cause "real and concrete harm"). Congress required "that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (discussing Fed. R. Civ. P. 65(d) regarding injunctions). Plaintiffs' proposed injunction falls well short of that standard.

Second, Plaintiffs ask this Court to enjoin Defendants from "unconstitutionally and unlawfully" seeking "to induce California election officials to undertake a 'program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters' within 90 days of the election in violation of the NVRA moratorium, specifically 52 U.S.C. § 20507(c)(2)(A))." Pls.' TRO Mot. at 3. The law already prohibits Defendants from violating § 20507(c)(2)(A), so Plaintiffs' request appears to be nothing more than a disfavored "obey-the-law injunction[.]" *Reid v. Buttigieg*, No. CV 20-1262 (TJK), 2023 WL 2184549, at *9 (D.D.C. Feb. 23, 2023). The proposed injunction also is impermissibly vague by prohibiting unspecified government actions that may, in Plaintiffs' view, improperly "induce" California officials to violate § 20507(c)(2)(A). Further, it is unclear whether and to what extent the injunction would

prohibit Defendants from communicating with California or other jurisdictions about enforcement of 18 U.S.C. § 611. Plaintiffs appear to contend that any action by the federal government to encourage California to set aside ballots from non-citizens would violate § 20507(c)(2)(A), but that is not the law, as explained above. *See League of Women Voters*, 2026 WL 2879700, at *3 (stating that "*individualized* inquiries" are "permitted under federal law during this period"). Nor have Plaintiffs presented any authority to support the astonishing assertion that the Court may prohibit the federal government from attempting to persuade a state government to comply with federal law. Such an impermissible restraint would infringe on core separation of powers and government speech principles.

Third, Plaintiffs ask the Court to order federal officials not to "impose themselves upon election administration procedures that the Constitution and federal law assign to the States, including as to: (i) applying data-base matching on the State's voter rolls; (ii) removal of registered voters from voter registration lists; (iii) issuance of ballots to registered voters; and (iv) the counting and tabulation of ballots." Pls.' TRO Mot. at 3. That similarly vague provision fails to comply with Rule 65(d). No one disputes that the federal government may not remove voters from state registration lists, issue ballots, or tabulate election results. An injunction that simply restates existing law under penalty of contempt is prohibited. *See Trump v. CASA, Inc.,* 606 U.S. 831, 858 (2025) ("[T]he Judiciary does not have unbridled authority to enforce" the Executive's "duty to follow the law."); *see also Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (holding that a court cannot fashion an injunction that abstractly commands the Secret Service to obey the First Amendment, noting that an injunction requiring party to do nothing more specific than "'obey the law' is impermissible.").

Fourth, nothing prohibits DHS from lawfully obtaining a state's voter roll[6] and reviewing it for potential aliens who are not authorized to vote in furtherance of enforcing 18 U.S.C. § 611. In this case, California's voter roster containing voter registration information is available for purchase. *See* Cal. Elec. Code § 2188. Thus, Plaintiffs' request to prohibit "data-base matching on the State's voter rolls" is overbroad and legally flawed.

Fifth, the injunction is even more problematic because of the confusing and vague request that the Court order federal officials not to "impose themselves upon election administration procedures" that Plaintiffs believe are assigned to the states. Pls.' TRO Mot. at 3. The lack of specificity about what conduct this aspect of the injunction prohibits flouts Rule 65's requirement to describe the actions prohibited by the injunction "specifically" and "in reasonable detail," Fed. R. Civ. P. 65(d)(1)(B)-(C).

Finally, Plaintiffs' proposed injunction violates the Supreme Court's decision in *CASA* by seeking universal relief not tailored to any particular Plaintiff. *See* 606 U.S. at 861 (stating that injunctive relief must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue."). For example, Plaintiffs cannot secure broad injunctive relief for all their unknown members, particularly those members who lack Article III standing in their own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-500 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."). Because "standing is not dispensed in gross," a preliminary injunction must be tailored only to those specific plaintiffs who have established standing "for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted).

---

[6] *See* Access to and Use of Voter Registration Lists, at www.ncsl.org/elections-and-campaigns/access-to-and-use-of-voter-registration-lists (summarizing state laws regarding access to voter registration lists)

As the Supreme Court emphasized, "federal courts do not exercise general oversight of the Executive Branch" and may not "prevent[ ] the Government from enforcing its policies against nonparties." *CASA*, at 859, 861. In short, Plaintiffs proposed injunction is legally unsound, practically unworkable, violates fundamental prohibitions against universal relief, and fail to specify the conduct that would be restrained.

## **CONCLUSION**

For the reasons explained above, the Court should deny Plaintiffs' motion for temporary restraining order and preliminary injunction.

Dated: October 26, 2026

BRETT A. SHUMATE
Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

ANDREW I. WARDEN
Assistant Branch Director

*/s/ Ty Turley Trejo*
TY TURLEY TREJO
Counsel to the Assistant Attorney General
United States Department of Justice
Civil Division
950 Pennsylvania Ave., NW
Washington, DC 20530
Tel: 202-532-0100
Email: Ty.Trejo@usdoj.gov

*Counsel for Defendants*