**Declaration of Dr. Barreto and UCLA Social Scientists on DHS Database Matching Errors**

1. My name is Matt A. Barreto, and I am a Professor of Political Science and Chicana/o and Central American Studies at the University of California, Los Angeles. I serve as the faculty director of the UCLA Voting Rights Project and have published numerous social science articles on the topics of complex data matching of voter information. My academic published work regularly uses state voter file databases and has pioneered research methodologies to more accurately understand information on voter files. I have authored expert reports and testified as an expert witness in dozens of matters related to voting rights issues, specifically about database matching. Attached is a copy of my CV.

2. I collaborated on this declaration with six additional social science experts at UCLA on this declaration who have decades of experience in voter file database matching: Gary M. Segura is Professor of Public Policy and Chicana/o Studies, and the former Dean of the Luskin School of Public Affairs at UCLA; Efrén Pérez, is a Professor of Political Science and Psychology at UCLA and director of the UCLA, Race, Ethnicity, Politics and Society Lab; Lorrie Frasure is a Professor of Political Science and African American Studies at UCLA; Natalie Masuoka is an Associate Professor of Political Science and Asian American Studies and currently the Chair of the Asian American Studies Department at UCLA; Chris Zepeda-Millán is an Associate Professor of Political Science, Public Policy and Chicana/o and Central American Studies at UCLA; and Michael B. Rios is Senior Data Scientist at the UCLA Voting Rights Project.

3. As social scientists, we have collectively performed hundreds of large-scale analyses of voter data, including database matching analysis. These analyses have been published in the leading journals in their fields (e.g. The American Political Science Review, Sociological Methods & Research) and have been provided as testimony in, and accepted as reliable by, both federal and state courts. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 662 (S.D. Tex. 2014); *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1059 (D. Kan. 2018); *Brakebill v. Jaeger*, No. 1:16-CV-008, 2016 WL 7118548, at *4 (D.N.D. Aug. 1, 2016).

4. I have reviewed documents related to this matter, including 1) the Declaration of Nicolas Bartell in *United States of America v. State of California, et al.;* 2) the Declaration of Eric McLoughlin in *United States of America v. State of California, et al*.; and 3) the Order Granting Preliminary Injunction in *California Nurses Association, et al., v. Markwayne Mullin, et al* and others. Based on my review of these documents and my expertise as a social scientist, I am of the opinion, based on the limited information that the federal government has released, that database matching system utilized by the Department of Homeland Security (DHS) is at high risk of mislabeling citizen voters and citizens. Decades of well-established social science practice and research support my opinion. Should the federal government continue with their current practices or target voters based on their database matching, large numbers of eligible voters are at risk of being targeted and misidentified as noncitizens.

**I. Analysis of Defendants Declarations in *U.S. v. State of California et al*.,**

5. I reviewed four documents describing the general process by which the Department of Homeland Security (DHS) identifies "noncitizen" voters for inspection, removal from state voter rolls, and possible investigation for further criminal violations. The documents are: 1) the Declaration of Nicolas Bartell in *United States of America v. State of California, et al*.; 2) the Declaration of Eric McLoughlin in *United States of America v. State of California, et al*.; the Declaration of Kassra Oskooii in *United States of America v. State of California, et al.*; and 3) the Order Granting Preliminary Injunction in *California Nurses Association, et al., v. Markwayne Mullin, et al*.

6. All four documents underscore the ambiguity in the DHS data matching process and the potential for false matches. In my review, I identified oversights and unclear methods in the documents that warrant further investigation. These issues that I identified are ones uncommon in work by any ordinary data or social scientist because standard practice in working with large swathes of government administrative data requires transparent, reproducible documentation to ensure thoroughness and accuracy.

7. As both McLoughlin's and Bartell's declarations state, the process begins with the Fraud Detection and National Security Directorate (FDNS) within U.S. Citizenship and Immigration Services (USCIS). Given that, I will begin with the Bartell declaration.

**<u>Declaration of Nicolas Bartell</u>**

8. Nicolas Bartell is the Associate Director of the FDNS, a role he assumed in July 2026. In his declaration, he claims the FDNS receives official statewide voter file records from the DHS and reviews them for potential noncitizens who unlawfully registered to vote or voted in a federal election. They then flag these individuals and send them to Homeland Security Investigations (HSI) for further review. Bartell claims that the FDNS and the USCIS conduct "extensive data analysis" of these rolls and information to identify and match such individuals.

9. He also claims that the FDNS receives statewide voter files containing "information about the listed individual such as name, mailing address, date of birth or age, social security number, phone number, email, registration information, voter-history information, and more." He adds that USCIS "enhances" the voter data using a "reliable third-party data analytics" and "investigative platform." USCIS then combines the "enhanced" voter records and "pairs" them with an internal USCIS alien number. USCIS then scores and ranks potential identity matches because the resulting data may be "incomplete, outdated, or mismatched." Several issues arise from these statements, I will explain each in turn

10. First, Bartell never discloses which third-party source he used to enhance the voter data. He also does not identify the investigative platform or say whether it is available for purchase or

proprietary to USCIS. Without knowing the source, it is impossible to verify or validate the accuracy of these lists. In social science and data science, source transparency is of the utmost importance.

11. Second, Bartell never explains how the data analytics provided by the third-party source "enhances" the voter records, which already contain sensitive information, including a voter's name, address, date of birth, and place of birth; The use of the vague term provides little information on how, if at all, the voter record data is actually being improved for use of data matching.

12. Third and most importantly, Bartell glosses over one of the most difficult aspects of working with different data sources: record matching. Bartell could address many concerns by disclosing which specific pieces of information are used to match a voter record to an internal USCIS alien number. As discussed above, a voter record and other databases are prone to common errors; names may be misspelled, shortened, changed after marriage, or entered differently across databases. Addresses change, dates may be formatted differently, and variations in capitalization, punctuation, and spacing can also cause problems. Potentially thousands of people in California alone share the same first and last names and dates of birth but are different individuals. A similar name, birth year, or address cannot establish that two records belong to the same person. No information is provided explaining how this is accounted for. Instead, Bartell explains that the resulting unified database may contain records that are incomplete, outdated, or mismatched. Rather than acknowledge the limits of matching records across sources, USCIS ranks the most complete matches that serve its purposes.

13. Bartell claims that the FDNS received the California voter file on May 8, 2026, and processed it as outlined. He noted that the FDNS analyzed the original file and then "enhanced the data with third-party data." Once again, he overlooked the transparency needed when working with data, failing to identify the data source or explain how the data was enhanced.

**<u>Declaration of Eric McLoughlin</u>**

14. Eric McLoughlin is the Assistant Director for the Cyber and Operational Technology section at Homeland Security Investigations (HSI), a role he assumed in July 2026. In his declaration, McLoughlin describes the same data–transfer process: HSI obtains the statewide voter files and sends them to FDNS to "enhance" the voter file. He clarifies how the matching works, stating that the resulting voter profiles matched to DHS noncitizen records include: "name, mailing address, date of birth or age, social security number, phone number, email, registration information, voter-history, and more." He adds that "the more data identifiers that match, the higher the confidence it is that individual." This is alarming because, as noted earlier, matching records is extremely difficult: names, addresses, phone numbers, emails, and other identifying information can change over time. It also underscores that the DHS process is not designed to guarantee a complete match, but instead to match as

many identifiers as possible. Using multiple identifiers is only helpful if they contain a unique key to match records, and they are from reputable scientific sources.

15. McLoughlin adds that after FDNS completes its analysis, HSI conducts an additional quality-control review that "consists of identifying duplicate entries, incomplete records, inconsistent formatting, missing identifiers, and other data quality issues." This again highlights the limitations of the database matching system DHS uses. Rather than acknowledge that duplicate, incomplete, and inconsistent records limit their work, officials ignore these shortcomings and proceed with whichever records contain enough identifiers to warrant further investigation by immigration officers. The so-called "quality-control review" does nothing to assess validity or accuracy. According to reporting in the New York Times,[1] the lists HSI provided to at least one county in California, was not even for the correct county, calling into question: was any quality-control review ever performed?

16. He also reveals that the "reliable third-party data analytics" Bartlett said the FDNS uses refers to "third-party commercial data." Commercial data typically consists of consumer information that links official voter records with details gathered from sources such as online shopping histories, store reward programs, magazine subscriptions, e-applications, and public survey sites. It may be used to estimate a voter's income, property value, and education level. It can also supply missing cell phone numbers and email addresses collected through commercial marketing activity. But to be clear, these third-party commercial data sources are not required to be official, legal or accurate. Given this revelation, and the fact that anyone can purchase commercial data, it is unclear why DHS has kept secret the sources it used and the information appended to the data. This was the "enhanced" data used to flag more than 20,000 (and counting) California voters as noncitizens. Yet according to an analysis by Los Angeles County deputy registrar of voters, many individuals on the so-called "enhanced" list were U.S. born citizens – not even immigrants.

17. Finally, one more point must be made. As Bartell's and McLoughlin's declarations explain, the Fraud Detection and National Security Directorate (FDNS) at U.S. Citizenship and Immigration Services (USCIS) is primarily responsible for "enhancing" statewide voter files before turning its "analysis" over to Homeland Security Investigations (HSI). Although the process is ambiguous, it is clearly complex: it involves data transfers, record matching across several unique databases – including third-party, non-governmental databases – and an unknown ranking system based on identifiers.

18. Given the complexity of this process and his responsibilities as Associate Director of the FDNS, Bartell is presumed to have extensive experience in data analytics and social science research. He holds a bachelor's degree in history and a juris doctor. Since 2008, his experience has consisted of supportive, supervisory, and leadership roles in immigration field offices. Although his career has followed a positive trajectory, his experience, education, and

---

[1] "It's not our voters that were listed," said Katrina Bartolomie, the Mendocino clerk-recorder. "It's from another county." https://www.nytimes.com/2026/10/23/us/justice-dept-california-noncitizen-voters.html

training do not indicate any substantive training in data analytics or computer systems. Managing employees and offices is very different from managing large population databases. In seven paragraphs, Bartell describes a complex process for removing individuals from registered voter rolls for review for possible criminal charges. A traditional data scientist or research scientist might conclude that Bartell is either being intentionally opaque in his declaration to withhold information or does not understand the process because of his limited analytical background.

19. While most of the voter file "enhancement" is performed by the FDNS, HSI also performs a distinct analysis and quality control review. McLoughlin, Assistant Director of the Cyber and Operational Technology section adds in his declaration that "HSI's processing adds value by applying consistent quality controls and enrichment processes before voter records are disseminated as investigative referrals or routed for another authorized purpose."

20. He describes his role as "leading operational technology and systems-development functions that support investigative, analytic, and operational activities." Given these responsibilities, it is reasonable to assume that he has extensive experience in cybersecurity education and training, as well as a strong background in computer science. He does not. McLoughlin holds a bachelor's degree in criminal justice and a Master of Business Administration (MBA). He has impressive experience in several roles and has advanced steadily in law enforcement with U.S. Customs and Border Protection and HSI. However, nowhere in his experience, education, or training does he describe a background in work relevant to overseeing a complex process that analyzes tens of millions of individual records. Nor does he appear to have the experience to understand what his office should be looking for when implementing quality control measures, as he states.

21. After reviewing both declarations, while impressed by Bartell's and McLoughlin's careers, they are not data science experts at all. Both have extensive law enforcement and fieldwork experience and demonstrate a commitment to immigration enforcement. Unfortunately, that experience does not prepare them to oversee a complex, sensitive record-matching process with significant real-world consequences for voters and naturalized Americans. Neither declaration clearly explains the process, and I have sincere questions about their understanding of it.

**Order Granting Preliminary Injunction in California *Nurses Association, et al., v. Markwayne Mullin, et al.***

22. The Order Granting Preliminary Injunction in *California Nurses Association, et al., v. Markwayne Mullin, et al.*, helps clarify the ambiguous process described in both declarations. The document indicates that the "investigative platform" Bartlett likely meant is a software system called "iLab," which uses "unknown artificial intelligence tools to ingest data from various systems and create a compiled list of individual profiles." This suggests that the "technical and analytic experts" McLoughlin mentioned in his declaration are likely not manually joining data in software traditionally used by data scientists and research scientists.

23. The Order also claims that HSI conducts “field interviews, or interrogations about voter eligibility,” which are “expressly designed to resolve the discrepancies” in the flawed records and matching process USCIS uses to produce the target lists. As noted several times, record matching is a sensitive process, and analysts cannot verify the duplicated, incomplete, and inconsistent records solely utilizing the processes described by Bartlett and McLoughlin in their declarations.

24. All three documents reveal serious, fundamental flaws in DHS's process for matching voter records with noncitizen records. There is a type of secrecy around the DHS process, particularly in Bartlett’s declaration, that is not accepted scientific practice of data scientists, analysts, and research scientists. This is especially concerning for the third-party data-enrichment source, which turned out to be commercial data likely available to any consumer. These third-party commercial sources do not collect citizenship status information, and they cannot be used to verify an individual’s legal identity, let alone their eligibility to vote.

25. The DHS also cannot explain exactly which identifiers it uses to match records. In both declarations, Bartlett and McLoughlin list identifiers used for matching but end the list with “and more.” Trained analysts should be able to provide a complete list of the identifiers they are trying to match. This ambiguity is alarming because the DHS may be using unknown AI tools, and its analysts may not understand which identifiers are being used or what process is being followed. Neither declaration does much to restore confidence. Moreover, the underlying matching process produces inconsistent and incomplete records, yet DHS disregards those records in favor of matches it considers sufficient to justify interrogating voters in person.

26. We also reviewed three documents filed after the Plaintiff’s response in *United States of America v. State of California*: (1) the Declaration of Nicolas Bartell Regarding Dean Logan’s Sample List; (2) Declaration #2 of Nicolas Bartell in Support of the United States' Ex Parte Application for Temporary Restraining Order and the Order to Show Cause Why a Preliminary Injunction Should Not Issue; and (3) Declaration #2 of Eric McLoughlin in Support of the United States' Ex Parte Application for Temporary Restraining Order and the Order to Show Cause Why a Preliminary Injunction Should Not Issue.

**<u>The Declaration of Nicolas Bartell Regarding Dean Logan’s Sample List</u>**

27. Bartell claims that USCIS creates the merged database of Los Angeles County's Sample List matched to the DHS List and adds two columns to the sample list: “USCIS Country of Birth (COB)” and the “voter roll Place of Birth.” This redundancy points to a more troubling pattern: FDNS consistently disregards voters’ self-reported information in favor of third-party data enhancement. The California voter file already contains place of birth and does not require additional birthplace external data.

28. His declaration continues to contain significant inconsistencies and ambiguities that are inconsistent with proper data analyst handling of sensitive voter information. On page 9

(Document 107-1), Exhibit C shows FDNS renaming self-reported columns in the California voter file, including “VoterProvidedDOB,” “VoterProvided,” and “VoterProvided.” The labels for the last two columns are cut off in the exhibit production, and Bartell does not explain what either column means. These columns further indicate that DHS does not consider voter file data reliable and relabels columns, replacing their original names with ones containing “VoterProvided.”

**Declaration #2 of Nicolas Bartell in Support of the United States' Ex Parte Application for Temporary Restraining Order and the Order to Show Cause Why a Preliminary Injunction Should Not Issue**

29. In his second declaration, Bartell offers more detail about the “extensive data analysis” his office uses to identify and match potential noncitizen voters. The key revelation is that USCIS “enhances” voter data using “Lexis Nexis’s Accurint Service (Accurint).” Although Bartell describes how Accurint supposedly enhances voter files, he remains ambiguous about the software or service and how it is used. The company and service are easy to find through a simple search of the Lexis Nexis website.[2] A closer look at Accurint reveals this disclaimer at the bottom of its homepage:

> “The Accurint® services are not provided by “consumer reporting agencies,” as that term is defined in the Fair Credit Reporting Act (15 U.S.C. § 1681, et seq.) (“FCRA”) and do not constitute “consumer reports,” as that term is defined in the FCRA. Accordingly, the Accurint service may not be used in whole or in part as a factor in determining eligibility for credit, insurance, employment or for other eligibility determination purposes that would qualify the service as a consumer report under the FCRA”

30. If Accurint itself discourages users from relying on information provided through its services to determine eligibility for credit, insurance, or employment, why should it be considered a reliable third-party resource for determining voter eligibility and citizenship status? On the Accurint for Government tab of its website, the company describes its services as “a point-of-need investigative solution that enables government agencies to locate people, detect fraud, uncover assets, verify identity, perform due diligence and visualize complex relationships.” At the bottom of that page, the same disclaimer mentioned above appears, followed by several additional sentences about Accurint for Government services:[3]

> “…Due to the nature of the origin of public record information, the public records and commercially available data sources used in reports may contain errors. Source data is sometimes reported or entered inaccurately, processed poorly or incorrectly, and is generally not free from defect. This product or service aggregates and reports data, as provided by the public records and commercially available data sources, and is not the source of the data, nor is it a comprehensive compilation of the data. Before relying on

---

[2] https://www.lexisnexis.com/pdf/LexisNexis_Accurint-for-Legal-Professionals_Overview.pdf (page 2)
[3] https://www.lexisnexis.com/pdf/LexisNexis_Accurint-for-Legal-Professionals_Overview.pdf (page 2)

any data, it should be independently verified. LexisNexis, the Knowledge Burst logo, LexID and the LexID logo are registered trademarks of RELX Inc., used under license. Other products and services may be trademarks or registered trademarks of their respective companies."

31. Once again, Accurint warns users that their data may contain errors because of poor or incorrect processing and should be independently verified. In this case, the DHS's chosen method of independent verification is to send HSI field officers to interrogate naturalized citizens individually.

32. Because Bartell and DHS do not reveal much about their use of LexisNexis, we went deeper to understand the accuracy and potential errors in such a large commercial database. Legal analysts [4] have concluded "Errors in LexisNexis reports are more common than many realize. With billions of records being merged from thousands of sources, mistakes can easily occur." According to an extensive analysis[5] of how LexisNexis collects, aggregates and merges records the database is prone to extensive errors:

> "LexisNexis aggregates data from thousands of public and private sources including court records, regulatory filings, news archives, and third-party data vendors. Errors enter the system through multiple pathways: data entry mistakes during court record digitization, algorithmic merging of records belonging to different people with similar names, incorrect association between individuals and corporate entities, adverse media articles that misidentify the subject, and outdated information that was never updated after a court decision, regulatory clearance, or name change. The consequences of false information in LexisNexis are immediate and severe. Banks screen every new client and periodically re-screen existing clients. A false adverse entry discovered during periodic screening can result in account closure of a longstanding customer relationship — with no advance notice and no opportunity to respond before the decision is made."

33. Bartell continues his declaration by claiming that USCIS "isolates the following data fields from the California voting records and sends them to Accurint: First Name, Middle Name or Initial, Last Name, Street Address, City and State." Several aspects of this claim are troubling. First, Bartell omitted identifiers, such as date of birth, that could further distinguish individual voters. Second, the public voter file provided by California has no single street address column. The California Secretary of State's "Voter Registration Information File Request" webpage links to a PDF titled "VoteCal PVRDR File Layout," which lists all columns provided in response to a public request. Street address may comprise up to nine columns: "AddressNumber," "HouseFractionNumber," "AddressNumberSuffix," "StreetDirPrefix," "StreetName," "StreetType," "StreetDirSuffix," "UnitType," and "UnitNumber." Bartell does not explain which of these columns are used, or whether all of

[4] https://checkrlawsuit.com/blog/lexisnexis-clue-dispute
[5] https://sanctionslawyers.net/reputation/lexisnexis-false-information/

them are used. Given that FDNS excluded unique identifying columns in favor of casting a wider net in its data-enhancement analysis, it is possible that it selected only the street name.

34. Using a similar publicly requested California voter file, extracted on June 3, 2026, we examined common names and street addresses to assess how likely the FDNS was to falsely match individuals using those columns. In Los Angeles County, 900 first-, middle-, and last-name combinations occur more than 50 times. Meaning 900 sets exact name matches occur at least 50 times. For example, 250 individuals in the county are named "David Garcia" with no middle name. Narrowing the lookup further, we found more than 20,000 combinations of first, middle, and last names, street name, city, and state that occur more than once. For example, four voters named "Adrian Ramirez" live on "Colden" street in the City of Los Angeles. Countless additional duplicates can be found in Los Angeles, a county of 5.8 million registered voters with numerous voters having common names such as "Daniel Hernandez" and more. This matters because that was the only information FDNS isolated before sending it through Accurint to add information about Social Security numbers and dates of birth.

**<u>Declaration #2 of Eric McLoughlin in Support of the United States' Ex Parte Application for Temporary Restraining Order and the Order to Show Cause Why a Preliminary Injunction Should Not Issue</u>**

35. Eric McLoughlin's second declaration is brief. He states its purpose is to confirm that the voter file DHS received came from the California Secretary of State's Office, and attaches an email as an exhibit to support that claim. This reveals a major disconnect between Homeland Security Investigations (HSI) and the analysis conducted by FDNS. DHS claims they started with an official California voter file. The concern is the "extensive data analysis" FDNS performed on the file before returning it to HSI. McLoughlin appears largely unaware of, and unconcerned about, FDNS's work, even though he previously stated that his office is responsible for final quality control of the list it receives. He provides no further details about the quality control measures in place at HSI.

## II. Larger Concerns with Data Matching of Large-Scale Government Records

36. The Department of Homeland Security various database matching programs are rife with error. Decades of well-established social science practice and research confirms this. Should the Federal Government continue with their current practices of targeting voters based on their non-scientific database matching, thousands of eligible voters across the country run the risk of disenfranchisement. In this declaration we seek to provide this Court with important context. We highlight the fundamental flaw in DHS and similar databases and dispel the claims of heightened accuracy stated without evidence by DHS.

37. In the fields of law, computer science, and social science, the limitations of large-scale databases and data matching have been known for years. The Department of Homeland Security's (DHS) use of database matching ignores these flaws and even expands them.

While DHS *claims* to have modified and enhanced their system's ability to process names, these are unqualified assertions by non-experts in database matching. The reality is their numerous systems do not follow best practices in data science.

38. Such inaccuracies have existed in other matching systems utilized by DHS, who continually fail to prioritize data system improvement and methodology. This starkly contrasts another federal agency, the United States Census Bureau (Census Bureau) who regularly studies, publishes, and improves on methods of accurately maintaining and matching large scale government databases. Large-scale database matching is a complex, multi-faceted science, one that requires careful methodology and safeguards to ensure accuracy. DHS' hastily put together system lacks these. Not only is their system hastily constructed, they seem to keep changing the name and hiding the actual system they use.

39. It is common knowledge in the social sciences that large scale data matching can be dangerously unreliable, absent proper safeguards and methodology. Numerous studies illustrate the difficulty of performing such comparisons and achieving reliable results when dealing specifically with voter registration lists and like records.

40. To start, voter registration databases themselves can be prone to inaccuracies due to typos, omissions and the like.[6] The breadth of these errors expand when combining data from different sources, which themselves are collected and recorded using their own unique processes and standards. A 2006 report illustrated the problem thusly:[7]

**The Problem(s) with Matching: Examples of Potential Database Errors**

**Name of Registrant**

| Source of Error | On Voter Registration Form | In Database |
|---|---|---|
| Typos | Pierce | Peirce or Pearce or Perce or Pierrce |
| Transliteration | Mohammad | Muhammed |
| Marriage | Mary Pierce (née Owens) | Mary Owens or Mrs. Martin Pierce |
| Nickname | Sam Pierce | Samuel Pierce |
| Transposed field | Bao Lu | Lu Bao |
| Double names | "Mary Ann" (first) "Pierce" (last) | "Mary" (first") "Ann" (middle) "Pierce" (last) |
| Hyphenated name | "Mary" (first) "Owens-Pierce (last) | "Mary" (first") "Owens" (middle) "Pierce" (last) |
| Punctuation | al-Amin | al Amin |

**Date of Birth**

| Source of Error | On Voter Registration Form | In Database (Voter, DMV and/or SSA) |
|---|---|---|
| Typos | 01/03/05 | 02/03/05 or 1/00/05 or 1/03/05 or 11/03/05 |
| Transposed field | 01/03/05 | 03/01/05 or 05/01/03 |
| Invented default | 01/03/05 | 01/01/05 (submitted only as January 2005) |

---

[6] Wendy R. Weiser, et al., *Making the List: Database Matching and Verification Processes for Voter Registration*, BRENNAN CENTER FOR JUSTICE (March 24, 2006) at 4, https://www.brennancenter.org/our-work/research-reports/making-list-database-matching-and-verification-processes-voter
[7] *Id.*

41. The same study warned of possible disenfranchisement on a mass scale if one were to rely solely on this type of data matching.[8] And even "the most sophisticated matching technologies—which are not being used in most states—will leave many eligible voters unmatched."[9]

42. Countless other studies have agreed. Working with election officials in Idaho, computer and political scientists agreed that efforts to match external data to voter registration databases are rife with "various anomalies such as missing values in the required fields, abnormal age entries, unspecified gender types, non-unique driver's license numbers, and formatting errors."[10]

43. Data matching experts Stephen Ansolabehere & Eitan D. Hersh, who have testified in countless voting cases on this issue, similarly reiterated the ability of such errors to add up over multiple databases, noting, "[e]ven when the incidence of key-punching errors is low, the probability of at least one error in a series of multiple indicators is not trivial."[11] Identifiers such as Social Security Numbers are not immune to such errors; as Ansolabehere and Hersh point out, "SSN9 fields sometimes contain 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, 123456789 or 999999999, which are invalid SSN9s."[12]

44. Several other social science reports expand on the effects such database errors have on accurate matching. Political and data scientists Ted Enamorado, Benjamin Fifield, and Kosuke Imai note a common problem where "a unique identifier that unambiguously links records is often unavailable, and data may contain missing and inaccurate information."[13] The results of this problem is severe, especially for large-scale administrative models, and "deterministic merge methods cannot quantify the uncertainty of the merging procedure and instead typically rely on arbitrary thresholds to determine the degree of similarity sufficient for matches."[14] The results "fail to account for the uncertainty of the merging procedure, yielding a bias due to measurement error."[15] Indeed the DHS has admitted that they do not have a unique identification key available in their countless third-party commercial databases, nor do they have a unique identification key common across internal government databases that can be matched to a state voter file.

---

[8] *Id.* at 5.
[9] *Id.*
[10] Nahid Anwar, et al., *Detecting Anomalies in Voter Registration Data*, 25(2) ELEC. L. J.: RULES, POL., AND POL'Y 113, 113 (2026).
[11] Stephen Ansolabehere & Eitan D. Hersh, *ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name*, 4(1) STAT. AND PUB. POL'Y, 1, 4 (2017).
[12] *Id.*
[13] Ted Enamorado et al., *Using a Probabilistic Model to Assist Merging of Large-Scale Administrative Records*, 113(2) Am. Pol. Sci. Rev., 353, 353 (2019).
[14] *Id.*
[15] *Id.*

45. In yet another example, statisticians Zhenbang Wang and Martin Slawski collaborated with U.S. Census Bureau data scientist Emanuel Ben-David, and describe another issue regarding integration of different sources of data, stating:

> [A] rather common scenario in data integration problems in which different pieces of information about a shared set of entities reside in multiple data sources that need to be combined in order to perform a given data analysis task. The process of identifying matching parts across two or more files is often far from trivial in the absence of unique identifiers, and has thus grown into a vast and active field of research known as *record linkage*.[16] (internal citation omitted)

46. Legal challenges involving voting rights issues have similarly found database matching inaccurate. *See Fair Fight Action, Inc. v. Brad Raffensperger*, 593 F. Supp. 3d 1320, 1330-1331 (N.D. Ga. 2021) (Where Plaintiff's expert testified that "an individual can be flagged for verification failure even for 'a minor mistake on a registration form, such as a one-character difference in spelling or spacing in a name, an apostrophe, a misplaced hyphen or a typographical error,'" and a representative of the Georgia Secretary of State testified to a social security match process error rate of "20 or 30 percent"); *Fish v. Kobach,* 309 F. Supp. 3d 1048, 1085 (D. Kan. 2018) (Plaintiffs' expert Dr. Hersh finding that that "the number of purported incidents of noncitizen registration found by Defendant is consistent with the quantity of other low-incidence idiosyncrasies in [statewide voter registration database] and in voter files more generally, and is suggestive of administrative errors."); *Arcia v. Sec'y of Fla*., 772 F.3d 1335, 1341 (11th Cir. 2014) (Finding standing of naturalized citizens in a case challenging Florida's removal of suspected noncitizens from voter rolls, as "there was a realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process."); *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1176 n.5 (11th Cir. 2008) (Barker, J., dissenting) ("The matching scheme in itself is problematic because of the numerous administrative and technological barriers, such as computer glitches or human error that make the possibility of non-matches for qualified voters a strong possibility.")

47. Social science has developed methods to produce reliable approximate quantifications of a characteristic among individuals listed in data sets. On example of this is comparison of the voter roll with driver's license databases. In cases where experts have been called on to perform this type of large-scale data matching, they have done so using extreme care and scientific protocol to ensure maximum accuracy. Even then the reliability of these methods extends only so far as the top line number of matches or mis-matches. If used to personally idented and target individuals for investigation, it would also likely flag false positives. For example, when matching multiple databases to determine voters who might lack a specific identification required to vote, plaintiffs expert Stephen Ansolabehere, performed a detailed

---

[16] Zhenbang Wang et al., *Regularization for Shuffled Data Problems via Exponential Family Priors on the Permutation Group*. 206 (2023), at 1 https://proceedings.mlr.press/v206/wang23a/wang23a.pdf.

scientific process. He first "scrubbed" the voter registration list, removing inactive, duplicate, relocated, deceased or otherwise exempt voters using algorithms specifically designed to consider common errors in spelling and naming conventions found in these lists. *Veasey v. Perry*, 71 F. Supp. 3d 627, 659-60 (S.D. Tex. 2014). Another expert confirmed these results utilizing a similar method and both "had to write codes so that the fields of the respective databases were compared correctly, even though the databases were formatted differently." *Id*. The reviewing court placed value on the techniques of "coding and algorithms used in the matching methodology that were consistent with the demands of the scientific field." *Id*. Not only is the process scientific, but it must be transparent and replicable. In the case of DHS they have not revealed any of their methods, essentially telling the court, just trust us.

48. As demonstrated, social scientists and statisticians with years of training have published repeatedly on the complex issues that arise when performing the task that DHS non-scientists claim to do. To be clear, voter file and voter registrations are not so inaccurate that the lists themselves are useless for their purpose, nor do they lack any value for research and legal cases involving voting rights.[17] However, these lists must be used with care, utilizing the latest techniques of data science, statistics and computer science, that have been constantly studied and improved over the past few decades. This is *especially* the case when attempting to *exclude* someone from their right to vote.

49. What is dangerous is handling voter lists, or any large swathes of personal and governmental databases in a way that boasts accuracy but ignores proper science and methodology; that prioritizes output over accuracy and that runs the risk of labeling someone as a criminal in the event of even the smallest of errors; that is exactly what DHS is doing with their erroneous database matching. The federal agencies have provided little factual evidence that the newest system is today *more accurate*, or even accurate at all. There is no indication that there have been attempts to validate, clean or update the accuracy of the various databases that DHS searches. Indeed, if anything a declaration from a database manager for Los Angeles County reported that in a random analysis of 200 records provided to them by DHS, a majority were not voters and a very large share were U.S. born citizens. This stunning account is exactly what decades of data science research has reported, that database matching is a complex process that needs to be handled with care, and validated before moving for widespread deployment.

50. An examination of DHS practices regarding maintenance and use of large-scale databases compared to that of another entity responsible for large scale data matching, the U.S. Census

---

[17] The work of Dr. Stephen Ansolobehere referenced in this declaration is just one of many examples of how this data can be properly used. Recognizing limitations of and errors present in databases, including voter lists, he and others created an algorithm to minimize the effect of these common issues and heighten accuracy of matching. See *Veasey v. Perry*, 71 F. Supp. at 659-60 *and* Stephen Ansolabehere & Eitan D. Hersh, *ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name*, 4(1) Stat. and Pub. Pol'y, 1, 1-8 (2017). Indeed, almost all other social scientists referenced in this paper, as well as we have conducted and published peer reviewed research describing methods in minimizing error in the type of matching discussed here.

Bureau, provides insight into the lax attitudes that likely went into the creation and use of database matching within the DHS.

51. Published research has documented that DHS databases are unreliable for matching specific individuals. DHS records often pull together a combination of private, commercial, and government databases which are regularly inconsistent, and not up to date.[18] Large-scale data collection by federal agencies can be prone to error, with experts noting specifically that within DHS databases a "reasonable fraction of the data in their files will be the result of inaccurate and faulty matches."[19] Indeed, large databases managed and gathered in pursuit of homeland security "depend heavily on matching and record linkage methods that intrinsically are statistical in nature, and whose accuracy deteriorates rapidly in the presence of serious measurement error."[20]

52. More recently, DHS attempted to compile large databases through the short-lived implementation of data analysis and information sharing Repository for Analytics in a Virtualized Environment platform better known as RAVEn.[21] Through this program DHS would "ingest data from tens of thousands of sources, then make it searchable, shareable between agents, and graphable by values like time and place."[22] However, despite data coming from a wide array of sources, such data was not required to be verified for accuracy.[23] This system fell into disuse and was described as "atrocious" and as hindering, rather than helping, investigations.[24]

53. This failure illustrates DHS' pattern of problematic implementation of complex technological systems. Those close with the agency note that "developing or changing IT systems at ICE

---

[18] Professor Huimin Zhao from the University of Wiconsin, Milwaukee opined on the likelihood of error in situations like this: "consider an example of two security-related databases owned by different organizations. They contain several common attributes and overlapping records, though they also include discrepancies and data errors." Huimin Zhao, *Semantic Matching Across Heterogeneous Data Sources* 50 COMMC'N OF THE ACM. RSCH. AND ADVANCES (2007) 45, 46. Zhao expanded on this, noting "[m]ost operational databases include wrong data, spelling errors, and different abbreviations. Human names are often misspelled, mistaken for similar-sounding names (such as Keafer and Keefer), or substituted with nicknames (such as Andy and Andrew)." *Id.* at 47.

[19] STEPHEN E. FEINBERG, *Homeland Insecurity: Data Mining, Privacy, Disclosure Limitation, and the Hunt for Terrorists*, *in* TERRORISM INFORMATICS: KNOWLEDGE MANAGEMENT AND DATA MINING FOR HOMELAND SECURITY. Eds. 205 (Hsinchun Chen, et al.) (2008).

[20] *Id.* at 213.

[21] Mary Pat Dwyer & Rachel Levinson-Waldman, *A Realignment for Homeland Security Investigations,* Brennan Center for Justice (June 29, 2023) at 12-13, https://www.brennancenter.org/our-work/research-reports/realignment-homeland-security-investigations (*quoting* Caroline Haskins, *Google, Amazon, and Microsoft Have Taken Advantage of a Commonly Used but Little-Known Tool to Quietly Enter Dozens of Contracts with ICE and CBP*, Business Insider (Oct. 4, 2021).

[22] *Id.* at 13.

[23] This was consistent with other reports that conclusions that Homeland Security Investigations would produce memos targeting and labeling immigrants as gang members based on "speculative evidence, such as unverified information drawn from state and local gang databases, which can contain false and inaccurate information." *Id.* at 6.

[24] Lindsey Wilkinson, *'Atrocious' tech hurt ICE investigation branch efforts to counter fentanyl influx*, FedScoop (Aug. 25, 2026), https://fedscoop.com/ice-hsi-technology-fentanyl-investigation-inspector-general-report/

and DHS has long been an arduous, slow process."[25] And that despite an influx of funding the agency lacks "a focus on good governance and genuine systems improvement."[26] An inspector agreed, recommending that DHS when dealing with such vast tools, "develop and implement a process that evaluates capabilities of tools prior to deployment…"[27]

54. An examination of the U.S. Census Bureau shows a contrasting approach to large databases matching. Comparison of the two agencies provides a shocking glimpse into the truly lackadaisical approach DHS has taken in managing their databases. The Census Bureau has pioneered extensive research on database matching. Even so, in contrast to DHS boasting about the accuracy of their systems, the Census Bureau acknowledges that, despite methodological advances, matching and record linkage remains an area prone to error and imprecision.[28] While non-scientists at DHS claim their system is highly accurate, highly credential data scientists at the Census Bureau rightfully acknowledge the process is not accurate, at least down to the individual level.

55. The Census Bureau maintains its own matching system called *BigMatch*, one of the most accurate data matching systems to date.[29] After the creation of this system, the Census Bureau continued to work to improve methodology.

56. For example, by utilizing a new method in record matching proposed by expert statisticians involving partitioning accounts meant for matching, the Census Bureau was able to improve accuracy and streamline the process.[30] The Census Bureau continues to build on this and

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] Record Linkage is defined by the Census Bureau as "the means of combining information from a variety of computerized files." WILLIAM E. WINKLER, U.S. CENSUS BUREAU, OVERVIEW OF RECORD LINKAGE AND CURRENT RESEARCH DIRECTIONS (2006), https://www.census.gov/library/working-papers/2006/adrm/rrs2006-02.html. Other sources sometimes use the term interchangeably with data matching. *See* Olivier Binette & Rebecca C. Steorts, *(Almost) All of Entity Resolution,* STAT.ME (2022) at 6 ("Record linkage is broadly used in the literature and refers to merging together multiple databases and removing duplicate records across the databases."); *see also* Zhenbang Wang et. al., *Regularization for Shuffled Data Problems via Exponential Familyy Priors on the Permutation Group,* 206 PMLR 1 (2023) ("The process of identifying matching parts across two or more files is often far from trivial in the absence of unique identifiers, and has thus grown into a vast and active field of research known as record linkage"). For the purposes of this declaration, we refer to record linkage generally as a necessary tool and step for accurate matching analogous to that necessary for DHS systems.
[29] *See* U.S. CENSUS BUREAU, RECORD LINKAGE & MACHINE LEARNING (2026), https://www.census.gov/topics/research/stat-research/expertise/record-linkage.html ("Multiple evaluations at the Census Bureau … have shown the record-linkage software developed in CSRM/SRD, such as BigMatch, perform better than open-source competitors in general.")
[30] U.S. CENSUS BUREAU, RECORD LINKAGE & MACHINE LEARNING (2026), https://www.census.gov/topics/research/stat-research/expertise/record-linkage.html ("Muti-file record linkage, as proposed by Sadinle and Fienberg proceeds, from information on the constructs underlying all logically possible assignment of multi-record matches as a whole…This raises the potential of retrieving a full spectrum of logically valid record matches between the records of a Census, post-enumeration survey and internal or third-party administrative files simultaneously, rather than piecing together initially independent record pairs, as is mostly done at this time.")

other theories to "take advantage of the ever-increasing computational power made available and to expand the latest scientific advances in an equally functional set-up."[31]

57. Despite advances made, the leading expert within the Census Bureau, Dr. Yves Thibaudeau, notes continued difficulties in matching records across multiple databases still exist.[32] The Census Bureau, even with its careful and constant review of methodology and techniques (such as data partitioning), acknowledges that there is still much work to be done. For example, Dr. Thibaudeau explained that linkage becomes more difficult as the number of fields and databases matched increases.[33] According to Thibaudeau, even trying to match four fields across four databases can exacerbate existing problems.[34]

58. Further, in stark contrast to the approach taken by DHS, to respond to the complications of matching persons across various information sources absent unique identifiers, the Census Bureau created a system entitled the Person Identification Validation System to "ascertain unique person and address identifiers."[35] The use of these systems is subject to ongoing review and testing.[36]

59. DHS and the Census Bureau show opposite approaches to utilizing large scale databases for matching purposes. While the DHS appears to have vast amounts of funding to improve its methodology, it appears to employ a "throwing at the wall to see what sticks" approach to how to use such data. This is demonstrated by its: disregard for errors and accuracy in data; frequent and unexplained (or simply not thought out) changes in programs and data practices; and the clear lack of information on its methodology and testing on how the agency manages and utilizes the vast array of information it collects. By contrast, the Census Bureau, though it has created a well-thought-out and accurate matching system, recognizes the inherent shortcomings in the science of data matching and continues to research and improve their systems. A cursory glance at the public website managed by the Census Bureau shows a

---

[31] *Id.*
[32] Yves Thibaudeau, *A Review of Modern Multinomial-Derived and Partition-Based Record-Linkage Methods* 17 WIREs Comput. Stat. 1, 12 (2025), https://doi.org/10.1002/wics.70015 ("Despite these very encouraging advances, genuinely large applications (linking databases of millions or billions of records) remain beyond the scope of dynamic Bayesian record linkage at the time of this writing.")
[33] Notably, here DHS attempts to link at least *five* fields (first name, last name, date of birth, social security, reason for verification) across *sixteen* database systems. Appl. for Stay at 6-7.
[34] Yves Thibaudeau, *A Review of Modern Multinomial-Derived and Partition-Based Record-Linkage Methods* 17 WIREs Comput. Stat. 1, 13 (2025), https://doi.org/10.1002/wics.70015 ("The difficulty is the likelihood [equation]becomes analytically complex, as the dimension of the clusters and the number of comparison fields grow… For example, linking four files over four comparison fields entails a likelihood of supporting 24 latent classes and 2208 parameters. The observed sufficient statistic has 7,962,624 cells.")
[35] U.S. Census Bureau, Deborah Wagner & Mary Layne, The Person Identification Validation System (PVS): Applying the Center for Administrative Records Research and Applications' (CARA) Record Linkage Software (2014) at 2, https://www.census.gov/content/dam/Census/library/working-papers/2014/adrm/carra-wp-2014-01.pdf
[36] *See* U.S. Census Bureau, Deborah Wager, Mary Layne and Cynthia Rothhaas, Estimating Record Linkage False Match Rate for the Person Identification Validation System (2014), https://www.census.gov/content/dam/Census/library/working-papers/2014/adrm/carra-wp-2014-02.pdf

plethora of research on current practices and ongoing projects and studies meant to improve current practices.

60. The contrast between the two is significant. Both agencies manage unfathomable amounts of data that affect the daily lives of Americans; however, only one of them attempts to be guided by the latest social science best practices – the Census Bureau.

61. The current iteration and use of database matching by DHS stand in direct defiance of proper database use dictated by years of published and recognized social science. Its continued use threatens to harm voters nationwide.

Matt A. Barreto, Ph.D.
Los Angeles, California
October 28, 2026

UCLA College Social Sciences


# MATT A. BARRETO – BARRETOM@UCLA.EDU

UNIVERSITY OF CALIFORNIA, LOS ANGELES, 3345 BUNCHE HALL, LOS ANGELES CA 90095 / 909.489.2955


***EMPLOYMENT:***

**Professor**, Political Science, University of California Los Angeles (2015 – present)
**Professor,** Chicana/o & Central American Studies, University of California Los Angeles (2015 – present)
**Lecturer,** School of Law, University of California Los Angeles (2018 – present)
**Co-Founder & Faculty Director**, UCLA Voting Rights Project (VRP) (2018 – present)
**Co-Founder & Faculty Director**, Latino Policy & Politics Institute (LPPI) (2017-2024)

Dept. Political Science, University of Washington
**Professor** (2014 – 2015)
**Associate Professor** (2009 – 2014)
**Assistant Professor** (2005 – 2009)
**Co-Founder & Director,** Washington Institute for the Study of Ethnicity and Race (WISER)
**Founding Director,** Center for Democracy and Voting Rights, UW School of Law

Affiliated Research Centers

Chicano Studies Research Center (CSRC), University of California, Los Angeles

Center for the Study of Los Angeles (CSLA), Loyola Marymount University

***PERSONAL:***

Born: San Juan, Puerto Rico

High School: Washburn Rural HS, Topeka, KS

***EDUCATION:***

**Ph.D., Political Science**
University of California – Irvine
Sub Fields: American Politics / Race, Ethnicity and Politics / Methodology
Thesis: Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation
Thesis Committee: Bernard Grofman (chair), Louis DeSipio, Katherine Tate, Carole Uhlaner
Thesis Awards: *Ford Foundation Dissertation Fellowship for Minorities, 04-05*
*University of California President's Dissertation Fellowship, 04-05*
*University of California Institute for Mexico & the U.S. Dissertation Grant, 04-05*

**Master of Science, Social Science**
University of California – Irvine

**Bachelor of Science, Political Science**
Eastern New Mexico University, Portales, NM
Minor: English. Cumulative GPA: 3.9, *Summa Cum Laude*

## PUBLICATION RECORD

Google Scholar citation indices: Cites: 7,316 h-index: 40 i10-index: 76 i100-index: 20 Cites/year: 366

### ***BOOK MANUSCRIPTS:***

Barreto, Matt and Christopher Parker. nd. The Great White Hope: Donald Trump, Race, and the Crisis of American Politics. Under Contract, University of Chicago Press. *expected Fall 2024*

Barreto, Matt and Gary Segura. 2014. Latino America: How America's Most Dynamic Population is Poised to Transform the Politics of the Nation. Public Affairs Books. (Sept)

Barreto, Matt and David Leal, editors. 2018. Race, Class, and Precinct Quality in American Cities. Springer Press.

Christopher Parker and Matt Barreto. 2013. Change They Can't Believe In: The Tea Party and Reactionary Politics in America. Princeton University Press. *Winner: APSA Best Book Award for Race, Ethnicity, Politics, 2014*

Barreto, Matt. 2010. Ethnic Cues: The Role of Shared Ethnicity in Latino Political Participation. University of Michigan Press

### ***PEER-REVIEWED ARTICLES***

92. Hariharan, Ananya, MA Barreto and CW Dunn. 2026. "Mapping racial voting patterns: Using RPV dispersion plots to measure and visualize voting rights evidence" *Political Geography.* Forthcoming.

91. Barreto, M.A., Casillas, D.R, Vargas, E. "Immigrant Withdrawal in Reaction to Trump's Unconstitutional Denial of Birthright Citizenship" *PS: Political Science & Politics..* Forthcoming.

90. Hariharan, Ananya, MA Barreto and CW Dunn. 2026. " Racially Polarized Voting Dispersion Plots: A Method to Measure and Visualize Racial Voting Patterns" *Journal of Methods and Measurements in the Social Sciences.* Forthcoming.

89. Frasure, Lorrie, J Wong, ED Vargas and MA Barreto. 2025. "Introduction to the Collaborative Multiracial Post-Election Survey (CMPS) Oversamples" *PS: Political Science & Politics.* April.

88. Barreto, Matt, Lorrie Frasure and Matt Hall 2025. "Race and the Capital Riot: How Racial Attitudes Relate to Anti-Democratic Beliefs Following the January 6th Insurrection." *Journal of Race, Ethnicity and Politics.* 10(1): 1-4.

87. Rush, Tye, C. Jones, M. Herndon and MA Barreto. 2025. "Catalysts of Insurrection: How White Racial Antipathy Influenced Beliefs of Voter Fraud and Support for the January 6th Insurrection." *Journal of Race, Ethnicity and Politics.* 10(1)

86. Decter-Frain, A, P Sachdeva, L Collingwood, H Murayama, J Burke, MA Barreto, S Henderson, S Wood, J Zingher. 2025. "Comparing Methods for Estimating Demographics in Racially Polarized Voting Analyses" *Sociological Methods & Research*.

85. Haro-Ramos, AY, G Sanchez and MA Barreto. 2024. "Immigration Concerns and Social Program Avoidance: The Roles of Legal Status and Family Composition Among Asian and Latino Communities." *Journal of Migration and Health*, 100275

84. Rush, Tye, S. Hall and MA Barreto. 2024. "The Importance of Counting All Immigrants for Apportionment and Redistricting." *University of California Law Journal,* 75 (6)

83. Haro-Ramos, AY, G Sanchez and MA Barreto. 2024. "Health Care Discrimination and Immigration Fears: Unpacking COVID-19 Vaccine Hesitancy in Latino Adults." American *Journal of Public Health*, 114 (S6)

82. Vargas, Edward, Gabriel Sanchez, Barbara Gomez-Aguinaga, and Matt Barreto. 2024. "How Latinos' Perceptions of Environmental Health Threats Impact Policy Preferences." *Social Science Quarterly.* 105(1).

81. Leslie, GJ, T Rush, J Collins, MA Barreto. 2024. "Perceived racial efficacy and voter engagement among African Americans." *Politics, Groups, and Identities.* 12(4)

80. Barreto, Matt, Claudia Alegre, Isaiah Bailey, Alexandria Davis, Joshua Ferrer, Joyce Nguy, Christopher Palmisano, and Crystal Robertson. 2023. "Black Lives Matter and the Racialized Support for the January 6 Insurrection" *The Annals of the American Academy of Political and Social Science*.

79. MA Barreto, M Cohen, L Collingwood, CW Dunn, S Waknin. 2022. "A Novel Method for Showing Racially Polarized Voting: Bayesian Improved Surname Geocoding" *New York University Review of Law & Social Change.*

78. MA Barreto, GR Sanchez, HL Walker. 2022. "Battling the Hydra: the disparate impact of voter ID requirements in North Dakota." *Journal of Race, Ethnicity, and Politics*, 1-22

77. M Roman, H Walker, M Barreto. 2022. "How Social Ties with Undocumented Immigrants Motivate Latinx Political Participation." *Political Research Quarterly*, 10659129211019473

76. Gomez-Aguinaga, Barbara, Ana Oaxaca, Matt Barreto, and Gabriel Sanchez. 2021. "Spanish-Language News Consumption and Latino Reactions to COVID-19" *International Journal of Environmental Research and Public Health.*

75. B Gomez-Aguinaga, GR Sanchez, MA Barreto. 2021. "Importance of State and Local Variation in Black–Brown Attitudes: How Latinos View Blacks and How Blacks Affect Their Views" *Journal of Race, Ethnicity, and Politics* 6 (1), 214-252

74. H Walker, M Roman, MA Barreto. 2020. "The Ripple Effect: The Political Consequences of Proximal Contact with Immigration Enforcement" *Journal of Race, Ethnicity and Politics* 5 (3), 537-572.

73. CW Dunn, MA Barreto, M Acevedo, M Cohen, S Waknin. Legal Theories to Compel Vote-by-Mail in Federal Court" *Calif. L. Rev.* 11, 166

72. Reny, Tyler and Matt A. Barreto. 2020. “Xenophobia in the time of pandemic: othering, anti-Asian attitudes, and COVID-19 ” *Politics, Groups, and Identities*. 8(2).

71. Flores, Lucy and Matt A. Barreto. 2020. “Latina Voters: The key electoral force” *Journal of Cultural Marketing Strategy*. 4(2).

70. Frasure-Yokley, Lorrie, Janelle Wong, Edward Vargas and Matt A. Barreto 2020. “THE COLLABORATIVE MULTIRACIAL POST-ELECTION SURVEY (CMPS): BUILDING THE ACADEMIC PIPELINE THROUGH DATA ACCESS, PUBLICATION, AND NETWORKING OPPORTUNITIES” *PS: Political Science & Politics.* 53(1)

69. Barreto, Matt, Loren Collingwood, Sergio Garcia-Rios and Kassra Oskooii. 2019. “Estimating Candidate Support: Comparing Iterative EI and EI-RxC Methods” *Sociological Methods and Research*. 48(4).

68. Gonzalez-OBrien, Benjamin, Matt Barreto and Gabriel Sanchez. 2019. “They’re All Out to Get Me! Assessing Inter-Group Competition Among Multiple Populations.” *Politics, Groups and Identities*. 7(4).

67. Oskooii, Kassra, Karam Dana and Matt Barreto. 2019. “Beyond generalized ethnocentrism: Islam-specific beliefs and prejudice toward Muslim Americans.” *Politics, Groups and Identities* 7(3)

66. Walker, Hannah, Marcel Roman and Matt Barreto. 2019. “The Direct and Indirect Effects of Immigration Enforcement on Latino Political Engagement.” *UCLA Law Review.* 67.

65. Gutierrez, Angela, Angela Ocampo, Matt Barreto, and Gary Segura. 2019. “Somos Más : How Racial Threat and Anger Mobilized Latino Voters in the Trump Era” *Political Research Quarterly.* 72(4)

64. Chouhoud, Youssef, Karam Dana, and Matt Barreto. 2019. “American Muslim Political Participation: Between Diversity and Cohesion.” *Politics and Religion*. 12(S3).

63. Barreto, Matt, Stephen Nuño, Gabriel Sanchez, and Hannah Walker. 2019. “Race, Class and Barriers to Voting in the 21st Century: The Unequal Impact of Voter ID Laws.” *American Politics Research*

62. Barreto, Matt. 2018. “The cycle of under-mobilization of minority voters: A comment on ‘Selective recruitment of voter neglect?’” *Journal of Race, Ethnicity, and Politics.* 3(1).

61. Ocampo, Angela, Karam Dana and Matt Barreto. 2018. "The American Muslim Voter: Community Belonging and Political Participation." *Social Science Research.* 69(4).

60. Barreto, Matt, Lorrie Frasure-Yokley, Edward Vargas, Janelle Wong. 2018. "Best practices in collecting online data with Asian, Black, Latino, and White respondents: evidence from the 2016 Collaborative Multiracial Post-election Survey." *Politics, Groups & Identities.* 6(1).

59. Barreto, Matt, Tyler Reny and Bryan Wilcox-Archuleta. 2017. "A debate about survey research methodology and the Latina/o vote: why a bilingual, bicultural, Latino-centered approach matters to accurate data." *Aztlán: A Journal of Chicano Studies.* 42(2).

58. Barreto, Matt and Gary Segura. 2017. "Understanding Latino Voting Strength in 2016 and Beyond: Why Culturally Competent Research Matters." *Journal of Cultural Marketing Strategy.* 2:2

57. Dana, Karam, Bryan Wilcox-Archuleta and Matt Barreto. 2017. "The Political Incorporation of Muslims in America: The Mobilizing Role of Religiosity in Islam." *Journal of Race, Ethnicity & Politics*.

56. Collingwood, Loren, Kassra Oskooii, Sergio Garcia-Rios, and Matt Barreto. 2016. "eiCompare: Comparing Ecological Inference Estimates across EI and EI: RxC." *The R Journal*. 8:2 (Dec).

55. Garcia-Rios, Sergio I. and Matt A. Barreto. 2016. "Politicized Immigrant Identity, Spanish-Language Media, and Political Mobilization in 2012" *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 2(3): 78-96.

54. Barreto, Matt, Collingwood, Loren, Christopher Parker, and Francisco Pedraza. 2015. "Racial Attitudes and Race of Interviewer Item Non-Response." *Survey Practice*. 8:3.

53. Barreto, Matt and Gary Segura 2015. "Obama y la seducción del voto Latino." *Foreign Affairs Latinoamérica*. 15:2 (Jul).

52. Barreto, Matt and Loren Collingwood 2015. "Group-based appeals and the Latino vote in 2012: How immigration became a mobilizing issue." *Electoral Studies*. 37 (Mar).

51. Collingwood, Loren, Matt Barreto and Sergio García-Rios. 2014. "Revisiting Latino Voting: Cross-Racial Mobilization in the 2012 Election" *Political Research Quarterly*. 67:4 (Sep).

50. Bergman, Elizabeth, Gary Segura and Matt Barreto. 2014. "Immigration Politics and Electoral Consequences: Anticipating the Dynamics of Latino Vote in the 2014 Election" *California Journal of Politics and Policy*. (Feb)

49. Barreto, Matt and Sergio García-Rios. 2012. "El poder del voto latino en Estados Unidos en 2012" *Foreign Affairs Latinoamérica*. 12:4 (Nov).

48. Collingwood, Loren, Matt Barreto and Todd Donovan. 2012. "Early Primaries, Viability and Changing Preferences for Presidential Candidates." *Presidential Studies Quarterly*. 42:1(Mar).

47. Barreto, Matt, Betsy Cooper, Ben Gonzalez, Chris Towler, and Christopher Parker. 2012. "The Tea Party in the Age of Obama: Mainstream Conservatism or Out-Group Anxiety?." *Political Power and Social Theory*. 22:1(Jan).

46. Dana, Karam, Matt Barreto and Kassra Oskoii. 2011. "Mosques as American Institutions: Mosque Attendance, Religiosity and Integration into the American Political System." *Religions*. 2:2 (Sept).

45. Barreto, Matt, Christian Grose and Ana Henderson. 2011. "Redistricting: Coalition Districts and the Voting Rights Act." *Warren Institute on Law and Social Policy*. (May)

44. Barreto, Matt and Stephen Nuño. 2011. "The Effectiveness of Co-Ethnic Contact on Latino Political Recruitment." *Political Research Quarterly*. 64 (June). 448-459.

43. Garcia-Castañon, Marcela, Allison Rank and Matt Barreto. 2011 "Plugged in or tuned out? Youth, Race, and Internet Usage in the 2008 Election." *Journal of Political Marketing.* 10:2 115-138.

42. Barreto, Matt, Victoria DeFrancesco, and Jennifer Merolla. 2011 "Multiple Dimensions of Mobilization: The Impact of Direct Contact and Political Ads on Latino Turnout in the 2000 Presidential Election." *Journal of Political Marketing.* 10:1

41. Barreto, Matt, Loren Collingwood, and Sylvia Manzano. 2010. "Measuring Latino Political Influence in National Elections" *Political Research Quarterly*. 63:4 (Dec)

40. Barreto, Matt, and Francisco Pedraza. 2009. "The Renewal and Persistence of Group Identification in American Politics." *Electoral Studies*. 28 (Dec) 595-605

39. Barreto, Matt and Dino Bozonelos. 2009. "Democrat, Republican, or None of the Above? Religiosity and the Partisan Identification of Muslim Americans" *Politics & Religion* 2 (Aug). 1-31

38. Barreto, Matt, Sylvia Manzano, Ricardo Ramírez and Kathy Rim. 2009. "Immigrant Social Movement Participation: Understanding Involvement in the 2006 Immigration Protest Rallies." *Urban Affairs Review*. 44: (5) 736-764

37. Grofman, Bernard and Matt Barreto. 2009. "A Reply to Zax's (2002) Critique of Grofman and Migalski (1988): Double Equation Approaches to Ecological Inferences." *Sociological Methods and Research.* 37 (May)

36. Barreto, Matt, Stephen Nuño and Gabriel Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate – New Evidence from Indiana." *PS: Political Science & Politics*. 42 (Jan)

35. Barreto, Matt, Luis Fraga, Sylvia Manzano, Valerie Martinez-Ebers, and Gary Segura. 2008. "Should they dance with the one who brung 'em? Latinos and the 2008 Presidential election" *PS: Political Science & Politics.* 41 (Oct).

34. Barreto, Matt, Mara Marks and Nathan Woods. 2008. "Are All Precincts Created Equal? The Prevalence of Low- Quality Precincts in Low-Income and Minority Communities." *Political Research Quarterly.* 62

33. Barreto, Matt. 2007. "*Sí Se Puede!* Latino Candidates and the Mobilization of Latino Voters." *American Political Science Review*. 101 (August): 425-441.

32. Barreto, Matt and David Leal. 2007. "Latinos, Military Service, and Support for Bush and Kerry in 2004." *American Politics Research.* 35 (March): 224-251.

31. Barreto, Matt, Mara Marks and Nathan Woods. 2007. "Homeownership: Southern California's New Political Fault Line?" *Urban Affairs Review.* 42 (January). 315-341.

30. Barreto, Matt, Matt Streb, Fernando Guerra, and Mara Marks. 2006. "Do Absentee Voters Differ From Polling Place Voters? New Evidence From California." *Public Opinion Quarterly*. 70 (Summer): 224-34.

29. Barreto, Matt, Fernando Guerra, Mara Marks, Stephen Nuño, and Nathan Woods. 2006. "Controversies in Exit Polling: Implementing a racially stratified homogenous precinct approach." *PS: Political Science & Politics.* 39 (July) 477-83.

28. Barreto, Matt, Ricardo Ramírez, and Nathan Woods. 2005. "Are Naturalized Voters Driving the California Latino Electorate? Measuring the Impact of IRCA Citizens on Latino Voting." *Social Science Quarterly.* 86 (December): 792-811.

27. Barreto, Matt. 2005. "Latino Immigrants at the Polls: Foreign-born Voter Turnout in the 2002 Election." *Political Research Quarterly.* 58 (March): 79-86.

26. Barreto, Matt, Mario Villarreal and Nathan Woods. 2005. "Metropolitan Latino Political Behavior: Turnout and Candidate Preference in Los Angeles." *Journal of Urban Affairs*. 27(February): 71-91.

25. Leal, David, Matt Barreto, Jongho Lee and Rodolfo de la Garza. 2005. "The Latino Vote in the 2004 Election." *PS: Political Science & Politics.* 38 (January): 41-49.

24. Marks, Mara, Matt Barreto and Nathan Woods. 2004. "Harmony and Bliss in LA? Race and Racial Attitudes a Decade After the 1992 Riots." *Urban Affairs Review.* 40 (September): 3-18.

23. Barreto, Matt, Gary Segura and Nathan Woods. 2004. "The Effects of Overlapping Majority-Minority Districts on Latino Turnout." *American Political Science Review.* 98 (February): 65-75.

22. Barreto, Matt and Ricardo Ramírez. 2004. "Minority Participation and the California Recall: Latino, Black, and Asian Voting Trends 1990 – 2003." *PS: Political Science & Politics.* 37 (January): 11-14.

21. Barreto, Matt and José Muñoz. 2003. "Reexamining the 'politics of in-between': political participation among Mexican immigrants in the United States." *Hispanic Journal of Behavioral Sciences*. 25 (November): 427-447.

20. Barreto, Matt. 2003. "National Origin (Mis)Identification Among Latinos in the 2000 Census: The Growth of the "Other Hispanic or Latino" Category." *Harvard Journal of Hispanic Policy.* 15 (June): 39-63.

***Edited Volume Book Chapters***

19. Barreto, Matt and Gary Segura. 2020. "Latino Reaction and Resistance to Trump: Lessons learned from Pete Wilson and 1994." In Raul Hinojosa and Edward Telles (eds.) Equitable Globalization: Expanding Bridges, Overcoming Walls. Oakland: University of California Press.

18. Barreto, Matt, Albert Morales and Gary Segura. 2019. "The Brown Tide and the Blue Wave in 2018" In Larry Sabato, Kyle Kondik, Geoffrey Skelley (eds.) The Blue Wave. New York: Rowman & Littlefield.

17. Gutierrez, Angela, Angela Ocampo and Matt Barreto. 2018. "Obama's Latino Legacy: From Unknown to Never Forgotten" In Andrew Rudalevige and Bert Rockman (eds.) The Obama Legacy. Lawrence, KS: University of Kansas Press.

16. Barreto, Matt, Thomas Schaller and Gary Segura. 2017. "Latinos and the 2016 Election: How Trump Lost Latinos on Day 1" In Larry Sabato, Kyle Kondik, Geoffrey Skelley (eds.) Trumped: The 2016 Election that Broke All the Rules. New York: Rowman & Littlefield.

15. Walker, Hannah, Gabriel Sanchez, Stephen Nuño, Matt Barreto 2017. "Race and the Right to Vote: The Modern Barrier of Voter ID Laws" In Todd Donovan (ed.) Election Rules and Reforms. New York: Rowman & Littlefield.

14. Barreto, Matt and Christopher Parker. 2015. "Public Opinion and Reactionary Movements: From the Klan to the Tea Party" In Adam Berinsky (ed.) New Directions in Public Opinion. 2nd edition. New York: Routledge Press.

13. Barreto, Matt and Gabriel Sanchez. 2014. "A 'Southern Exception' in Black-Latino Attitudes?." In Anthony Affigne, Evelyn Hu-Dehart, Marion Orr (eds.) Latino Politics en Ciencia Política. New York: New York University Press.

12. Barreto, Matt, Ben Gonzalez, and Gabriel Sanchez. 2014. "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks." In Josh Kun and Laura Pulido (eds.) Black and Brown in Los Angeles: Beyond Conflict and Coalition. Berkeley, CA: University of California Press.

11. Barreto, Matt, Loren Collingwood, Ben Gonzalez, and Christopher Parker. 2011. "Tea Party Politics in a Blue State: Dino Rossi and the 2010 Washington Senate Election" In William Miller and Jeremy Walling (eds.) Stuck in the Middle to Lose: Tea Party Effects on 2010 U.S. Senate Elections. Rowman & Littlefield Publishing Group.

10. Jason Morin, Gabriel Sanchez and Matt Barreto. 2011. "Perceptions of Competition Between Latinos and Blacks: The Development of a Relative Measure of Inter-Group Competition." In Edward Telles, Gaspar Rivera-Salgado and Mark Sawyer (eds.) Just Neighbors? Research on African American and Latino Relations in the US. New York: Russell Sage Foundation.

9. Grofman, Bernard, Frank Wayman and Matt Barreto. 2009. "Rethinking partisanship: Some thoughts on a unified theory." In John Bartle and Paolo Bellucci (eds.) Political Parties and Partisanship: Social identity and individual attitudes. New York: Routledge Press.

8. Barreto, Matt, Ricardo Ramírez, Luis Fraga and Fernando Guerra. 2009. "Why California Matters: How California Latinos Influence the Presidential Election." In Rodolfo de la Garza, Louis DeSipio and David Leal (eds.) Beyond the Barrio: Latinos in the 2004 Elections. South Bend, ID: University of Notre Dame Press.

7. Francisco Pedraza and Matt Barreto. 2008. "Exit Polls and Ethnic Diversity: How to Improve Estimates and Reduce Bias Among Minority Voters." In Wendy Alvey and Fritz Scheuren (eds.) Elections and Exit Polling. Hoboken, NJ: Wiley and Sons.

6. Adrian Pantoja, Matt Barreto and Richard Anderson. 2008. "Politics *y la Iglesia*: Attitudes Toward the Role of Religion in Politics Among Latino Catholics" In Michael Genovese, Kristin Hayer and Mark J. Rozell (eds.) Catholics and Politics. Washington, D.C: Georgetown University Press..

5. Barreto, Matt. 2007. "The Role of Latino Candidates in Mobilizing Latino Voters: Revisiting Latino Vote Choice." In Rodolfo Espino, David Leal and Kenneth Meier (eds.) Latino Politics: Identity, Mobilization, and Representation. Charlottesville: University of Virginia Press.

4. Abosch, Yishaiya, Matt Barreto and Nathan Woods. 2007. "An Assessment of Racially Polarized Voting For and Against Latinos Candidates in California." In Ana Henderson (ed.) Voting Rights Act Reauthorization of 2006: Perspectives on Democracy, Participation, and Power:. Berkeley, CA: UC Berkeley Public Policy Press.

3. Barreto, Matt and Ricardo Ramírez. 2005. "The Race Card and California Politics: Minority Voters and Racial Cues in the 2003 Recall Election." In Shaun Bowler and Bruce Cain (eds.) Clicker Politics: Essays on the California Recall. Englewood-Cliffs: Prentice-Hall.

2. Barreto, Matt and Nathan Woods. 2005. "The Anti-Latino Political Context and its Impact on GOP Detachment and Increasing Latino Voter Turnout in Los Angeles County." In Gary Segura and Shawn Bowler (eds.) Diversity in Democracy: Minority Representation in the United States. Charlottesville: University of Virginia Press.

1. Pachon, Harry, Matt Barreto and Frances Marquez. 2004. "Latino Politics Comes of Age in the Golden State." In Rodolfo de la Garza and Louis DeSipio (eds.) Muted Voices: Latino Politics in the 2000 Election. New York: Rowman & Littlefield

***<u>RESEARCH AWARDS AND FELLOWSHIPS</u>***

| | | |
|---|---|---|
| August 2026 | The San Francisco Foundation (SFF)<br>UCLA Voting Rights Project [With Chad Dunn] | *$300,000 – 24 months* |
| August 2026 | Weingart Foundation<br>UCLA Voting Rights Project [With Bernadette Reyes] | *$100,000 – 24 months* |
| May 2026 | Levi Strauss Foundation<br>UCLA Voting Rights Project [With Sonni Waknin] | *$50,000 – 12 months* |
| Apr 2026 | Haas Jr. Foundation<br>UCLA Voting Rights Project | *$770,000 – 36 months* |
| Apr 2026 | Silicon Valley Community Fund<br>UCLA Voting Rights Project | *$215,000 – 18 months* |
| Feb 2026 | Four Freedoms Foundation<br>UCLA Voting Rights Project [With Sonni Waknin] | *$155,000 – 18 months* |
| Jan 2026 | California Secretary of State<br>UCLA Voting Rights Project [With Michael Rios] | *$315,000 – 24 months* |
| Apr 2025 | Haas Jr. Foundation<br>UCLA Voting Rights Project | *$325,000 – 24 months* |
| Apr 2025 | Levi Strauss Foundation<br>UCLA Voting Rights Project [With Sonni Waknin] | *$150,000 – 24 months* |
| Jan 2024 | Four Freedoms Foundation<br>UCLA Voting Rights Project [With Sonni Waknin] | *$105,000 – 12 months* |
| Jan 2023 | Open Societies Foundation<br>UCLA Latino Policy & Politics Initiative [With Arturo Vargas Bustamante] | *$2,500,000 – 36 months* |
| Jan 2022 | California Secretary of State<br>UCLA Voting Rights Project [With Michael Rios] | *$550,000 – 12 months* |
| June 2020 | WK Kellogg Foundation<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$2,500,000 – 24 months* |
| June 2020 | Casey Family Foundation<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$900,000 – 18 months* |
| Aug 2018 | Provost Initiative for Voting Rights Research<br>UCLA Latino Policy & Politics Initiative [With Chad Dunn] | *$90,000 – 24 months* |
| April 2018 | Democracy Fund & Wellspring Philanthropic<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$200,000 – 18 months* |
| March 2018 | AltaMed California<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$250,000 – 12 months* |
| Dec 2017 | California Community Foundation<br>UCLA Latino Policy & Politics Initiative [With Sonja Diaz] | *$100,000 – 12 months* |
| July 2013 | Ford Foundation<br>UW Center for Democracy and Voting Rights | *$200,000 – 12 months* |

***RESEARCH GRANTS AND FELLOWSHIPS CONTINUED…***

| | | |
|---|---|---|
| April 2012 | American Values Institute [With Ben Gonzalez]<br>Racial Narratives and Public Response to Racialized Moments | *$40,000 – 3 months* |
| Jan 2012 | American Civil Liberties Union Foundation [With Gabriel Sanchez]<br>Voter Identification Laws in Wisconsin | *$60,000 – 6 months* |
| June 2011 | State of California Citizens Redistricting Commission<br>An Analysis of Racial Bloc Voting in California Elections | *$60,000 – 3 months* |
| Apr 2011 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? A national conference on the political and social incorporation of American Muslims | *$50,000 – 18 months* |
| Jan 2011 | impreMedia [With Gary Segura]<br>Latino public opinion tracking poll of voter attitudes in 2011 | *$30,000 – 6 months* |
| Oct 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>Measuring Latino Influence in the 2010 Elections | *$128,000 – 6 months* |
| Oct 2010 | We Are America Alliance (WAAA) [With Gary Segura]<br>Latino and Asian American Immigrant Community Voter Study | *$79,000 – 3 months* |
| May 2010 | National Council of La Raza (NCLR) [With Gary Segura]<br>A Study of Latino Views Towards Arizona SB1070 | *$25,000 – 3 months* |
| Apr 2010 | Social Science Research Council (SSRC) [With Karam Dana]<br>Muslim and American? The influence of religiosity in Muslim political incorporation | *$50,000 – 18 months* |
| Oct 2009 | American Association of Retired Persons (AARP) [With Gary Segura]<br>Health care reform and Latino public opinion | *$25,000 – 3 months* |
| Nov 2008 | impreMedia & National Association of Latino Elected Officials (NALEO)<br>[With Gary Segura] 2008 National Latino Post-Election Survey, Presidential Election | *$46,000 – 3 months* |
| July 2008 | National Association of Latino Elected Officials (NALEO) [With Gary Segura]<br>Latino voter outreach survey – an evaluation of Obama and McCain | *$72,000 – 3 months* |
| June 2008 | The Pew Charitable Trusts, Make Voting Work Project<br>[with Karin MacDonald and Bonnie Glaser] Evaluating Online Voter Registration (OVR) Systems in Arizona and Washington | *$220,000 – 10 months* |
| April 2008 | National Association of Latino Elected Officials (NALEO) &<br>National Council of La Raza (NCLR), 2008 Latino voter messaging survey | *$95,000 – 6 months* |
| Dec. 2007 | Research Royalty Fund, University of Washington<br>2008 Latino national post-election survey | *$39,000 – 12 months* |
| Oct. 2007 | Brenan Center for Justice, New York University<br>[with Stephen Nuño and Gabriel Sanchez] Indiana Voter Identification Study | *$40,000 – 6 months* |
| June 2007 | National Science Foundation, Political Science Division [with Gary Segura]<br>American National Election Study – Spanish translation and Latino oversample | *$750,000 – 24 months* |
| Oct. 2006 | University of Washington, Vice Provost for Undergraduate Education<br>Absentee voter study during the November 2006 election in King County, WA | *$12,000 – 6 months* |

***RESEARCH GRANTS AND FELLOWSHIPS CONTINUED…***

| | | |
|---|---|---|
| Mar. 2006 | Latino Policy Coalition Public Opinion Research Grant [with Gary Segura]<br>Awarded to the Washington Institute for the Study of Ethnicity and Race | *$40,000 – 18 months* |
| 2005 – 2006 | University of Washington, Institute for Ethnic Studies, Research Grant | *$8,000 – 12 months* |
| Mar. 2005 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Conduct Exit Poll during Los Angeles Mayoral Election, Mar. 8 & May 17, 2005<br>Awarded to the Center for the Study of Los Angeles | *$30,000 – 6 months* |
| 2004 – 2005 | Ford Foundation Dissertation Fellowship for Minorities | *$21,000 – 12 months* |
| 2004 – 2005 | University of California President's Dissertation Fellowship | *$14,700 – 9 months* |
| 2004 – 2005 | University of California Mexico-US (UC MEXUS) Dissertation Grant | *$12,000 – 9 months* |
| Apr – 2004 | UC Regents pre-dissertation fellowship, University of California, Irvine, | *$4,700 – 3 months* |
| 2003 – 2004 | Thomas and Dorothy Leavey Foundation Grant [with Fernando Guerra]<br>Awarded to the Center for the Study of Los Angeles | *$20,000 – 12 months* |
| 2002 – 2003 | Ford Foundation Grant on Institutional Inequality [with Harry Pachon]<br>Conducted longitudinal study of Prop 209 on Latino and Black college admittance<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 12 months* |
| 2002 – 2003 | Haynes Foundation Grant on Economic Development [with Louis Tornatzky]<br>Knowledge Economy in the Inland Empire region of Southern California<br>Awarded to Tomás Rivera Policy Institute | *$150,000 – 18 months* |
| 2001 – 2002 | William F Podlich Graduate Fellowship, Center for the Study of Democracy,<br>University of California, Irvine | *$24,000 – 9 months* |

***EXPERT REPORTS:***

- Keller School District, Texas, 2026, *Vallejo v. Keller ISD*
- Texas Statewide redistricting, 2025, *LULAC v. Abbott* (on behalf of Brooks Plaintiffs)
- Orange County, NY, 2024, Newburgh town council, under NYVRA
- Florida 2024, State Senate districts, *Nord Hodges v. Passidomo and Byrd*
- North Carolina 2024, *North Carolina NAACP v. Hirsch*, SB 824 Voter ID law
- North Carolina 2023, State Senate redistricting, *Democracy Project II. Pierce v. NC State Board of Elections*
- Dodge City, Kansas 2022-23, city redistricting, *Coca et al. vs. Dodge City, KS.*
- Florida 2022-23, Statewide redistricting, *Common Cause et al. vs. Byrd*
- Galveston County, Texas 2022-23, county redistricting, *Petteway et al. v. Galveston County, TX.*
- Benton, Chelan, Yakima counties signature rejection, 2022-23, *Reyes et al. v. Chilton et al.*
- San Juan County, New Mexico 2022-23, county redistricting, *Navajo Nation v. San Juan County, NM*
- Texas Statewide redistricting, 2022, *LULAC v. Abbott* (on behalf of Mexican American Legislative Caucus)
- Franklin County, WA, 2021-22, county redistricting, rebuttal expert for Plaintiffs, *Portugal et al. vs. Franklin County*
- Texas Statewide redistricting, 2021-22, *Brooks v. Abbott* Senate District 10 (Tarrant County)
- Baltimore County Council, 2021-22, *NAACP v. Baltimore County*, (on behalf of NAACP and ACLU-MD)
- Maryland Office of Attorney General, 2021-22, racially polarized voting analysis as part of statewide redistricting
- Pennsylvania House Democrats, 2021-22, racially polarized voting analysis as part of statewide redistricting
- Washington State Senate Democrats, 2021-22, racially polarized voting analysis as part of statewide redistricting
- City of San Jose, 2021, racially polarized voting analysis as part of city redistricting
- Santa Clara County, 2021, racially polarized voting analysis as part of county redistricting
- Pennsylvania, 2020, Boockvar v. Trump, Expert for Intervenors, (Perkins Coie) related to voter intimidation
- Missouri, 2020, Missouri NAACP vs. State of Missouri, Expert for plaintiffs related to vote by mail
- Georgia, 2020, Black Voters Matter vs. Raffesnsperger, Expert for plaintiffs related to vote by mail
- New York, 2019, Expert for NYAG New York v. U.S. Immigration and Customs Enforcement 1:19-cv-08876
- North Carolina, 2019, Expert for Plaintiffs in North Carolina voter ID lawsuit, NAACP v. Cooper
- East Ramapo CSD, 2019, Expert for Plaintiffs in Section 2 VRA lawsuit, assessed polarized voting
- New York, 2018, Expert for Plaintiffs in Census Citizenship Lawsuit, New York v. U.S. Dept of Commerce (also an expert related cases: *California v. Ross* and *Kravitz v. Dept of Commerce*)
- Dallas County, TX, 2017, Expert for Defense in Section 2 VRA lawsuit, Harding v. Dallas County
- Kansas, 2016, Expert for Plaintiffs in Kansas voter registration lawsuit, Fish v. Kobach 2:16-cv-02105-JAR
- North Dakota, 2015, Expert for Plaintiffs in North Dakota voter ID lawsuit, Brakebill v. Jaeger 1:16-cv-00008-CSM
- Alabama, 2015, Expert for Plaintiffs in Alabama voter ID lawsuit, Birmingham Ministries v. State of Alabama 2:15-cv-02193-LSC
- Texas, 2014, Testifying Expert for Plaintiffs in Texas voter ID lawsuit, Veasey v. Perry 2:13-cv-00193

- Galveston County, TX Redistricting, 2013, Expert report for Dunn & Brazil, LLC, Demographic analysis, vote dilution analysis, and racially polarized voting analysis for Section 2 lawsuit Galveston County JP/Constable districting
- Pasadena, TX Redistricting, 2013, Expert report for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, and racially polarized voting analysis for Section 2 lawsuit within Pasadena School District
- Harris County, TX Redistricting, 2011, Testifying Expert for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, and racially polarized voting analysis for Section 2 lawsuit within Harris County
- Pennsylvania, 2012, Testifying Expert for ACLU Foundation of Pennsylvania in voter ID lawsuit, Applewhite v. Commonwealth of Pennsylvania No. 330 MD 2012
- Milwaukee County, WI, 2012, Testifying Expert for ACLU Foundation of Wisconsin in voter ID lawsuit, Frank v. Walker 2:11-cv-01128(LA)
- Orange County, FL, 2012, Consulting Expert for Latino Justice/PRLDEF, Racially polarized voting analysis in Orange County, Florida
- Anaheim, CA, 2012, Consulting Expert for Goldstein, Demchak & Baller Legal, Racially polarized voting analysis for CVRA redistricting case Anaheim, CA
- Los Angeles County, CA, 2011, Consulting Expert for Goldstein, Demchak & Baller Legal, Racially polarized voting analysis for three redistricting cases in L.A.: Cerritos Community College Board; ABC Unified Schools; City of West Covina
- Harris County, TX Redistricting, 2011, Consulting Expert for Dunn & Brazil, LLC, Demographic analysis, voter registration analysis, for Section 5 objection within Harris County
- Monterey County, CA Redistricting, 2011, Consulting Expert for City of Salinas, Demographic analysis, creation of alternative maps, and racially polarized Voting analysis within Monterey County
- Los Angeles County Redistricting Commission, 2011, Consulting Expert for Supervisor Gloria Molina, Racially Polarized voting analysis within L.A. County
- State of California, Citizens Redistricting Commission, 2011, Consulting Expert, Racially Polarized Voting analysis throughout state of California
- Asian Pacific American Legal Center, 2011, Racially Polarized Voting analysis of Asian American candidates in Los Angeles for APALC redistricting brief
- Lawyers' Committee for Civil Rights and Arnold & Porter, LLP, 2010-12, Racially Polarized Voting analysis of Latino and Asian candidates in San Mateo County, concerning San Mateo County Board of Supervisors
- ACLU of Washington, 2010-11, preliminary analysis of Latino population patterns in Yakima, Washington, to assess ability to draw majority Latino council districts
- State of Washington, 2010-11, provided expert analysis and research for *State of Washington v. MacLean* in case regarding election misconduct and voting patterns
- Los Angeles County Chicano Employees Association, 2008-10, Racially Polarized Voting analysis of Latino candidates in L.A. County for VRA case, concerning L.A. County Board of Supervisors redistricting (6 reports issued 08-10)
- Brennan Center for Justice and Fried, Frank, Harris, Shriver & Jacobson LLP, 2009-10 Amicus Brief submitted to Indiana Supreme Court, *League of Women Voters v. Rokita*, regarding access to voter identification among minority and lower resource citizens
- State of New Mexico, consulting expert for state in *AAPD v. New Mexico*, 2008,
- District of Columbia Public Schools (DCPS), statistical consultant for survey methodology of opinion survey of parents in DCPS district (for pending suit), 2008,
- Brennan Center for Justice, 2007-08, Amicus Brief submitted to U.S. Supreme Court, and cited in Supreme Court decision, *Crawford v. Marion County*, regarding access to voter identification among minority and lower-resource citizens
- Los Angeles County Chicano Employees Association, 2002-07, Racially Polarized Voting analysis of Latino candidates in L.A. County for VRA case, concerning L.A. County Board of Supervisors redistricting (12 + reports issued during 5 years)

- Monterrey County School Board, 2007, demographic and population analysis for VRA case
- Sweetwater Union School District, 2007-08, Racially Polarized Voting analysis, and demographic and population analysis for VRA case
- Mexican American Legal Defense Fund, 2007-08, Racially Polarized Voting analysis for Latino candidates, for City of Whittier city council races, for VRA case
- ACLU of Washington, 2008, preliminary analysis of voting patterns in Eastern Washington, related to electability of Latino candidates
- Nielsen Media Research, 2005-08, with Willie C. Velasquez Institute, assessed the methodology of Latino household recruitment in Nielsen sample

***TEACHING EXPERIENCE:***

UCLA & UW 2005 – Present

- Minority Political Behavior (Grad Seminar)
- Politics of Immigration in the U.S. (Grad Seminar)
- Introduction to Empirical/Regression Analysis (Grad Seminar)
- Advanced Empirical/Regression Analysis (Grad Seminar)
- Qualitative Research Methods (Grad Seminar)
- Political Participation & Elections (Grad Seminar)
- The Voting Rights Act (Law School seminar)
- Research methodology II (Law School Ph.D. program seminar)
- U.S. Latino Politics
- Racial and Ethnic Politics in the U.S.
- Politics of Immigration in the U.S.
- Introduction to American Government
- Public Opinion Research
- Campaigns and Elections in the U.S.
- Presidential Primary Elections

**Teaching Assistant**
University of California, Irvine 2002 – 2005

- Intro to American Politics (K. Tate)
- Intro to Minority Politics (L. DeSipio)
  **Recognized as Outstanding Teaching Assistant, Winter 2002**
- Statistics and Research Methods (B. Grofman)
  **Recognized as Outstanding Teaching Assistant, Winter 2003**

***BOARD & RESEARCH APPOINTMENTS***

**Founder and President**
Barreto Segura Partners (BSP) Research, LLC 2021 - Present

**Founding Partner**
Latino Decisions 2007 – 2020

**Board of Advisors**
American National Election Study, University of Michigan 2010 – 2017

**Advisory Board**
States of Change: Demographics & Democracy Project 2014 – 2021
*CAP, AEI, Brookings Collaborative Project*

**Research Advisor**
American Values Institute / Perception Institute 2009 – 2014

**Expert Consultant**
State of California, Citizens Redistricting Committee 2011 – 2012

**Senior Scholar & Advisory Council**
Latino Policy Coalition, San Francisco, CA 2006 – 2008

**Board of Directors**
CASA Latina, Seattle, WA 2006 – 2009

**Faculty Research Scholar**
Tomás Rivera Policy Institute, University of Southern California 1999 – 2009

***PHD STUDENTS***

**Committee Chair or Co-Chair**

- Francisco I. Pedraza – Arizona State University (UW Ph.D. 2009)
- Loren Collingwood – University of New Mexico (UW Ph.D. 2012)
- Betsy Cooper – Public Religion Research Institute, Washington DC (UW Ph.D. 2014)
- Sergio I. Garcia-Rios – University of Texas (UW Ph.D. 2015)
- Hannah Walker – University of Texas (UW Ph.D. 2016)
- Kassra Oskooii – University of Delaware (UW Ph.D. 2016)
- Angela Ocampo – University of Texas (UCLA Ph.D. 2018)
- Ayobami Laniyonu – University of Toronto (UCLA Ph.D. 2018)
- Bryan Wilcox-Archuleta – Meta Analytics (UCLA 2019)
- Tyler Reny – Claremont Graduate University (UCLA 2020)
- Adria Tinin – Environmental Policy Analyst (UCLA Ph.D. 2020)
- Angie Gutierrez – University of Texas (UCLA Ph.D. 2021)
- Vivien Leung – Santa Clara University (UCLA Ph.D. 2021)
- Marcel Roman – Harvard University (UCLA Ph.D. 2021)
- Ana Oaxaca – University of Wisconsin (UCLA Ph.D. 2022)
- Estefania Castañeda-Perez – University of Southern California (UCLA Ph.D. 2022)
- Tye Rush - University of California, Davis (UCLA Ph.D. 2023)
- Chelsea Jones – Brennan Center at NYU (UCLA Ph.D. 2024)
- Michael Herndon – University of Texas (UCLA Ph.D. 2026)
- Shakari Byerly-Nelson – *in progress* (UCLA)
- Jessica Cobian – *in progress* (UCLA)
- Ananya Hariharan – *in progress* (UCLA)

**Committee Member**

- Emily Ortiz – *in progress* (UCLA)
- Claudia Allegre – (UCLA Ph.D. 2026)
- Alexandra Davis – Virginia Commonwealth University UCLA Ph.D., 2025)
- Erik Hanson – University of Southern California (UCLA Ph.D. 2022)
- Joy Wilke – Director of Polling, Blue Labs (UCLA Ph.D. 2021)
- Christine Slaughter – Boston University (UCLA Ph.D. 2021)
- Barbara Gomez-Aguinaga – University of Nebraska (UNM Ph.D. 2020)
- Bang Quan Zheng – Florida International University (UCLA Ph.D. 2020)
- Jessica Stewart – Emory University (UCLA Ph.D. 2018)
- Jonathan Collins – Columbia University (UCLA Ph.D., 2017)
- Lisa Sanchez – University of Arizona (UNM Ph.D., 2016)
- Nazita Lajevardi – Michigan State University (UC San Diego Ph.D., 2016)
- Kiku Huckle – Cal Lutheran University (UW Ph.D. 2016)
- Patrick Rock (Social Psychology) – (UCLA Ph.D. 2016)
- Raynee Gutting – Loyola Marymount University (Stony Brook Ph.D. 2015)
- Christopher Towler – Sacramento State University (UW Ph.D. 2014)
- Benjamin F. Gonzalez – San Diego State University (UW Ph.D. 2014)
- Marcela Garcia-Castañon – San Francisco State University (UW Ph.D. 2013)
- Justin Reedy (Communications) – University of Oklahoma (UW Ph.D. 2012)
- Dino Bozonelos – Cal State San Marcos (UC Riverside Ph.D. 2012)
- Brandon Bosch – University of Nebraska (UW Ph.D. 2012)
- Karam Dana (Middle East Studies) – UW Bothell (UW Ph.D. 2010)
- Lauren Goldstein (Social Psychology) – *in progress* (UCLA)