**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COALITION FOR HUMANE IMMIGRANT RIGHTS and PEDRO TRUJILLO,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DEPARTMENT OF HOMELAND SECURITY, *et al.*,**<br><br>**Defendants.** | **Civil Action No. 26-3072 (JEB)** |

## MEMORANDUM OPINION

The Executive Branch has intervened in California's ongoing election with a bid to change the rules for counting mail-in ballots. It first produced lists of thousands of people who it claimed would receive mail-in ballots from the state despite not being U.S. citizens. And then it demanded that election officials deviate from California law by setting aside the ballots of voters on those lists until their citizenship was confirmed.

But the lists are flawed. Plaintiff Coalition for Humane Immigrant Rights (CHIRLA), an organization that assists recently naturalized citizens with voting, has identified scores of its members who are highly likely to be wrongly listed as non-citizens. And officials in at least some California counties have confirmed that they are actively reviewing the lists. Those factors together create a non-speculative risk that CHIRLA's members will have their ability to vote impeded, which both CHIRLA and its members have taken steps to forestall. That provides the

basis for their standing to seek a temporary restraining order and preliminary injunction against the Executive Branch's actions.

The Court will grant that relief because it agrees with CHIRLA that the Executive Branch has likely violated the Constitution's Elections Clause, which commits authority over election rules to the states and Congress alone. As Congress has not provided otherwise, California may decide for itself what procedures to use for verifying the citizenship of registered voters and for deciding whether to count their mail-in ballots. As the Executive Branch lacks authority to unilaterally impose its preferred procedures, the Court will enjoin its attempt to do so here.

## I. Background

California law requires state officials to mail ballots "to every registered voter" beginning roughly one month before each election. See Cal. Elec. Code § 3000.5(a). The state permits only U.S. citizens to register and vote. See id. § 2101(a). Yet, in lists provided to county election officials in October, the federal government claimed to have identified at least 20,000 non-citizens on California's voter rolls. See ECF No. 39-3 (Aman Bhullar Decl.), ¶ 3; see also ECF No. 38-1 (DHS Letter to California Secretary of State Shirley Weber) at ECF p. 2 (originally identifying, in July, nearly 200,000 non-citizens registered to vote in California based on "[p]reliminary review" of state records).

Accompanying those lists of suspected non-citizens, the Department of Justice sent state and county officials letters with demands that are the focus of this suit. The letters requested that officials "confirm [the] citizenship status" of voters on the federal government's lists. See ECF No. 38-3 (DOJ Letter to L.A. County) at ECF p. 1. For individuals whose status could not be confirmed, DOJ demanded that officials either refrain from sending or "segregate — not cancel — [their] vote-by-mail ballots until their citizenship status [could] be determined." Id. at ECF p.

1. These steps were necessary, DOJ said, to enforce the federal-law prohibition on non-citizen voting in federal elections. Id. (citing 18 U.S.C. § 611(a)). Failure to take them, it also insisted, could amount to encouraging illegal voting, raising the specter of legal consequences for defiant state officials. Id.

Officials flatly rejected the demands, however, as inconsistent with not only state but also federal law. See ECF Nos. 38-2 (California Reply Letter); 38-4 (L.A. County Reply Letter). In California, "the fact that a person certifies to his or her United States citizenship by signing his or her affidavit of registration shall be deemed evidence of citizenship" for voting purposes. See Cal. Elec. Code § 2112. And nationwide, Congress has prohibited "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" within 90 days of a federal election. See 52 U.S.C. § 20507(c)(2)(A).

DOJ nonetheless sued the California Secretary of State and the Los Angeles County Clerk in the Central District of California, seeking a TRO to enforce its demands. See United States of America v. California, No. 26-12025, ECF No. 22 (Emergency TRO Application) (C.D. Cal. Oct. 19, 2026). The California district court denied that relief last week. United States v. California (California I), 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026). It held that the government likely lacked standing, a cause of action, and a legal basis for an order enforcing its demands, and that such an order itself would likely violate federal election law as well as the equitable principle against federal-court interference in impending elections. Id. at *5–11, 14–15; see Purcell v. Gonzalez, 549 U.S. 1, 5 (2006). DOJ then filed an emergency motion for an injunction pending appeal with the Ninth Circuit, but that court also denied relief. See United States of America v. California (California II), 2026 WL 3268272, at *3–8 (9th Cir. Oct. 30, 2026).

Meanwhile, DOJ doubled down by issuing similar demands and lists to election officials in every one of California's 58 counties. See ECF No. 37 (Pls. Third Suppl. Notice) at 2. Although DOJ has not reprised its tactic of suing to enforce compliance, the letters sent to county officials "threaten legal action" for non-compliance. See ECF No. 37-2 (Exh. B to Pls. Third Suppl. Notice); see also ECF No. 37-3 (DOJ Letter to Santa Clara County) at 1–3; cf. ECF No. 40-1 (Exh. to Pls. Fourth Suppl. Notice) (reporting that DOJ has "pursue[d] criminal subpoenas of state and local officials regarding their roles administering allegedly illegal voting"). Indeed, officials in some counties have publicly acknowledged that they are reviewing the lists. See, e.g., ECF Nos. 37-1 (Exh. A to Pls. Third Suppl. Notice) at ECF pp. 3–4; 39 (Reply) at 4–5.

Against that backdrop, the instant lawsuit presents a different kind of challenge to DOJ's actions. It is brought by Pedro Trujillo, a naturalized citizen who intends to vote in the election, and CHIRLA, whose members and clients include other such individuals in California. See ECF No. 1 (Compl.), ¶¶ 10–14. Plaintiffs assert that DOJ's actions threaten to impede the electoral participation of recently naturalized citizens, given the possibility that they may be incorrectly identified as non-citizens. Id., ¶¶ 83–93. The upshot of their various statutory and constitutional claims is that the Executive Branch lacks authority to interfere in this way with state administration of elections. Id., ¶¶ 94–151.

In the present Motion, Plaintiffs seek a temporary restraining order and preliminary injunction against what they now term DOJ's "Alleged Non-Citizen Removal Policy." ECF No. 34 (Mot.) at 1; see Reply at 1. Although the contours of that alleged policy remain somewhat unclear, it has two key components: (1) the federal government's compilation of lists of suspected non-citizens on California's voter rolls and (2) its demands that California election officials refrain from sending or counting the ballots of voters on those lists until their citizenship

can be confirmed. See Mot. at 1–3; see also ECF No. 38 (Opp.) at 7 n.2, 12 n.3. Plaintiffs accordingly request declaratory and injunctive relief against Defendants' "compiling" their "lists of alleged noncitizen voters," as well as their "issuing demands and threats (civil and criminal) against voters" who may be on the lists and "against California election officials" who refuse to withhold or segregate the ballots of such voters. See Mot. at 2–3.

The Court held a hearing on the Motion on October 30, 2026, at which it ordered Defendants to produce to Plaintiffs in discovery the list of 20,000 suspected non-citizens that has been the basis for the demands made to California officials. See Minute Order of Oct. 30, 2026. The purpose of that Order was to provide CHIRLA an opportunity to ascertain whether any of its members were erroneously included on the lists, a key issue for determining its standing. See Reply at 3 (noting that, previously, "CHIRLA [could not] know which and how many of its members are on each of the flawed lists"); cf. Nat. Res. Def. Council v. Pena, 147 F.3d 1012, 1024 (D.C. Cir. 1998) (permitting "jurisdictional discovery and factfinding if allegations indicate its likely utility").

Review of the lists by CHIRLA's expert confirmed that its members were indeed erroneously included. See ECF No. 43 (Pls. Suppl. Standing Br.). The expert — whom the Court finds to be well qualified and credible, including based on his experience analyzing the California voter file — compared DOJ's list of suspected non-citizens against CHIRLA's list of citizen members using criteria such as first and last name, date of birth, and exact address. See ECF No. 43-1 (Matt Barreto Suppl. Decl.), ¶¶ 7–11. That review yielded the following conclusions: (1) It is "certain" that "at least 22" CHIRLA citizen members "fully match" entries on DOJ's list. Id., ¶ 8. (2) An additional 66 CHIRLA citizen members are "near certain full matches" to entries on the list, meaning they are likely to be identified as included on the list.

Id., ¶ 9. (3) Using more relaxed criteria — such as first name, last name, and either date of birth or address — yielded "hundreds or more cases that are highly likely matches." Id., ¶ 10. (4) Finally, using "probabilistic" criteria — "first name, last name and criteria such as birth year, street name, or zip code" — produced "6,140 CHIRLA citizen entries at risk of investigation as highly probable matches on the DHS ineligible list." Id., ¶ 11. The highly likely matches were identified as being in counties where state election officials are actively reviewing the lists. Id., ¶ 13 (citing news report from Santa Cruz county).

Defendants responded to these developments by, essentially, denying that they had any impact on the standing analysis. See ECF No. 44 (Resp. to Pls. Suppl. Mem.) at 7–10. They also objected to the way that Plaintiffs used the data provided under the Court's Order. See id. at 1. In a separate motion that remains pending, Defendants seek to strike a portion of Plaintiffs' supplemental submission and ask the Court to sanction Plaintiffs for violating the limitations that the Court's Order placed on use of the voter data that Defendants produced. See ECF No. 45 (Mot. to Strike and Show Cause). The Court does not address those collateral issues here, confining itself to whether Plaintiffs are entitled to preliminary relief.

## II. Legal Standard

A party seeking a TRO or PI "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Council on Am.-Islamic Rels. v. Gaubatz, 667 F. Supp. 2d 67, 74 (D.D.C. 2009). Those remedies are "extraordinary" and "may only be

awarded upon a clear showing that the plaintiff is entitled" to them. Hanson v. District of Columbia, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting Winter, 555 U.S. at 22).

## III. Analysis

The Court assesses each of the Winter factors in turn.

### A. Likelihood of Success

Likelihood of success — the "first and most important" factor — comprises both standing and the merits of Plaintiffs' claims. Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

#### 1. *Standing*

At this stage, at least one plaintiff must have "set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity, 878 F.3d 371, 377 (D.C. Cir. 2017) (cleaned up); see also Bost v. Illinois State Bd. of Elections, 607 U.S. 71, 76 n.3 (2026). That is, a plaintiff "must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." FDA v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024). An organizational plaintiff like CHIRLA can make that showing on behalf of its members or on its own behalf. Am. Legal Found. v. FCC, 808 F.2d 84, 89 (D.C. Cir. 1987). The Court concludes that CHIRLA has done both.

First, CHIRLA has established "associational standing" because it is likely to be able to identify at least one member who has "standing to sue in his own right." Make the Rd. New York v. Mullin, 179 F.4th 16, 26 (D.C. Cir. 2026) (cleaned up); Mot. at 19–21. CHIRLA has identified multiple members who are citizens but are wrongly included on DOJ's lists. See Barreto Suppl. Decl., ¶¶ 7–11. And it has introduced evidence that election officials in some

California counties are reviewing the lists. See, e.g., Exh. A to Pls. Third Suppl. Notice at 3–4; Reply at 4–5; Barreto Suppl. Decl., ¶ 13 & n.1. Given that fact, CHIRLA's members' erroneous inclusion on the lists threatens their ability to vote and requires them to take "measures to minimize the likelihood" of having their ballots segregated or rejected. Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 154 (2010); see ECF No. 34-5 (Angelica Salas Decl.), ¶ 7. When lists "do not accurately reflect" individuals' citizenship status, making it "likely" that they will be "required to provide additional proof of citizenship," their "'need to take . . . affirmative steps to avoid risk of harm . . . constitutes a cognizable injury' supporting standing." DHS v. League of Women Voters, 2026 WL 2879700, at *2 (U.S. Sep. 25, 2026) (quoting Meese v. Keene, 481 U.S. 465, 475 (1987)). And CHIRLA can assert that injury on behalf of its members because the injury is "germane" to its "purpose" of promoting voting among naturalized citizens, and "[n]either the legal claims nor the relief sought" require individuals' participation in the suit. Int'l Dark-Sky Ass'n, Inc. v. FCC, 106 F.4th 1206, 1218 (D.C. Cir. 2024).

Defendants insist that this injury remains too "speculative" to confer standing. See Opp. at 12; ECF No. 44 (Resp. to Pls. Suppl. Mem.) at 7–10; see also Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) ("[A]llegations of possible future injury are not sufficient.") (cleaned up). It is true that no California official has publicly acceded to DOJ's demands to use the lists. But CHIRLA's members need not wait for their ballots to be segregated. An injury is "sufficiently 'imminent' for standing purposes" when there is a "substantial risk" that it will occur. New York Republican State Comm. v. SEC, 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting Attias v. Carefirst, Inc., 865 F.3d 620, 627 (D.C. Cir. 2017)); see Clapper, 568 U.S. at 414 n.5.

That standard is met here based on the "reasonable probability" that election officials in at least some counties, absent judicial intervention, will buckle under DOJ's threats of legal

consequences and require additional citizenship verification from individuals on the lists before their ballots are counted. Monsanto, 561 U.S. at 153; see also Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1341–42 (11th Cir. 2014). That prospect is not speculative here. After all, some officials are already reviewing the lists. See Pls. Suppl. Standing Br. at 2 n.2; Reply at 4; Barreto Suppl. Decl., ¶ 13 & n.1. And if those officials believe, based on such review, that a registered voter is in fact a non-citizen, they arguably have an obligation under state law to "cancel the registration" of that voter. See Cal. Elec. Code § 2201(a)(8); but see id. § 2112. The errors in the lists thus present a real and present threat to voters erroneously included on them.

In its most recent submission, Defendants seek to minimize the letters they have sent to state officials, characterizing them as "not self-executing" and indicating that "states and counties may disregard the government's demands" absent an "order from an Article III court to compel" compliance. See Resp. to Pls. Suppl. Standing Br. at 7. Yet Defendants maintain that recipients of the letters ignore them "at their own legal peril," id., and the Executive Branch has loudly publicized that failure to comply with the demands may open officials to criminal investigation and prosecution. See, e.g., DOJ Letter to Santa Clara County at 1–3. On this record, given that some county officials have already begun to work the lists, the "predictable effect" of DOJ's threats — and, of course, their expressly intended effect — is to secure those officials' compliance with the demands. Dep't of Com. v. New York, 588 U.S. 752, 768 (2019); see also id. at 785 ("[Courts] are not required to exhibit a naiveté from which ordinary citizens are free.") (cleaned up). Also, to the extent that Defendants intend to wring some benefit here from the failure of their suit to compel compliance by the Secretary of State and L.A. County, see Resp. to Pls. Suppl. Standing Br. at 7–8, that suit did not include all the other county officials who remain subject to an escalating campaign of pressure from the federal government.

Defendants also object that CHIRLA has not identified a particular citizen member who is wrongfully included on the lists and has incurred costs to ensure that his or her vote is counted. See Opp. at 10–11; Resp. to Pls. Suppl. Mem. at 2–4. But the only question at this stage is whether CHIRLA is likely to identify such a member later in the case. See Centro de Trabajadores Unidos v. Bessent, 167 F.4th 1218, 1229 (D.C. Cir. 2026). The Court believes that it is, based on the expert report identifying citizen members who are erroneously identified as non-citizens and CHIRLA's declarations attesting to the widespread fear among its recently naturalized members. See, e.g., ECF No. 34-9 (Carl Bergquist Decl.), ¶¶ 5–8. The lack of a declaration from an individual in the record so far is explained by the fact that the Court, at Defendants' request, has barred CHIRLA from informing its members that they are named on the lists. See Minute Order of Oct. 30, 2026. At bottom, then, Plaintiffs have established that CHIRLA is likely to establish associational standing.

Second, CHIRLA has also likely established "organizational standing" from harm to its "core business activities." All. for Hippocratic Med., 602 U.S. at 393–95; see Mot. at 15–19. It contends that Defendants' actions have harmed its "mission" — "protecting and advancing lawful electoral participation" among "immigrants" and "new voters," Mot. at 17 (quoting Bergquist Decl., ¶ 2) — by forcing it to "divert" resources from "traditional voter engagement efforts" to "new mobilization efforts" and other "steps to ensure that" its clients' and members' "voting rights are not impeded" or "chill[ed]." Id. at 18 (citing Salas Decl., ¶¶ 8–10, 19). For instance, "[s]ince the announcement from DOJ regarding their alleged non-citizen list, CHIRLA staff have been contacted by dozen of CHIRLA's members concerned about voting and expressing fear to cast their ballot[s] during this midterm election." Salas Decl., ¶ 6. And the

organization "is taking affirmative steps to check the status of" its at-risk members' "registration before the possib[ly] flagged members go [to] vote." Id., ¶ 7.

That use of limited resources to "counteract" the "harm" to CHIRLA's "activities" caused by Defendants' actions suffices for standing. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (cleaned up). Groups that engage in similar voter-registration and -mobilization work regularly have standing to challenge policies that make that work more difficult. See, e.g., League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016); Sandusky Cnty. Democratic Party v. Blackwell, 387 F.3d 565, 574 (6th Cir. 2004); Vote Forward v. DeJoy, 490 F. Supp. 3d 110, 119–21 (D.D.C. 2020); League of United Latin Am. Citizens v. Exec. Off. of the President, 780 F. Supp. 3d 135, 188 (D.D.C. 2025); Colorado Montana Wyoming State Area Conf. of the NAACP v. Smith, 180 F.4th 1266, 1275 (10th Cir. 2026).

Defendants nonetheless object that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing." All. for Hippocratic Med., 602 U.S. at 394; see Opp. at 14–18; Resp. to Pls. Suppl. Mem. at 10–11. That objection blinks this record. CHIRLA has suffered a concrete injury to its existing programs because it must make tradeoffs with its limited resources, redirecting them to counteract the effects of Defendants' actions on its mission. See, e.g., Salas Decl., ¶ 16; Bergquist Decl., ¶ 8. This case is thus akin to Center for Taxpayer Rights v. IRS, 190 F.4th 990 (D.C. Cir. 2026); see Reply at 7–8. There, an IRS policy of disclosing taxpayer information to ICE "made many immigrant taxpayers less willing to come to the Center's events, to seek its guidance, or to engage with the Center's education and outreach," which in turn caused the Center to divert "its limited resources to counteract" those effects. Id. at 1001 (cleaned up). Because the "details of the IRS's

disclosure policy" were "unclear," the Center apparently could not show that anyone's information had actually been disclosed, let alone that ICE would imminently act upon it, but the information was subject to disclosure under the new policy, and that prospect had the "predictable effect" of diminishing engagement with the Center's activities. Id. at 999, 1001 (cleaned up). So too here.

In sum, Defendants' actions have created a substantial risk that it will be harder for CHIRLA's members to vote in this election, which has caused both the members and the organization itself to take costly steps to avoid that risk. Those are sufficiently concrete and imminent injuries to confer standing. Traceability and redressability are also established. The costs are "readily attributable" to the policy that causes the increased risk of ballot segregation, and "a judicial order prohibiting" that policy therefore would "remedy [Plaintiffs'] injuries by eliminating or minimizing the risk" to which they are responding. Monsanto, 561 U.S. at 155. Although the Court cannot order any relief that runs directly to the state election officials who are not parties here, it can order Defendants to cease issuing threatening demands to those officials to modify the mail-in–ballot procedures. That will relieve the main source of pressure on the officials to segregate ballots of voters on the lists, reducing the risk of injury to such voters and thus "likely" providing at least partial redress for Plaintiffs' claimed injuries. Hecate Energy LLC v. FERC, 126 F.4th 660, 666–67 (D.C. Cir. 2025).

2. *Merits*

On the merits, Plaintiffs bring an array of statutory and constitutional causes of action, but the Court need only conclude that they are likely to succeed on one that justifies the relief that they seek. It accordingly focuses on the claim that Defendants' attempts to impose a different procedure for mailing, receiving, and counting mail-in ballots exceeds the Executive

Branch's constitutional authority. See Compl., ¶¶ 116–22, 133; see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 491 n.2 (2010) (recognizing cause of action directly under Constitution for such separation-of-powers claims). Because "neither the Constitution nor any statute explicitly grants" the Executive Branch the power to undertake these actions, that claim is likely to succeed on the merits. League of United Latin Am. Citizens, 780 F. Supp. 3d at 194; see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself.").

Under the Constitution, states have the sole authority to determine the qualifications of voters in federal elections. See U.S. Const., art. I, § 2, cl. 1; id., amend. XVII. The Elections Clause also grants states default authority to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives," though Congress may "by Law make or alter such Regulations." Id., art. I, § 4. The category governed by the Elections Clause includes rules related to "registration" and procedures for the casting and counting of ballots. Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1, 9 (2013) (quoting Smiley v. Holm, 285 U.S. 355, 366 (1932)); see also Watson v. Republican Nat'l Comm., 609 U.S. 672, 677, 681–83 (2026).

As Defendants recognize, this scheme grants the Executive no independent constitutional authority over the manner of conducting federal elections. See Opp. at 26. The President of course has a duty to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3; see Trump v. United States, 603 U.S. 593, 620 (2024). But Congress has not provided for the procedures that the Executive Branch is attempting to impose upon California. It has legislated extensively with respect to voter-registration issues. See, e.g., 52 U.S.C. §§ 20503–20507. Yet the Executive Branch, tellingly, has not attempted to claim that any such provision of federal

election law requires California to segregate the ballots or confirm the citizenship status of registered voters that it identifies as likely non-citizens.

Instead, the only legal authority that Defendants rely upon is 18 U.S.C. § 611(a) — a statute that imposes criminal penalties upon non-citizens who vote in federal elections. See Opp. at 26–27. To state the obvious, and as Defendants even appear to concede, that statute does not regulate the time, place, or manner of elections. See id. at 26 ("[A]cting under its plenary authority over immigration law, Congress passed 18 U.S.C. § 611(a) — the law undergirding the federal government's actions in California.") (emphasis added). Section 611(a), which is not directed to state election officials, certainly does not override their obligations under state law with respect to the sending, receiving, and counting of ballots.

After all, there is no "conflict" between the federal-law prohibition on non-citizen voting and a state's procedures that aim to ensure that only lawful ballots are cast and counted. Watson, 609 U.S. at 697. If state procedures neglect to screen out non-citizens who end up voting in violation of state and federal law, then those non-citizens can be prosecuted under Section 611(a). Absent any conflict, Section 611(a) cannot preempt state election procedures. Compare, e.g., Kansas v. Garcia, 589 U.S. 191, 202 (2020) (rejecting preemption based on "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" or "some brooding federal interest") (cleaned up), with Opp. at 28–29 (arguing that Section 611(a) preempts state procedures that "compromise the effectiveness" of prosecuting non-citizen voting) (cleaned up). The Court thus agrees with other courts that have recently rejected the Executive Branch's reliance on Section 611(a) to justify its actions in California. See California I, 2026 WL 3252428, at *7–9; California II, 2026 WL 3268272, at *3–5.

Defendants' invocation of aiding-and-abetting liability is a red herring. See Opp. at 28–30. Insofar as Section 611(a) directly implicates the administration of elections, it pertains to voter qualifications, the question of who can vote, which "forms no part of the power to be conferred upon the national government" by the Elections Clause. See Inter-Tribal Council, 570 U.S. at 17 (quoting The Federalist No. 60, at 371 (A. Hamilton)). Federal law thus can only reinforce the underlying state-law rules for voter qualifications — for instance, by "impos[ing] additional penalties for the violation of state laws." Opp. at 27 (quoting Smiley, 285 U.S. at 366–67). State officials likely cannot aid or abet a violation of such a prohibition by conforming to the letter of state law regarding verifying voter eligibility. Put another way, "[s]ince the power to establish voting requirements is of little value without the power to enforce those requirements, . . . it would raise serious constitutional doubts if a federal statute precluded a State from" enforcing voting requirements according to its own evidentiary standards. Inter-Tribal Council, 570 U.S. at 17. It is thus highly doubtful that Section 611(a) could be constitutionally applied to criminalize state officials' compliance with state-law procedures for counting ballots cast by registered voters.

The upshot is that the Executive Branch's role under Section 611(a) is limited to prosecuting non-citizens who "knowingly" cast ballots in federal elections. United States v. Knight, 490 F.3d 1268, 1271 (11th Cir. 2007). That is not what Plaintiffs are challenging here or what the Court finds that Defendants are doing. See Mot. at 19. Instead, although it invokes a criminal statute, the Executive Branch plainly is attempting to unilaterally impose additional procedural requirements for the mailing and counting of ballots of suspected non-citizens because it believes that the operative state procedures are inadequate. That is an attempt to effectively arrogate to the Executive a power that the Elections Clause commits elsewhere,

principally to the states. Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 230 (2023) ("The Constitution deals with substance, not shadows.") (cleaned up). Defendants' demands that California officials change the procedures under which ballots are counted therefore likely violate the Constitution.

B. Irreparable Harm

"The irreparable injury requirement erects a very high bar for a movant." Coalition for Common Sense in Gov't Procurement v. United States, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) (citing Varicon Int'l v. OPM, 934 F. Supp. 440, 447 (D.D.C. 1996)). "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin., 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting Gulf Oil Corp. v. Dept. of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)). "[T]he alleged injury must be certain, great, actual, and imminent." Id. (citing Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs have met that bar given the risk that CHIRLA's members will be deterred or prevented from casting ballots in the 2026 election. The right to vote is precious; interference with it undoubtedly has a serious effect on voters. See Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); cf. Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). And once that harm is incurred and the election passes, it becomes irreparable. The D.C. Circuit thus has recognized that a "substantiated risk of distorting the electoral process would amount to irreparable harm." KalshiEX LLC v. CFTC, 119 F.4th 58, 66 (D.C. Cir. 2024).

Defendants again point to a lack of imminent injury, which they say poses an even greater obstacle to Plaintiffs' showing of irreparable harm than it does to their standing. See Opp. at 34 ("The irreparable-harm standard requires a more significant showing than the injury-in-fact standard.") (quoting Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S., 878 F. Supp. 2d 42, 60 (D.D.C. 2012)). Yet Defendants again misapprehend the nature of Plaintiffs' injuries, which do not wholly depend upon whether state officials ultimately choose to comply with DOJ's demands and to segregate the ballots of voters on the lists. Even if that risk never materializes, Defendants' actions impose a present injury on CHIRLA and its members by setting up potential barriers to the ballot box, requiring them to incur costs to ensure that they can prove their entitlement to vote.

C. Equities and Public Interest

The remaining factors — *i.e.*, the balance of the equities and the public interest — "merge" in a suit against the government. Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)). Here, they favor Plaintiffs.

To be sure, the Executive Branch has a significant interest in election integrity and in enforcing federal law. See Opp. at 36; cf. Eu v. San Francisco Cnty. Democratic Central Comm., 489 U.S. 214, 231 (1989). Under the Elections Clause, however, Congress and the states have the primary authority for choosing how that interest will be pursued. Those constitutional actors have chosen not to require the voter-citizenship-verification procedures that the Executive Branch has attempted to impose unilaterally upon California. The President evidently believes that it would be good public policy for more stringent procedures to be put in place. No matter how strong that policy case may be, however, it does not justify overstepping

the bounds of the Executive Branch's limited constitutional authority in this domain. See Pursuing Am.'s Greatness, 831 F.3d at 511 (weighing interest in preventing abridgment of constitutional rights over interest in "limiting fraud, abuse, and confusion" related to elections); cf. Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs., 816 F. Supp. 3d 27, 63 (D.D.C. 2026) ("[A]n injunction against the perpetuation of unconstitutional government action axiomatically favors the public interest.").

That is especially true here given the strong public interests on the other side of the ledger. Defendants' flawed lists risk chilling or preventing lawful votes from being cast and counted. "By definition, the public interest . . . favors permitting as many qualified voters to vote as possible." Richardson v. Trump, 496 F. Supp. 3d 165, 189 (D.D.C. 2020) (cleaned up). The disruptive effects of Defendants' demands, moreover, threaten to extend beyond however many California voters are wrongfully included on the lists. They also threaten to modify the "operation of voter identification procedures" with voting already underway, causing "voter confusion and consequent incentive to remain away from the polls." Purcell v. Gonzalez, 549 U.S. 1, 4–5 (2006). An order reinforcing the state-law status quo for administration of this ongoing election thus serves the important public interest in regular administration of the election.

D. Scope of Relief

Having concluded that Defendants' attempts to impose new procedures for counting ballots, through threats of criminal prosecution of state election officials, is unconstitutional, the Court will award Plaintiffs injunctive relief. The Court therefore is required to state "specifically" and in "reasonable detail" the "act or acts restrained." Fed. R. Civ. P. 65(d)(1). Plaintiffs request that it order Defendants not to "impose themselves upon election

administration procedures that the Constitution and federal law assign to the States," including as to "removal of registered voters from voter registration lists," "issuance of ballots to registered voters," and "the counting and tabulation of ballots." Mot. at 3. Defendants object to this request as "vague," Opp. at 40, and the Court agrees. It is not clear what it means for Defendants to "impose themselves upon election administration procedures."

Instead, the Court will simply order Defendants not to issue demands to California election officials seeking to compel the segregation of ballots, or other deviations from existing state elections procedures, based on voters' inclusion on the lists of suspected non-citizens. That relief is specific and narrowly tailored to redress Plaintiffs' injuries, as discussed *supra*, although it may of course also "incidentally" benefit California election officials and other voters not before the Court. Trump v. CASA, Inc., 606 U.S. 831, 851 (2025).

E. Bond

Federal Rule of Civil Procedure 65(c) requires that a movant for a temporary restraining order or preliminary injunction "give[ ] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In line with this Court's "broad discretion . . . to determine the appropriate amount of an injunction bond" and the lack of "material monetary injury" shown by Defendants as a result of this preliminary injunction, the Court will require that Plaintiffs post a nominal $1.00 bond. Endocrine Soc'y v. FTC, 832 F. Supp. 3d 1, 21 (D.D.C. 2026) (cleaned up).

## IV. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' emergency application for a temporary restraining order and preliminary injunction.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: November 2, 2026